Nos. 25–2540, 25-2541, 25-2612, 25-2613

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

REBECCA CARTEE-HARING and DAWN MARINELLO,
INDIVIDUALLY AND ON BEHALF OF
SIMILARLY SITUATED FEMALE EMPLOYEES,

*Plaintiff-Teachers/Appellees/Cross Appellants*

v.

CENTRAL BUCKS SCHOOL DISTRICT,

*Defendant/Appellant/Cross Appellee*.

Appeal from Order of August 1, 2024; Order of March 21, 2025; Order of May 8, 2025, Memorandum and Order of July 15, 2025; Memorandum and Order of July 21, 2025; and Order of June 21, 2024 all as entered in the U.S. District Court E.D. Pa.
Consolidated Case Nos. 2:20-cv-01995, 2:21-cv-02587 and 2:22-cv-04019

(Hon. Michael M. Baylson)

Edward S. Mazurek (PA ID 50278)
25201 Cornerstone Dr.,
Yardley, PA 19067
(267) 243-3393
emazurek@mazureklawfirm.com
Counsel for Plaintiff-Teachers/Appellees/Cross Appellants

**TABLE OF CONTENTS**


**I. JURISDICTIONAL STATEMENT …………………………………….. 1**

**II. STATEMENT OF THE ISSUES ……………………………………….. 1**

**III. STATEMENT OF THE CASE ………………………………………….. 3**

**IV. SUMMARY OF THE ARGUMENT ……………………………………. 8**

**V. ARGUMENT ……………………………………………………………… 11**

**A. The Teacher-Plaintiffs Are Entitled To Proceed As A Collective Action. …………………………………………………….. 11**

**B. Plaintiff-Teachers Were Entitled To Judgment As A Matter Of Law After The First Trial. ………………………….. 18**

**1. Uncontroverted Trial Evidence Established That Male Teachers Employed By CBSD Performed Substantially Equal Work Under Similar Working Conditions Relative To Plaintiff-Teachers. ………………………… 20**

**2. Uncontroverted Trial Evidence Established That Male Teachers Employed By The District Were Paid More Than Plaintiff-Teachers By Being Given Credit for All, Or Even More Than All, Of Their Years of Prior Teaching Experience When Placed On CBSD's Salary Scales. ………………………………………………………. 22**

**3. CBSD Did Not Adduce Evidence Which, If Believed, Would Establish That Its More Favorable Treatment Of Male Teachers In Compensation Relative to Plaintiff-Teachers Was In Fact Based On A Factor Other Than Sex. ……………………………………………………… 26**

**C. The Trial Court Erred As A Matter Of Law In Denying Cartee-Haring's and Marinello's Post-Trial Motion For Judgment As A Matter Of Law Or, Alternatively, To Amend The Judgments After The Re-Trial Of Their Individual EPA Claims. ……………………………………… 28**

**1. Plaintiffs' Backpay Awards Should Be Based On The Uncontroverted Evidence. …………………….. 28**

**2. Cartee-Haring And Marinello Are Entitled To Backpay Beginning From The Year In Which Each First Became Employed By CBSD. …………… 29**

**3. Plaintiffs Are Entitled To An Award Of Pre-Judgment Interest On The Amounts Of Backpay To Which Each Plaintiff Is Entitled. …………………………………….. 34**

**4. Each Plaintiff Is Entitled To A Monetary Award In An Amount Sufficient To Cover The Extra Taxes Each Plaintiff Will Have To Pay Because Of The Lump Sum Nature Of Their Awards. ……………………………… 36**

**5. Each Plaintiff Is Entitled To An Award Of Liquidated Damages In An Amount Equal To Her Backpay And Interest. …………………………………………………….. 38**

**6. The Judgment Should Be Amended To Include An Order That CBSD Compensate Marinello At The Same Teacher's Salary As John Donnelly. …………………… 40**

**D. Plaintiffs Are Entitled To The Attorneys' Fees And Costs They Sought. ……………………………………………………. 40**

**E. Summary Judgment Was Improperly Granted On Cartee-Haring's Sex And Age Discrimination and Retaliation Claims Regarding Her Position As The Girls Lacross Coach. .. 46**

**1. Summary Judgment Was Improper As To Sex Discrimination. …………………………………………… 46**

**2. Summary Judgment Was Improperly Granted With Respect To Plaintiff's Age Discrimination Claim. …… 50**

**3. Summary Judgment On Cartee-Haring's Retaliation Claims Was Improper. ……………………………………. 51**

**VI. CONCLUSION ………………………………………………………. 53**

# TABLE OF AUTHORITIES

***Cases Cited***

*Brobst v. Columbus Services Intern*, 761 F.2d 148 (3d Cir. 1985) ………. 20, 22

*Burton v. Teleflex, Inc.*, 707 F.3d 417 (3d Cir. 2013) …………………….. 47

*Camesi v. Univ. Pitt. Med. Ctr.*, 729 F.3d 239 (3d Cir. 2013) ……………. 15

*Campbell v. City of L.A.*, 903 F.3d 1090 (9th Cir. 2018) …………………. 12

*Carlisle* v. *United States,* 517 U.S. 416 (1996) …………………………… 35

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) ……………………………… 35

*Colgan v. Fischer Scientific Co.,* 935 F.2d, 1407 (3d Cir. 1991) ………… 31

*Connecticut v. Teal,* 457 U.S. 440 (1982) ………………………………… 27

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) …………………..4, 11, 21

*Cunningham v. Albright College*, No. 20-cv-01429
(E.D. Pa. Dec. 23, 2020) ……………………………………………… 30

*Dubowsky v. Stern, Lavinthal, Norgaard & Daly,* 922 F. Supp. 985
(D.N.J.1996) …………………………………………………… 19

*EEOC v. Delaware Dept. of Health and Social Services,* 865 F.2d 1408
(3rd Cir. 1989) ……………………………………………………… 18

*EEOC v. Md. Ins. Admin.*, 879 F.3d 114 (4th Cir. 2018) ………………….. 19, 27

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ………………. 43

*Eshelman v. Agere Systems, Inc.*, 554 F.3d 426 (3d Cir. 2009) ………….. 9, 34, 40

*Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005) ……………………………..47

*Fischer v. Federal Express Corp.* 42 F.4th 366 (3d Cir. 2022) …………...13

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ……………………………49

*Furnco Construction Corp. v. Waters,* 438 U.S. 567 (1978) ………………27

*Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013) ………………11, 12

*Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294
(3d Cir. 2002) …………………………………………………… 18

*Golod v. Bank of Am. Corp*., 403 F. App'x 699 (3d Cir. 2010) ………….. 47

*Hagan v. Rogers*, 570 F.3d 146 (3d Cir. 2009) …………………………… 13

*Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215(3d Cir. 2016)..11

*Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ………………. 50

*Healy v. New York Life Ins. Co.*, 860 F.2d 1209 (3d Cir. 1988) …………..27

*Heller v. Elizabeth Forward School. District.,* 182 Fed. App'x. 91
(3d Cir. 2006) …………………………………………………… 21, 40

*Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989) ………………. 11

*IN RE: The Prudential Insurance Company of America Sales Practices Litigation,* No. 06-3186 (3d Cir. 2002) ……………………………. 35

*Meyer v. Riegel Prods. Corp.,* 720 F.2d 303 (3d Cir.1983) ……………… 31, 32

*Mickelson v. New York Life Ins.,* 460 F.3d 1304 (10th Cir. 2006) …………20

*Miller v. Beneficial Mgmt. Corp*., 977 F.2d 834 (3d Cir. 1992) …………30, 31, 32

*Mineo v. Port Auth. of N.Y.& N.J.*, 779 F.2d 939 (3d Cir. 1985) ………… 12

*Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518
(11th Cir. 1992)……………………………………………….. 20

*Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206 (3d Cir. 2017) ……….52

*Mulhall v. Advance Sec., Inc.,* 19 F.3d 586 (11th Cir.1994) ………………19

*Oshiver v. Sedran & Berman,* 38 F.3d 1380 (3d Cir. 1994) ………………30

*Pentland v. Dravo Corp.*, 152 F.2d 851 (3d Cir. 1945) ……………………13

*Podobnik v. United States Postal Serv,,* 409 F.3d 584, 590 (3d Cir. 2005) ..31

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) ………51

*Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018) …………………………….. 4

*Ryan v. General MacHine Products*, 277 F. Supp. 2d 585(E.D. Pa. 2003) . 19

*Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135 (2d Cir. 2000) …..20

*Schengrund v. Pa. State Univ*., 705 F. Supp. 2d 425 (M.D. Pa. 2009) ……..30, 31

*Sec'y U.S. Dept. Labor v. Am. Future Sys. Inc.*, 873 F.3d 420
(3d Cir. 2017) ………………………………………………………38

*Selvato v. SEPTA*, 143 F. Supp.3d 257 (E.D. Pa. 2015) ……………………47

*Shultz v. Wheaton Glass*, 421 F.2d 259 (3d Cir. 1970) …………………... 4, 13

*Sinclair v. Auto. Club of Okla., Inc.*, 733 F.2d 726 (10th Cir. 1984) ……… 20

*Steuart v. McChesney***,** 498 Pa. 45 (1982) ……………………………….. 43

*Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000) …………………… *passim*

*Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189 (3d Cir. 2011)
*rev'd on other grounds* ……………………………………………….. 15

*Zavala v. Wal Mart Stores, Inc.* 691 F.3d 527 (3d Cir. 2012) ……………. . 12, 13

***Rules and Statutes Cited***

28 U.S.C. § 1291 ............................................................ 1

28 U.S.C. S 1651 ............................................................ 34

28 U.S.C. § 2861 ............................................................ 9

29 U.S.C. § 201, *et seq* ............................................................ 11

29 U.S.C. § 206(d)(1) ............................................................ 3

29 U.S.C. § 216(b) ............................................................ *passim*

29 U.S.C. § 621 *et seq.* ............................................................ 5

42 U.S.C. § 2000e *et seq.* ............................................................ 5

Fed. R. Civ. P. 23 ............................................................43

Fed. R. Civ. P. 50 ............................................................18

## I. JURISDICTIONAL STATEMENT

Appellees/Cross Appellants, Rebecca Cartee-Haring and Dawn Marinello, agree with the Jurisdictional Statement of Appellant, Central Bucks School District ("CBSD") except that in addition to Marinello, the women who opted-in *Marinello* pursuant to 29 U.S.C. § 216(b) and the district court's order granting final certification of *Marinello* as a collective action are among the Appellees/Cross Appellants in this appeal. (Collectively, Cartee-Haring, Marinello and the Plaintiffs who opted-in the *Marinello* lawsuit are referred to herein as the "Plaintiff-Teachers." Cartee-Haring and Marinello are referred to as "Plaintiffs".)

This Court has appellate jurisdiction over the Plaintiff-Teachers' appeal pursuant to 28 U.S.C. § 1291 since the Plaintiff-Teachers are appealing final decisions of the district court in issuing final judgments and other orders.

## II. STATEMENT OF THE ISSUES[1]

1. Whether the district court erred as a matter of law in decertifying the collective action in *Marinello* after it had previously granted final certification, tried the case as a collective action, and where the record evidence at trial

---

[1] The issues identified below are those presented by the Plaintiff-Teachers' cross appeal. Plaintiff-Teachers respectfully incorporate the trial court's rulings on the issues raised in CBSD's appeal and submits for the reasons set forth by the trial court, CBSD's arguments are without merit. (JA-106).

established that the Plaintiff-Teachers were similarly situated with one another. **Suggested answer: YES.**

2. Whether the district court erred as a matter of law in denying the Plaintiff-Teachers' first post-trial Motion for Judgment as a Matter of Law where, based on the trial evidence, Plaintiff-Teachers were entitled to judgment as a matter of law on their Equal Pay Act claims. **Suggested answer: YES.**

3. Whether the district court erred as a matter of law in denying Plaintiffs' second post-trial motion with respect to: (a) the amounts of backpay to which each plaintiff is entitled based on the uncontroverted trial evidence; (b) the number of years for which plaintiffs are entitled to recover their backpay; (c) an award of backpay for CBSD's willful violation of plaintiffs' rights under the EPA; (d) an award of the pre-judgment interest on the amounts of backpay to which each plaintiff is entitled; (e) an award to each plaintiff of an amount sufficient to cover the extra taxes each plaintiff will have to pay because of the lump sum nature of their award; (f) an award of liquidated damages in an amount equal to their backpay entitlement and pre-judgment interest; and (f) Marinello's request that the court enjoin CBSD to prospectively compensate her at the same teacher's salary rate as her male comparator, John Donnelly. **Suggested answer: YES.**

4. Whether the district court erred in substantially reducing the attorney's fees and costs to which Plaintiffs are entitled from CBSD. **Suggested answer: YES.**

5. Whether the district court erred as a matter of law in granting summary judgment in CBSD's favor and against Cartee-Haring with respect to Cartee-Haring's claims for sex and age discrimination in being terminated from her employment position as the head coach of the girls' lacrosse team and in CBSD's refusal to re-hire her for that position in retaliation for having made claims against CBSD for violation of the Title VII and the ADEA where genuine issues of material fact existed with respect to those claims. **Suggested answer: YES.**

## III. STATEMENT OF THE CASE

The Plaintiff-Teachers' employer, CBSD, violated the Equal Pay Act amendments to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(d)(1), and its enforcement provision, 29 U.S.C § 216(b) ("EPA"), in compensating them less favorably than at least one male teacher for equal work. Congress' purpose in enacting the EPA was to remedy "a serious and endemic problem of employment discrimination in private industry--the fact that the wage structure of many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same. The solution adopted was quite simple in principle:

to require that 'equal work will be rewarded by equal wages.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

Even before *Brennan,* this Court explained:

> The [Equal Pay] Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.

*Shultz v. Wheaton Glass*, 421 F.2d 259 (3d Cir. 1970).

And yet, despite these pronouncements, and "[a]lthough the Act has prohibited sex-based wage discrimination for more than fifty years, the financial exploitation of working women embodied by the gender pay gap continues to be an embarrassing reality of our economy." *Rizo v. Yovino*, 887 F.3d 453, 456 (9th Cir. 2018).[2]

---

[2] According to a 2023 study of the Annenberg Institute at Brown University, "Public teacher compensation is largely determined by fixed salary schedules that were designed to avoid payment inequalities based on demographic characteristics. Yet, recent research shows female teachers earn less than their male peers after controlling for experience, education, and school characteristics." https://edworkingpapers.com/sites/default/files/ai23-737.pdf. *See also Scrutinizing Equal Pay for Equal Work Among Teachers*, 2017 https://www.brookings.edu/articles/scrutinizing-equal-pay-for-equal-work-among-teachers/ ("The notion of equal pay for equal work resonates strongly in the teaching profession. Fixed salary schedules determine how the vast majority of public school teachers are paid. Yet, an inherent, often overlooked tension is this: Though salary schedules were designed to avoid wage inequalities on some dimensions, they institutionalized inequalities on others—namely, experience and credentials.")

In addition to CBSD's EPA violations, Cartee-Haring was fired from her position as the head coach of the girls' lacrosse team by CBSD because of her sex, age and/or disability in violation of Title VII of the Civil rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), respectively. (JA-142) Later, Cartee-Haring was subjected to retaliation in not being re-hired as the girls' lacrosse coach because she opposed unlawful discrimination and participated in proceedings to vindicate her rights against unlawful discrimination in violation of the anti-retaliation provisions of the Title VII and ADEA.

Cartee-Haring's EPA and discriminatory termination case was filed in April 2020; Marinello's EPA case in June 2021; and Cartee-Haring's retaliation case in October 2022.

The trial court consolidated these cases (JA-226, 229); granted final certification of *Marinello* as a collective action (JA-409, 424); granted CBSD summary judgment with respect to Cartee-Haring's discrimination and retaliation claims (JA-38-39); and conducted a jury trial with respect to liability on the Plaintiff-Teachers' EPA claims. (JA-583-1178) That trial resulted in a hung jury. (JA-1298).

Thereafter, *sua sponte*, the district court "decertified" the collective action without legal or factual basis or explanation where it had previously repeatedly ruled that final certification was in fact appropriate. (JA-65) The district court rejected the Plaintiff-Teachers' argument that the decertification of the collective action was improper and also refused to rule on the Plaintiff-Teachers' post-trial motion for judgment as a matter of law for over 6 months until after Plaintiff-Teachers filed a Petition for Writ of Mandamus with this Court. (JA-66, 76) While the Mandamus Petition was pending, the district court erroneously denied the Plaintiff-Teachers' post-trial motion for judgment as a matter of law. (JA-76, 78).

Thereafter, a second jury trial on Cartee-Haring's and Marinello's individual EPA claims resulted in verdicts and damages awards to both Plaintiffs. (JA-1469-2026) The jury awarded Marinello $81,000 and Cartee-Haring $84,000 in backpay. (JA-102). The district court then granted CBSD's post trial motion to reduce the backpay awards for Cartee-Haring to $68,774.36 and Marinello to $76,451.29 in backpay. (JA-103)

The district court granted plaintiffs' post trial motion in part by awarding both of them liquidated damages, doubling the backpay awards such that Cartee-Haring was ultimately awarded $137,548.72 and Marinello was awarded $152,902.58. (JA-106). The district court denied plaintiffs' post-trial motion with

respect to plaintiffs' requests that (a) *Marinello* be recertified as a collective action and re-tried as such; (b) the amounts of backpay to which each plaintiff is entitled be molded to the uncontroverted trial evidence; (c) the number of years for which plaintiffs are entitled to recover their backpay goes back to the years on which they began employment with the CBSD; (d) they be awarded backpay for CBSD's willful violation of the EPA; (e) they be awarded pre-judgment interest on the amounts of backpay to which each plaintiff is entitled; (e) the monetary award for each plaintiff include an amount sufficient to cover the extra taxes each plaintiff will have to pay because of the lump sum nature of their award; and (f) the court enjoin CBSD to prospectively compensate Marinello who remains employed with CBSD at the same teacher's salary rate as her male comparator, John Donnelly. (JA-106)

The district court granted the plaintiffs' Petition for their attorney's fees and costs in part, awarding only $516,415.26 in fees and a total of $119,863.62 in costs where plaintiffs sought $2,709,675.00 in fees in their Fee Petition, $46,987.50 in their Supplemental Fee Petition, and costs of $217,738.62. (JA-125, 127).

## IV. SUMMARY OF THE ARGUMENT

**A.** The Plaintiff-Teachers in *Marinello* are statutorily entitled to proceed as a collective action. All Plaintiff-Teachers were similarly situated with one another in that they were all female educators employed by CBSD who were subjected to the same Salary Schedules and received discriminatory placements on Salary Schedules which resulted in their underpayment relative to male teachers subject to the same Salary Scales. (JA-421-422). This was established at the certification hearing conducted by the district court as well as at trial.

**B.** The Plaintiff-Teachers were entitled to judgment as a matter of law as to liability on their EPA claims after the first trial. The uncontroverted evidence at trial established that every male teacher who was treated more favorably than the Plaintiff-Teachers by being given full credit for prior teaching experience, or more credit than he had years of experience, where the Plaintiffs were not, all performed substantially equal work as the Plaintiff-Teachers. The uncontroverted evidence also established that the male teachers were paid more than Plaintiff-Teachers by being given credit for all, or even more than all of their years of prior teaching experience when placed on the District's Salary Scales. Finally, CBSD completely failed to prove that all of the male teachers who were credited with all, or more than all, of their prior teaching experience for placement on the Salary Scales, where Plaintiff-Teachers were not so credited, were in fact placed on the Salary

Scales based on a factor other than sex. Applying the burden-shifting framework in *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000), the Plaintiff-Teachers were entitled to judgment as a matter of law.

**C.** The district court erred as a matter of law in denying Plaintiffs' second post-trial Motion for judgment as a matter of law or, alternatively, to amend the judgments after the re-trial of their cases with respect to the amounts of backpay to which each Plaintiff was entitled since the backpay awards were contrary to the undisputed evidence at trial.

Additionally, the statute of limitations applicable to the EPA claims did not begin to run until the plaintiffs discovered that they were subjected to discrimination and/or was tolled by virtue of CBSD's purposeful concealment of its wage discrimination practices. So, plaintiffs' backpay claims go back to the years in which each first became employed by CBSD.

Plaintiffs are entitled to an award of the pre-judgment interest on the amounts of backpay to which each plaintiff is entitled as part of their make-whole relief under *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 440-441 (3d Cir. 2009) and the All Writs Act, 28 U.S.C. § 2861. Likewise, plaintiffs are entitled to an award to an amount sufficient to cover the extra taxes each plaintiff will have to pay because of the lump sum nature of their award. *Id.*

Plaintiffs are also entitled to liquidated damages based on their entitlement to backpay and pre-judgment interest.

Marinello is entitled to an order requiring CBSD to prospectively compensate her at the same teacher's salary rate as her male comparator, John Donnelly. Otherwise, she will be compelled to bring lawsuit after lawsuit every year going forward that she is paid less than Donnelly for equal work where a jury already has determined that CBSD violated the EPA by compensating her less than Donnelly for equal work.

**D.** Plaintiffs are entitled to all of their attorney's fees from CBSD pursuant to 29 U.S.C. § 216(b) and the fee agreements between Plaintiffs and their counsel as part of their make whole relief. Additionally, they are entitled to recover the cost of the paralegal services that the district court denied because there is no requirement that a party disclose to the court the paralegal or other costs it incurs in litigation prior to petitioning the court for such costs.

**E.** The district court erred as a matter of law in granting summary judgment in favor of CBSD on Cartee-Haring's claims for sex and age discrimination and retaliation with respect to CBSD's termination of her employment as girls' lacrosse coach and refusal to re-hire her in that position. Genuine issues of material facts exist with respect to those claims rendering summary judgment inappropriate.

**F.** CBSD's arguments in its principle brief are without merit for the reasons stated by the district court in its July 15, 2025 Memorandum re: Parties' Post Trial Motions (JA-106), which is incorporated by reference herein.

## V. ARGUMENT

### A. The Teacher-Plaintiffs Are Entitled To Proceed As A Collective Action.

The EPA amended the Fair Labor Standards, 29 U.S.C. § 201, *et seq*., to secure "the principle of equal pay for equal work regardless of sex." *Brennan*, 417 U.S. at 190; *see also* 29 U.S.C. § 206(d)(1).

In enacting 29 U.S.C § 216(b):

> Congress has stated its policy that [FLSA] plaintiffs should have the opportunity to proceed collectively. [This] allows [FLSA] plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.

*Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Section 216(b) "gives employees **the right** to bring a private cause of action on their own behalf and on behalf of 'other employees similarly situated' for specified violations of the FLSA." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013) (citation omitted) (emphasis added). "By permitting employees to proceed collectively, the FLSA provides employees the advantages of pooling resources and lowering individual costs so that those with relatively small claims may pursue relief where individual litigation might otherwise be cost-prohibitive." *Halle v. W. Penn*

*Allegheny Health Sys. Inc.*, 842 F.3d 215, 223 (3d Cir. 2016). Proceeding as a collective action is a statutory right not subject to the subjective preference of a court. The text of § 216(b) requires no motion for opt-in, mandating only that any new plaintiff "gives his consent in writing . . . and such consent is filed in the court."

*Zavala v. Wal Mart Stores, Inc.* 691 F.3d 527 (3d Cir. 2012) instructs that "the standard to be applied on final certification is whether the proposed collective plaintiffs are 'similarly situated.'" *Id.* "Being similarly situated . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the [EPA]." *Id.* at 538. Courts typically consider whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment. *Id.* at 535-537.

"Courts, including this one, have similarly described the FLSA collective action device as a species of joinder. *See, e.g., Genesis Healthcare Corp.*, 569 U.S. at 70 n.1 (describing Section 216 as a 'joinder process); *Mineo v. Port Auth. of N.Y.& N.J.*, 779 F.2d 939, 941 n.5 (3d Cir. 1985) (describing § 216 as a form of 'permissive joinder); *Campbell [v. City of L.A.*, 903 F.3d 1090] at 1104–05 [(9th Cir. 2018)] ('The natural parallel [for FLSA named and opt-in plaintiffs] is to

plaintiffs initially named or later added under the ordinary rules of party joinder.)" *Fischer v. Federal Express Corp.* 42 F.4th 366, 378 (3d Cir. 2022). *See also Pentland v. Dravo Corp.*, 152 F.2d 851, 853 (3d Cir. 1945) (summarizing the early 1940s case law on § 216(b): "all think in terms of permissive joinder of parties.") In this vein, *Hagan v. Rogers*, 570 F.3d 146, 153 (3d Cir. 2009), this Court recognized:

> For courts applying Rule 20 and related rules, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." Rule 20 permits "the joinder of a person who has some interest in an action . . ., even when that interest is not so strong as to require his joinder" under Rule 19.

*Hagan v. Rogers*, 570 F.3d 146, 153 (3d Cir. 2009) (citations omitted).

The liberal principles of permissive joinder to be applied in the broadest possible scope of action are consistent with this Court's longstanding recognition that the FLSA's enforcement provisions are to be liberally construed to give effect to the Act's remedial purpose. *Zavala*, at 538 (Congress intended that FLSA be liberally construed including in determining appropriateness of certifying EPA case as a collective action); *Shultz*, at 265 (EPA must be liberally construed so as not to "destroy the remedial purposes of the Act.").

Here, all of the Plaintiff-Teachers are similarly situated and their claims arise out of the same series of transactions or occurrences and have common questions of law and fact. The trial court explicitly recognized this when it

consolidated the *Cartee-Haring* and *Marinello* cases. The trial correctly recognized, "Common questions of law and fact exist in both cases, as their Federal Equal Pay claims are the same. Both cases allege improper application of the pay scale to female teachers as opposed to male teachers, leading to unfair salary differentials." (JA-226) The trial court was right.

After an evidentiary hearing (JA-282-408), the trial court granted ***final*** certification of the *Marinello* case as a collective action under 29 U.S.C. §216(b) on August 24, 2022. (JA-409-425).[3] The trial court correctly ruled:

> The testimony given at the evidentiary record made clear that Plaintiff established, by a preponderance of the evidence, that several women were similarly situated to Plaintiff in that they were also female educators, employed by the District, who were subjected to the same District Salary Schedules, and who all received inaccurate placements on their respective school year's Salary Schedule which resulted in their underpayment. When compared to the twenty-six male educators who were also inaccurately placed on the Salary Schedules, but whose placements yielded overpayment not underpayment, **the Court finds Plaintiff sufficiently established her burden as outlined in Zavala such that final certification of Plaintiff's putative class is proper.**

(JA-421-422) (emphasis added).

---

[3] At the certification hearing, the trial court stated, "They remained as teachers, and they've never gotten credit for the prior teaching experience that they had, and they have some evidence that male teachers do. That's sufficient, in my mind, under the law to establish a collective action, that's all I'm holding -- is that the evidence is sufficient to proceed as a collective action." (JA-396:24-25-397:1-5). "But I'm telling you that I'm going to grant the motion for a collective action." (JA-398:24-25-399:1) "I think the evidence compels granting a collective action." (JA-407: 18-20).

Thereafter, the trial court ruled that final certification of the collective action was appropriate on at least four (4) occasions in the course of this lawsuit.

The trial court's final certification was conclusive. *Camesi v. Univ. Pitt. Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (in determining whether final certification is appropriate, a court "makes a **conclusive** determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.") *quoting Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011) *rev'd on other grounds, Symczyk,* 133 S.Ct. at 1526 (emphasis added).

Final certification having been granted, over 300 women school teachers opted-in the collective action and the collective action in *Marinello* and the *Cartee-Haring* cases went to trial with respect to liability. The evidence at trial confirmed that collective action status was statutorily required for all those electing to opt-in. Trial evidence established that all teachers -- the Plaintiff-Teachers and their male counterparts -- are paid according to the same Salary Scales irrespective of the subject matter or level they teach because they all perform their work with the same skill, effort and responsibility across all levels (JA-668:1-13; 726:6-13). They all perform substantially equal work of substantially equal skill, responsibility and effort under similar working conditions. (JA-668:1-23; 669:1-25; 670:1-25; 671:1-25; 712:1-15, 719:1-12, 726:14-25 - 727:1-25, 728:1-6). All

of the teachers employed by CBSD – Plaintiff-Teachers and men -- were certified by the Department of Education in the "art of teaching" (JA-618:7-14; 656:10-24; 718:15-25; 2258; 2259; 2261; 2263); they all evaluate students and assess and monitor their performance (JA-1150:3-7); they all make lesson plans (JA-1149:25 – 1150:1-2); they all attend open-houses and present at back-to school nights (JA-673:13-15; 732:2-4); all teachers collaborate with other teachers for curriculum development, student needs and school improvement (JA-1150:11-13); all teachers directly interact with students every day students are present (JA-1150:8-10); all teachers are subject to the same evaluations and grievance process (JA-673:23-25 - 674:1-3); all teachers support students with anything they need in and outside the classroom (JA-1150:23-25). All teachers work in substantially similar working conditions in modern school buildings. (JA-728.25 – 729:1-3).

Further, all teachers have active listening skills (JA-1148:13-15); presentation skills (JA-1148:17-19); the skill of running a group (JA-1148:21-23); the skill to have an adequate response to student behaviors (JA-1148:25 – 1149:1-2); the skill of crisis response (JA-1149:4-6); the skill of student career training and preparing students for their futures (JA-1149:8-16); classroom management skills (JA-1149:18-20); and all teachers have the skills to understand teacher responsibilities (JA-1149:22-24).

Consistent with this evidence, the uncontroverted evidence also established that the following male teachers received credit for all, or more than all, of their years of prior teaching experience when they were placed on CBSD's Salary Scales -- T. Carty, L. Freyer, W. Smith, C. Phillips, T. Swanson, S. Blake, M. Mosley, A. Kane, J. Bunn, M. Riley, D. Polis, W. Sandstrom, J. Donnelly, J. Achuff, R. Rowan and S. Murphy. (JA-2230 [PX-1]). These male teachers performed substantially equal work as the Plaintiff-Teachers but, unlike the men, the Plaintiff-Teachers teachers did not receive credit for all, or more than all, of their years of prior teaching experience when they were placed on CBSD's Salary Scales. (JA-2230 [PX-1]) (JA-719:23-25, 720:17-23).

Based on this uncontroverted evidence, the Plaintiff-Teachers easily meet the threshold for proceeding jointly as a collective action. Accordingly, *Marinello* should be recertified as a collective action and, if necessary, should be re-tried as a collective action unless the Court agrees with the Plaintiff-Teachers that they were entitled to judgment as a matter of law after the first trial. [4]

---

[4] After the district judge decertified the *Marinello* collective action, approximately 130 of the Plaintiff-Teachers filed a separate lawsuit asserting their EPA claims against CBSD that had earlier been tried. Contrary to Supreme Court and Third Circuit precedent on permissive joinder, the district judge, *sua sponte*, dismissed the complaint with leave for Jakubik to amend the complaint by deleting the allegations pertaining to the other plaintiffs and with leave to the other plaintiffs to file separate complaints. In addition to multiplying discovery and all other aspects of litigation by a factor of 130 times, the *Jakubik* plaintiffs would collectively incur filing fees alone totaling $52,650.00 and would incur other costs

### B. Plaintiff-Teachers Were Entitled To Judgment As A Matter Of Law After The First Trial.

Fed. R. Civ. P. 50 provides that in the aftermath of a jury trial, a court may grant a motion for judgment as a matter of law if it determines that there was no “legally sufficient evidentiary basis” for a reasonable jury to have found for a particular party on an issue, and that, without a favorable finding on that issue, the party cannot maintain his claim under controlling law. The court “must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the ‘minimum quantum of evidence from which a jury might reasonably afford relief.’” *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir. 2002).

In EPA claims, the plaintiff must first establish a *prima facie* case by proving that an employee of the opposite sex was paid more than she for performing "equal work" -- work of substantially equal skill, effort and responsibility, under similar working conditions. *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000); *E.E.O.C. v. Delaware Dept. of Health and Social Services,* 865 F.2d 1408, 1413-14 (3rd Cir. 1989).

---

of litigation by a factor of up to 130 times if they were not joined. The *Jakubik* plaintiffs appealed the dismissal of their complaint in 3d Cir. No. 25-1279.

The burden then shifts to the employer to prove the applicability of one of the EPA's four affirmative defenses. An employer must prove "**not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.**" *Stanziale*, 200 F.3d at 107-108 (emphasis added). *See also EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 123 (4th Cir. 2018) (holding defendant's "facially gender-neutral compensation system" did not shield it from EPA liability because defendant still had discretion to "place the claimants and the comparators on different steps of the pay scale at different starting salaries" based on sex).

As multiple courts have recognized, "in order to prove an EPA claim, a plaintiff need only establish that she was paid differentially because of her sex with respect to a single male employee." *Ryan v. General MacHine Products*, 277 F. Supp. 2d 585, 596 (E.D. Pa. 2003) *citing Dubowsky v. Stern, Lavinthal, Norgaard & Daly,* 922 F. Supp. 985, 990 (D.N.J.1996) *and Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 590 (11th Cir.1994), *cert. denied,* 513 U.S. 919 (1994). *See also U.S. Equal Emp't Opportunity Comm'n v. Md. Ins. Admin.*, 879 F.3d 114 (4th Cir. 2018) ("An EPA plaintiff is not required to demonstrate that males, as a class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex."); Third Circuit Model Civil Jury Instructions, 11.1.1, lines 27-28 ("A plaintiff need not

prove that she was paid less than every comparable male employee. . . . It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex.") This is because the EPA does not require proof of discriminatory intent but imposes a form of strict liability on employers who pay males more than females for performing the same work. *Mickelson v. New York Life Ins.,* 460 F.3d 1304 (10th Cir. 2006); *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (EPA "prescribes a form of strict liability"); *Sinclair v. Auto. Club of Okla., Inc.*, 733 F.2d 726, 729 (10th Cir. 1984).

**1. Uncontroverted Trial Evidence Established That Male Teachers Employed By CBSD Performed Substantially Equal Work Under Similar Working Conditions Relative To Plaintiff-Teachers.**

Plaintiff-Teachers proved that the work they perform entailed substantially equal skill, effort, and responsibility and was performed under similar working conditions relative to men who were compensated more favorably. *Brobst v. Columbus Services Intern*, 761 F.2d 148, 155 (3d Cir. 1985*) cert. denied*, 484 U.S. 1043 (1988). They established their case by proving actual job content. *Id.* By the same token, the employer may not rely merely on the job description in claiming that work is not substantially equal. *Id.* The relevant issue is not the name under which the position was classified but *what was actually done*. *Id.*

The applicability of the EPA is not limited to cases involving *identical* work. *Id. See also Brennan*, 417 U.S. at 204 (1974). Equal means substantially equal and "[a]ny other interpretation would destroy the remedial purposes of the Act." *Shultz* at 265. In a non-precedential decision, *Heller v. Elizabeth Forward School. District.,* 182 Fed. App'x. 91, 95 (3d Cir. 2006), the unanimous panel summed it up:

> When making out a prima facie case, a plaintiff need only show that the jobs being compared are substantially equal, not necessarily that they are identical. The EPA defines what constitutes equal work as jobs that require equal skill, effort, and responsibility. Additionally, when a court assesses the substantial equality between jobs, it should rely on actual job performance and content rather than job descriptions.

Here, the uncontroverted evidence at trial was that every male teacher who was paid more favorably than the Plaintiff-Teachers by being given full credit for prior teaching experience, or more credit than he had years of experience, where the Plaintiff-Teachers were not, were all comparators under the EPA because they all performed substantially equal work. That trial evidence is recounted in this Brief at pages 15-16, *supra.*

CBSD focused its defense on teaching certificates and job descriptions in an attempt to rebut the Plaintiff-Teachers' evidence that they performed substantially

equal work relative to their male comparators.[5] But, as *Brobst* makes abundantly clear, "**the employer may not rely merely on the job description**" and "**the relevant issue is not the name under which the position was classified but *what was actually done*.**" *Brobst*, at 155 (3d Cir. 1985) (emphasis added). Here, Plaintiff-Teachers adduced record evidence that they performed a "common core of tasks," and therefore performed substantially equal work relative to their male comparators and that evidence was uncontroverted by CBSD. *Id.* at 156.

**2. Uncontroverted Trial Evidence Established That Male Teachers Employed By The District Were Paid More Than Plaintiff-Teachers By Being Given Credit for All, Or Even More Than All, Of Their Years of Prior Teaching Experience When Placed On CBSD's Salary Scales.**

When Cartee-Haring was hired by the District as an English teacher in 2007, she had 9 years of prior teaching experience. (JA-786:13-25 - 787:1-5, 789:5-7). When first hired, Cartee-Haring was placed at Step E, the fourth Step of the 2007 Salary Scale. (JA-789:15-23). Unlike the male teachers who received credit for all, or more than all, of their prior teaching experience when they were placed on

[5] It bears noting that uncontroverted evidence established that teachers employed by CBSD are notvlimited to teaching only subject matters for which they receive a State teaching certificate. Teacher Keith Sinn was certified to teach Chemistry, but was also assigned by CBSD to teach Astronomy and Oceanography. (JA-704:4-19). Cartee-Haring was certified to teach English, but was assigned to teach Special Education and Classroom for the Future, an technology integration course. (JA-787:3-24). The teaching certificates do not reflect "what was actually done" by teachers. *Brobst*, 761 F.2d at 155.

the Salary Scales when they were hired -- T. Carty, L. Freyer, W. Smith, C. Phillips, T. Swanson, S. Blake, M. Mosley, A. Kane, J. Bunn, M. Riley, D. Polis, W. Sandstrom, J. Donnelly, J. Achuff, R. Rowan and S. Murphy (JA-2230 [PX-1]) – Cartee-Haring received credit for only 3 of her 9 years of prior teaching experience. (JA-790:4-6). Placed at Step E on the 2007 Salary Scale, Cartee-Haring's salary was **$54,100** with a Masters degree. (JA-2253 [PX-2D.0008]). Had she received full credit for her nine (9) years of prior experience like the male teachers listed above, she would have been placed at the tenth Step, Step K, which would have paid her **$69,250**. (*Id.*).

J. Bunn was hired as an English teacher like Cartee-Haring in 2004, just 3 years before Cartee-Haring, with only 3 years of prior teaching experience and was placed at Step 13. (JA-2230 [PX-1]). Had Cartee-Haring been given credit for 10 extra years prior teaching experience like Bunn, she would have had 19 years for purposes of placement on the Salary Scale at Step 16 at a salary of **$90,000** per year, instead of the **$54,100** she received. (JA-2253 [PX-2D.0008]).

Similarly, like Bunn, Marinello was hired as an English teacher in 2016 with 14 years of prior teaching experience and a Masters degree. (JA-745:23-25 – 746:1-16, 2230 [PX-1]). Unlike Bunn or the other men who received credit for all, or more than all of their years of prior teaching experience (JA-2230 [PX-1]), Marinello received ZERO credit for her prior experience and was placed at the first

Step on the Salary Scale. (JA-745:23-25 – 746:1-16, 2230 [PX-1]). Had Marinello been treated like her male colleagues by being given credit for all of her fourteen (14) years of prior teaching experience, she would have been placed at Step 15 of the Salary Scale and, under the Masters column, been paid **$98,389**, instead of the **$51,157** she received at Step 1. (JA-2248 [PX-2D.0003]). Had she been treated like Bunn, who received credit for an additional ten (10) years of teaching credit he did not have, Marinello would have had 24 years of credit and been placed at the highest Step 15(a) and been paid **$99,783**. (*Id.*).

Joan Collier was hired by the District in 2000 with 24 years of prior teaching experience. (JA-609:12-25 – 610:1-2, 12-17). Collier was given credit for only 3 years of teaching experience and placed at Step 4 of the Salary Scale when she started at CBSD. (JA-610:18-23). So, with a Master degree at Step 4, Collier was paid **$48,699**. (JA-2260 [PX-14.0014]). Had she been treated like male teachers who received credit for all, or more than all of their years of prior teaching experience, Collier would have started at the highest Step 15 on the 2000-2001 Salary Scale and been paid **$74,490**. (JA-2257 [PX-2D.0012]).

Tanya Barone-Durant was hired by CBSD as a School Counselor in 2008 and placed at Step 3 (or C) on the Salary Scale and paid **$54,600** even though she had 4 years of prior teaching experience. (JA-2230 [PX-1]). . Had she been given credit for her 4 years of prior experience, she would have been placed at Step 5 at a

salary of **$59,800**. (JA-2252 [PX-2D.0007]). Walter Sandstrom, a male, was also hired by CBSD as a School Counselor one year after Ms. Barone-Durant in 2009. (JA-147:14-20). With only 3 years of prior teaching experience, one year less than Barone-Durant had, Sandstrom was placed at Step F, the sixth Step of the Salary Scale, 3 full Steps higher than Barone-Durant who had more experience than him. (JA-834:9-15). Had Barone-Durant been treated like her colleague, Sandstrom, and been given credit for an additional 3 years of prior teaching credit she did not have, Barone-Durant would have been placed at Step G, the seventh Step of the 2008 Salary Scale, at a salary of **$65,300**, rather than the **$54,600** she received at Step 3. (JA-2252 [PX-2D.0007])

In stark contrast to male teachers who received credit for all, or more than all of their years of prior teaching experience when placed on their Steps on the Salary Scales, PX-1 (JA-2230) establishes that 143 women Plaintiffs received ZERO credit for their prior teaching experience when placed on the District's Salary Scales. In addition to the Plaintiff-Teachers who did not receive any credit for any of their prior teaching experience, the rest of the Plaintiff-Teachers did not receive credit for all of their prior teaching experience when placed on the Salary Scales like male teachers who received credit for all, or more than all of their years of prior teaching experience when placed on their Steps on the Salary Scales. (JA-2230 [PX-1]).

Moreover, no Plaintiff-Teacher was ever moved higher than one Step in a single year (JA 614:14-17; 750:18-21; 795:16-18). And yet two male teachers, Zappa and Burns, were advanced **4 and 5 Steps**, respectively, in a single year in 2021 after they started their employment with the District in 2015 (JA-2281, 2282, 2293, 2294). This evidence is also uncontroverted.

The Plaintiff-Teachers established that they were paid differently because of their sex with respect to at least sixteen (16) male employees for substantially equal work and, in so doing, established their *prima facie* case of CBSD's EPA violations. *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000).

#### 3. CBSD Did Not Adduce Evidence Which, If Believed, Would Establish That Its More Favorable Treatment Of Male Teachers In Compensation Relative to Plaintiff-Teachers Was In Fact Based On A Factor Other Than Sex.

CBSD had the burden of submitting evidence from which a reasonable factfinder could conclude "not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Stanziale*, 200 F.3d at 107-108. CBSD offered no such evidence.

In fact, CBSD admitted that it did not know what any factor was that explained why male teachers T. Carty, L. Freyer, W. Smith, C. Phillips, T. Swanson, S. Blake, M. Mosley, A. Kane, J. Bunn, M. Riley, D. Polis, W. Sandstrom, J. Donnelly, J. Achuff, R. Rowan and S. Murphy, who received credit

for all, or more than all of their years of prior teaching experience when placed on their Steps on the Salary Scales, were placed where they were placed on the Salary Scales. (JA-827:22-25 – 828:1, 828:9-13, 828:21-24, 828:25 – 829:1-3, 829:18-21, 829:22-25, 830:1-4, 830:5-8, 830:9-12, 830:13-16, 830:17-20, 830:21-24, 830:25 – 831:1-3, 831:4-7, 831:8-11, 831:12-15).

CBSD proffers the argument that, because it did not discriminate against all women or in favor of all men, it could not be liable for discriminating against the Plaintiff-Teachers. But, as this Court explained:

> ‘A [gender] balanced work force cannot immunize an employer from liability for specific acts of discrimination.’ The very nature of disparate treatment cases focuses on the bias against an individual because of […] sex. Because such bias is irrational, it may not follow a consistent pattern. As the Supreme Court explained: ‘**Congress never intended to give an employer license to discriminate against some employees . . . merely because he favorably treats other members of the employees' group**.’

*Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1218 (3d Cir. 1988) (emphasis added) *quoting Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579 (1978) and *Connecticut v. Teal,* 457 U.S. at 455, respectively. *See also EEOC v. Md. Ins. Admin.*, 879 F.3d 114 (4th Cir. 2018) (“An EPA plaintiff is not required to demonstrate that males, as a class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex.”)

Here, CBSD completely failed to prove that all of the male teachers who were credited with all, or more than all, of their prior teaching experience for placement on the Salary Scales where Plaintiffs were no so credited, were in fact placed on the Salary Scales based on a factor other than sex. This is fatal to CBSD's defense.[6] Therefore, all of the Plaintiff-Teachers are entitled to judgment as a matter of law with respect to CBSD's liability to them under the EPA and the district court should be directed to enter judgment in all Plaintiff-Teachers' favor and against CBSD as to liability and conduct a trial on their damages.

### C. The Trial Court Erred As A Matter Of Law In Denying Cartee-Haring's and Marinello's Post-Trial Motion For Judgment As A Matter Of Law Or, Alternatively, To Amend The Judgments After The Re-Trial Of Their Individual EPA Claims.

#### 1. Plaintiffs' Backpay Awards Should Be Based On The Uncontroverted Evidence.

At trial, Cartee-Haring adduced uncontroverted evidence of her backpay losses from the year she became employed by the District in the 2007-2008 school year through the 2023-2024 school year. (JA-2307 [PX-14]). Cartee-Haring's backpay losses totaled $392,427.00. (*Id.*). The jury awarded amounts of backpay

[6] While Mr. Donnelly is only one of 16 male teachers who received full credit for his prior teaching experience in contrast to the Plaintiff-Teachers at trial, CBSD tried to justify his placement on the Salary Scale as a Social Studies teacher by claiming that he was also a football coach. But, the District previously admitted that teachers do not receive credit for coaching sports for purposes of placement on the salary scales. (JA-819:8-14, 820:23-25 – 821:1-6).

to Cartee-Haring that contradicted the clear, uncontroverted evidence established in PX-14 (JA-2307) and had no basis from any other trial evidence. *See* Verdict Slip (ECF 453). Cartee-Haring is entitled to judgment as a matter of law with respect to the amounts of her backpay losses set forth in PX-14 (JA-2307). The Court should amend the judgment to reflect that Cartee-Haring is awarded $393,427.00 in backpay as reflected in PX-14 (JA-2307).

Marinello adduced uncontroverted evidence of her backpay losses from the year she became employed by the District in the 2016-2017 school year through the 2024-2025 school year. (JA-2308 [PX-15]). Marinello's backpay losses totaled $478,983.13. (*Id.*). The jury awarded amounts of backpay to Marinello that contradicted the clear, uncontroverted evidence established in PX-15 (JA-2308). *See* Verdict Slip (ECF 453). Marinello is entitled to judgment as a matter of law with respect to the amounts of her backpay losses set forth in PX-15 and the Court should amend the judgment to reflect that Marinello is awarded $478,983.13 in backpay as reflected in PX-15.

### 2. Cartee-Haring And Marinello Are Entitled To Backpay Beginning From The Year In Which Each First Became Employed By CBSD.

The trial court ruled that the statute of limitations barred Cartee-Haring's claims for damages that she suffered more than two years before she filed suit on April 22, 2020, or for three years before she filed suit in the case of a willful

violation of the EPA. (JA-106). Thus, Cartee-Haring's claims were limited to 2018 through 2024, or in the case of a willful violation, to 2017 through 2024. Likewise, the Court ruled that the statute of limitations barred Marinello's claims for damages that she suffered more than two years before filed suit on June 8, 2021, or for three years before she filed suit in the case of a willful violation of the EPA. Thus, Marinello's claims were limited to 2018 through 2024, or in the case of a willful violation, to 2017 through 2024. Plaintiffs respectfully submit that the trial court erred in limiting their claims in this regard. These trial court rulings were legally erroneous.

"Violations of the [Equal Pay Act] are subject to a two-year statute of limitations, unless the violation is shown to be willful, in which case the statute of limitations is extended to three years." *Cunningham v. Albright College*, No. 20-cv-01429 (E.D. Pa. Dec. 23, 2020) *quoting Schengrund v. Pa. State Univ*., 705 F. Supp. 2d 425, 440 (M.D. Pa. 2009) (citing 29 U.S.C. § 255; *Miller v. Beneficial Mgmt. Corp*., 977 F.2d 834, 842 (3d Cir. 1992)). Under the discovery rule in this Circuit, the statute of limitations in an EPA case begins to run when the plaintiff's cause of action accrues. The accrual date in an EPA case is the date on which the plaintiff discovers that she has been injured. *Schengrund,* 705 F. Supp. 2d at 440 *citing Oshiver v. Sedran & Berman,* 38 F.3d 1380, 1386 (3d Cir. 1994)(discussing the doctrines of the discovery rule and equitable tolling in the context of Title VII

sex discrimination claim); *Miller v. Beneficial Mgmt. Corp*., 977 F.2d at 842 (overruling district court's grant of summary judgment because questions of material fact existed as to whether plaintiff could have known about a pay disparity before learning similarly situated male employee's salary); *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1420 (3d Cir.1991) (foregoing announcement of a "bright line guide to the limitations problem," and holding that knowledge of an unfavorable performance evaluation does not start the statute of limitations clock because such knowledge, alone, is insufficient knowledge of an adverse employment action); *Podobnik v. United States Postal Serv,,* 409 F.3d 584, 590 (3d Cir. 2005) ("[T]he discovery rule is concerned with knowledge of *actual* injury, not legal injury.")

This Court's equitable tolling doctrine also enables the women teachers who were misled about the District's discriminatory compensation practices to assert claims for discrimination that occurred more than 2 or 3 years before they filed suit. Again, as the court explained in *Schendgrund* in the context of the EPA: "Equitable tolling 'steps in to stop the statute of limitations clock once accrual has occurred when the plaintiff does not have sufficient knowledge of the facts supporting her cause of action due . . . where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action." *Id.* at 1386, 1390 *citing Meyer v. Riegel Prods. Corp.,* 720 F.2d 303 (3d Cir.1983). For the defendant to have

actively misled the plaintiff respecting her cause of action, "the employer's own acts or omissions [must] have lulled the plaintiff into foregoing prompt attempts to vindicate his rights," but need not be "egregious acts of active deception." *Id. quting Miller,* 977 F.2d at 845 (3d Cir.1992) (citing *Meyer v. Riegel Prods.Corp.,* 720 F.2d 303, 307 (3d Cir. 1983)).

In this case, in its Memorandum of August 24, 2022, this trial court previously recognized that:

> Plaintiff set forth evidence of the District's unequal payment to female teachers beginning in 2000 and continuing through the present. Plaintiff also established the female teachers did not know they were being compensated less than their male counterparts before 2020, and on several occasions the District misstated how it utilized its Salary schedules to calculate the female teachers' annual salaries.

CBSD held itself out as maintaining the policy that it does not discriminate in its employment practices on the basis of gender. (JA-2279 [PX-4.000], 2280 [PX-5.0057]). The Plaintiffs had no reason to suspect that CBSD was violating its own stated policies and federal law in connection with their compensation until January 2020, in Cartee-Haring's case (JA-1659-1661), and, in Marinello's case, a few months before she filed suit (JA-1798-1799). It is undisputable that CBSD misrepresented to the Plaintiffs that it was not discriminating against them in pay and that the plaintiffs filed their lawsuits with months of discovering the discrimination. Accordingly, the EPA's statute of limitations did not begin to run on Cartee-Haring's EPA claim until January 2020 and a few months before June

2021 for Marinello. Accordingly, their claims for backpay going back to the time each plaintiff was first hired are not barred by the two/three year statute of limitations. Plaintiffs are, therefore, entitled to judgment as a matter of law, or an amended judgment, to reflect their backpay losses reflected in PX-14 (JA-2307) and PX-15 (JA-2308), which losses are uncontroverted.

To the extent the Court determines that the plaintiffs may only recover backpay for EPA violations occurring up to three years before they filed suit, then plaintiffs are entitled to judgment as a matter of law, or are entitled to an amended judgment, since the trial evidence clearly established that CBSD's violations were willful.

The trial court correctly instructed the jury that to find "willfulness," the District must be shown to have known or showed reckless disregard for whether Plaintiffs' underpayment was prohibited by the law. (ECF 434, Jury Instruction No. 9).

Here, based on the uncontradicted evidence, it is inconceivable CBSD did not know that Plaintiffs' underpayments were prohibited by the EPA or that it did not show reckless disregard. The EPA has been the law in the US since **1963**. CBSD had access to several lawyers who represented it including labor counsel. (JA-1882-1883). CBSD had access to retain a human resources consultant if it wanted to do so in connection with the EPA. (JA-1883). CBSD never conducted a

formal audit to determine whether its pay practices complied with the EPA. (JA-1884).

Adding insult to injury, in 2022 when these EPA lawsuits were fully in the throes of litigation, CBSD hired a Human Resources Director to be "in charge of all matters human resources, that includes . . . making sure that all of the laws of employment and hiring are complied with" with respect to 3400 employees. (JA 1865-1866, 1878). And yet, that HR Director had ZERO prior experience in HR and ZERO background or experience in employment law generally or the EPA specifically (JA-1878-1882). CBSD indisputably recklessly disregarded its obligations under the EPA resulting in willful violations.

### 3. Plaintiffs Are Entitled To An Award Of Pre-Judgment Interest On The Amounts Of Backpay To Which Each Plaintiff Is Entitled.

In *Eshelman*, 554 F.3d at 440-441, this Court explained:

> A chief remedial purpose of employment discrimination statutes […] is "to make persons whole for injuries suffered on account of unlawful employment discrimination." Congress armed the courts with broad equitable powers to effectuate this "make whole" remedy. District courts are granted wide discretion to "locate `a just result'" regarding the parameters of the relief granted in the circumstances of each case.
>
> **In exercising its discretion to fashion a remedy, district courts should, *inter alia*, endeavor "to restore the employee to the economic status quo that would exist but for the employer's conduct."**

(Footnote and citations omitted, emphasis supplied).

Further, federal courts are empowered by the All Writs Act to

"issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. S 1651. *IN RE: The Prudential Insurance Company of America Sales Practices Litigation,* No. 06-3186 (3d Cir. 2002) (non-precedential). The All Writs Act invests all courts established by Act of Congress with a power essentially equitable and, as such, not generally available to provide alternatives to other, adequate remedies at law. *See*, *e.* g., *Carlisle* v. *United States,* 517 U.S. 416, 429 (1996) ("'The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute'" (quoting *Pennsylvania Bureau of Correction,* 474 U. S., at 43); *Clinton v. Goldsmith*, 526 U.S. 529 (1999)

Consistent with *Eshelman* and the Court's equitable power under the All Writs Act, the judgments in these cases should be amended to reflect the pre-judgment interest plaintiffs lost over the years because of the pay disparities to which they were subjected. The expert analysis of Forensic Accountant, Royal Bunin, calculating the prejudgment interest to which each plaintiff would be entitled if awarded the full amounts of their backpay claims reflected in PX-14 and PX-15, and the prejudgment interest to which each Plaintiff would be entitled if awarded the amounts of their backpay claims reflected in the Verdict Slip was attached as Exhibit "A" to Plaintiffs' post-trial Motion (ECF 435-2). (A copy of that Exhibit is attached hereto as Addendum 1).

Using the backpay amounts set forth in PX 14, Cartee-Haring is entitled to $756,120.00 in backpay and prejudgment interest. Using the backpay amounts set forth in PX-15, Marinello is entitled to $665,673.00 in backpay and prejudgment interest. The district court should be directed to amend the judgment accordingly to account for their backpay and prejudgment interest consistent with their position that they are entitled to the backpay reflected on PX-14 and PX-15.

If this Court determines that Plaintiffs are not entitled to the backpay amounts in PX-14 and PX-15, but are entitled only to the amounts reflected on the Verdict Slip, then Plaintiffs request that the Court amend the judgment to reflect the prejudgment interest to which they are entitled consistent with Addendum 1.

#### 4. Each Plaintiff Is Entitled To A Monetary Award In An Amount Sufficient To Cover The Extra Taxes Each Plaintiff Will Have To Pay Because Of The Lump Sum Nature Of Their Awards.

In *Eshelman*, this Court affirmed the appropriateness of awarding prevailing plaintiffs an amount to cover the extra taxes they will have to pay on their monetary rewards as part of make whole relief. The judgments in these cases should be amended to account for the negative tax consequences to plaintiffs consistent with the Court's equitable powers under the All Writs Act.

Bunin calculated the extra taxes each Plaintiff will have to pay on her monetary award using PX-14 (JA-2307) and PX-15 (JA-2308), and also using the monetary awards in the Verdict Slip. (Addendum 1). Using PX-14, Cartee-

Haring's negative tax consequence on her award of backpay, prejudgment interest and liquidated damages is $859,468.00. Using the amounts set forth in the Verdict Slip, Cartee-Haring's negative tax consequence on her award of backpay, prejudgment interest and liquidated damages is $103,280.00. (Addendum 1).

Using PX-15, Marinello's negative tax consequence on her award of backpay, prejudgment interest and liquidated damages is $744,921.00. Using the amounts set forth in the Verdict Slip, Marinello's negative tax consequence on her award of backpay, prejudgment interest and liquidated damages is $82,876. (Addendum 1).

Plaintiffs, therefore, request that the trial court be directed to amend the judgment for an award to Cartee-Haring in the amount of $2,371,708.00 reflecting backpay, prejudgment interest, liquidated damages and negative tax consequence based on PX-14. If the Court determines that the amounts set forth in the Verdict Slip control – which are contrary to the uncontroverted evidence in PX-14 – then the judgment would be amended to the amount of $330,866.00 for Cartee-Haring for backpay, prejudgment interest, liquidated damages and tax consequences.

The trial court should also be directed to amend the judgment for an award to Marinello in the amount of $2,076,267.00 reflecting backpay, prejudgment interest, liquidated damages and negative tax consequence based on PX-15. If the Court determines that the amounts set forth in the Verdict Slip controls – although

they are contrary to the uncontroverted evidence in PX-15 – then the judgment would be amended to the amount of $294,804.00 for Marinello for backpay, prejudgment interest, liquidated damages and negative tax consequences.

#### 5. Each Plaintiff Is Entitled To An Award Of Liquidated Damages In An Amount Equal To Her Backpay And Interest.

The FLSA, 29 U.S.C. § 216(b), mandates recovery for an EPA violation consisting of the amount of underpayment and "an additional equal amount as liquidated damages." In this Circuit, "[l]iquidated damages are compensatory. They ease any hardship endured by employees who were deprived of lawfully earned wages." *Sec'y U.S. Dept. Labor v. Am. Future Sys. Inc.*, 873 F.3d 420 (3d Cir. 2017).

In Addendum 1, Bunin has calculated the amounts of liquidated damages to which Plaintiffs are entitled based on the damages they proved through PX-14 and PX-15, as well as the amounts of liquidated damages to which Plaintiffs are entitled based on the damages set forth in the Verdict Slip. Plaintiffs request that the judgment be amended to account for liquidated damages.

Using the damages proven through PX-14, Cartee-Haring is entitled to $756,120.00 in backpay and prejudgment interest. She is entitled to liquidated damages in an equal amount. Thus, she is entitled to $1,512,240.00 in backpay,

prejudgment interest and liquidated damages based on the uncontroverted evidence set forth in PX-14. (Addendum 1)

Using the damages set forth in the Verdict Slip, Cartee-Haring is entitled to $113,793.00 in backpay and prejudgment intertest. She is entitled to liquidated damages in an equal amount. Thus, she is entitled to $227,586 in backpay, prejudgment interest and liquidated damages based on the Verdict Slip. (Addendum 1).

Using the damages proven through PX-15, Marinello is entitled to $665,673 in backpay and prejudgment interest. She is entitled to liquidated damages in an equal amount. Thus, she is entitled to $1,331,346.00 in backpay, prejudgment interest and liquidated damages based on the uncontroverted evidence set forth in PX-15. (Addendum 1)

Using the damages set forth in the Verdict Slip, Marinello is entitled to $105,964.00. She is entitled to liquidated damages in an equal amount. Thus, she is entitled to $211,928 in backpay, prejudgment interest and liquidated damages based on the Verdict Slip. (*Id.)*

**6. The Judgment Should Be Amended To Include An Order That CBSD Compensate Marinello At The Same Teacher's Salary As John Donnelly.**

The jury concluded that CBSD violated the EPA in compensating Marinello less than John Donnelly for equal work. (ECF 453). Marinello remains employed

as a teacher by CBSD. Accordingly, consistent with its equitable powers under the All Writs Act and the make-whole principles in *Eshelman*, the trial court should be directed to enter an order requiring CBSD to compensate Marinello at the same teacher's salary rate as John Donnelly going forward. *Eshelman*, 554 F.3d at 440-441 ("In exercising its discretion to fashion a remedy, district courts should, *inter alia,* endeavor 'to restore the employee to the economic status quo that would exist but for the employer's conduct.'"); *Heller v. Elizabeth Forward School. District.,* 182 Fed. App'x. 91 (3d Cir. 2006) (non-precedential) (unanimous panel affirmed district court's order prospectively to place plaintiffs at higher compensation rates based on jury verdict). Absent such an order, Marinello will be effectively forced to file a new lawsuit every year to vindicate her right to equal pay since CBSD will continue to pay her less than Donnelly for equal work as the jury determined.

### D. Plaintiffs Are Entitled To The Attorneys' Fees And Costs They Sought.

As part of the EPA Amendments to the FLSA, 29 U.S.C. § 216(b) provides "The court in such action [under the Equal Pay Act] shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." Here, Plaintiffs seek their attorney's fees of $2,709,675 (JA-2339) and an additional $46,987.50 for the additional work counsel performed since filing the initial Fee Petition. (ECF 483).

The *Cartee-Haring* and *Marinello* lawsuits were the first EPA cases EVER brought against CBSD even though Plaintiff-Teachers subject to the discriminatory compensation practices of CBSD were represented by a large collective bargaining representative, the Pennsylvania State Education Association. As the trial court correctly observed on a number of occasions, these are important, complex cases. In fact, Plaintiff-Teachers adduced evidence that the systemic compensation discrimination to which women teachers employed by the District were subjected went back as far as at least 1985. (JA-2230 [PX-1]).

But, no one – not the teachers' union nor anyone else -- did anything about CBSD's discriminatory pay practices until Plaintiff-Teachers and their counsel undertook these precipitously uphill litigations.

Cartee-Haring and Marinello entered into Engagement Agreements with counsel providing that counsel will be paid a Contingency Fee, if and only if the plaintiffs obtain relief, in the greater amount of (a) three and a half times the hourly rate of $750 times the number of hours the undersigned expends on the matter; or (b) 40%, in Marinello's case, or 35% in Cartee-Haring's, of the gross value of any monetary recovery. (JA-2317, 2322)[7]

---

7 Cartee-Haring's Engagement Agreement also provided for her payment of a Fixed Fee of $30,000, in addition to the Contingency Fee. That is because Cartee-Haring asserted various discrimination claims against the District in connection with her termination as the girl's lacrosse coach. Those claims were erroneously dismissed on summary judgment.

The $750 hourly rate takes into account Plaintiffs' counsel's experience (JA-2339). The contractual multiplier of 3.5 times the hourly rate of $750 takes into account the extremely high risk associated with the cases and the societal benefits of vindicating the civil rights conferred by our laws. These litigations involve complex factual matters and even more complex legal issues, many of which are not settled in this Circuit. CBSD has made-good on its stated intention to appeal various legal issues to this Court and to the Supreme Court if necessary. Plaintiff-Teachers' fates have never been certain.

The Contingency Fee also takes into account that Plaintiff-Teachers' counsel is a solo practitioner who, in taking-on these highly complex, risky and time-consuming civil rights cases, would have to forego other representations and the opportunities for remuneration they would present.

As set forth in the Engagement Agreements, in the private market, lawyers charge a premium when all or a substantial part of their fee is contingent on winning a monetary recovery for the client. The premium added for contingency compensates the attorney for the risk of nonpayment if the suit does not succeed and yield a monetary recovery and for the delay in payment until the end of the arbitration or litigation -- factors not faced by a lawyer paid promptly as a legal representation progresses. In the private market, the premium for contingency sometimes is recouped by basing the fee on a percentage of the damages

recovered. The premium also could be computed, as in these cases, as part of an hourly rate that the lawyer bills after the litigation succeeds. Under either approach, the market-based fee or hourly rate that is contingent on success is necessarily higher than the hourly rate charged when payment is current and certain. This fee enhancement ensures that accepting cases on a contingent basis remains an economically attractive and feasible enterprise for lawyers. (JA-2317, 2322)

The attorney's fees and costs sought in these cases are predicated on binding contracts between the Plaintiffs and their attorney subject to Pennsylvania law since the contracts were entered into in Pennsylvania and the performance under the contracts was all in Pennsylvania. The attorney's fees sought by the Plaintiffs are those they owe to their attorney pursuant to those contracts. *Steuart v. McChesney*, 498 Pa. 45, 50-51, 444 A.2d 659 (1982) ("[T]his Court long ago emphasized that `[t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with . . . the accepted and plain meaning of the language used.'") This Court has similarly upheld the sanctity of private contracts. For example, in *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010), the Court ruled that, while Fed. R. Civ. P. 23 requires district courts to act as fiduciaries for the absent class

members in considering settlement agreements in class actions, that does not vest district courts with the broad powers to intrude upon the parties' bargain.

Here, the parties' bargain is the foundation for their claim for make-whole relief that includes their attorney's fees and costs. Because the Plaintiffs owe their attorney the fees and costs they have sought in these cases pursuant to binding contracts under state law, they should be awarded those fees and costs from the Defendant to make them whole as prescribed by *Eshelman*. Anything less does not make them whole.

The fees owed by Plaintiffs to their attorney for which they seek to be made whole are reasonable. Declarations of extremely highly reputed, knowledgeable, accomplished, and experienced attorneys were submitted to the trial court to assist it in confirming the fees that the Plaintiffs agreed to pay their lawyer, if and only if they achieved a monetary recovery, are reasonable. The Declarations of Maurice Mitts, Sydney Gold and Jeremy Heisler were filed at ECF 482-1, 2 and 4 and are attached hereto collectively as Addendum 2. Each of those highly experienced members of the bar unanimously, strongly and emphatically confirmed that the attorneys' fees Plaintiffs have sought are eminently reasonable in view of the risks associated with taking the cases, the aggressiveness with which CBSD litigated

them, the substantial societal benefit at stake, and the result achieved. (Addendum 2).[8]

Against this backdrop, the Defendant should be ordered to pay Plaintiffs' attorney fees. Under the Engagement Agreements with each Plaintiff, the undersigned is to receive a fee equal to those hours multiplied by $2,625 for a total of $2,709,675. (JA-2339) Additionally, as set forth in Plaintiffs' Supplemental Fee Petition (ECF 483), Plaintiffs should be awarded $46,987.50 for the additional work counsel performed since filing the initial Fee Petition.

Plaintiffs incurred the costs in connection with these matters which the trial court correctly awarded except that it disallowed Marinello's request for Paralegal costs at $250 per hour times 360 hours $90,000. Cartee-Haring served as a paralegal in the *Marinello* case but the trial court disallowed reimbursement for that cost for the stated reason that Marinello did not previously inform the court that Cartee-Haring was working on her case as a paralegal. There is, however, no requirement that a party apprise the court on an ongoing basis throughout a litigation of the costs it is incurring. Marinello should be awarded the $90,000 in paralegal costs for Cartee-Haring's extensive services.

---

[8] The Declarations all state that those attorneys' firms would not have taken the cases given the risks and burdens involved. That may explain why Plaintiffs were left with their attorney, flawed though he may be.

### E. Summary Judgment Was Improperly Granted On Cartee-Haring's Sex And Age Discrimination and Retaliation Claims Regarding Her Position As The Girls Lacross Coach.

Cartee-Haring asserted that she was terminated from her position as CBSD's Head Girls Lacrosse Coach because of her sex in violation of Title VII, and her age in violation of the ADEA. (JA-201). She also asserted that CBSD refused to re-hire her as Head Girls Lacrosse Coach because she opposed discrimination under the EPA, Title VII, the ADEA, and ADA and participated in proceedings to enforce those statutes. (JA-426). The district court consolidated Cartee-Haring's discrimination lawsuits. (JA-475).

The district court granted CBSD's motion for summary judgment as to all of those discrimination and retaliation claims. (JA-38). But, the trial court erred in granting summary judgment because there were genuine issues of material fact which, viewed in a light most favorable to Cartee-Haring, enable her to prevail on her claims.

#### 1. Summary Judgment Was Improper As To Sex Discrimination.

To avoid summary judgment, Cartee-Haring must first establish a prima facie case of discrimination. To do that, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) either members of the opposite sex were treated more favorably, or the adverse employment action occurred under

circumstances that could give rise to an inference of intentional gender discrimination. *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

Once a plaintiff establishes a *prima facie* case, the burden then "shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). "If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." *See id.*

The trial court concluded that Cartee-Haring could not satisfy the fourth prong of the *prima facie* case. But, a plaintiff can raise an inference that the likely reason for her firing was discriminatory "'in a number of ways, including, but not limited to, comparator evidence,' or evidence of similar . . .discrimination towards other employees." *Selvato v. SEPTA*, 143 F. Supp.3d 257, 268 (E.D. Pa. 2015) (*quoting Golod v. Bank of Am. Corp*., 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (not precedential)). Here, male coaches remained employed by CBSD as coaches for decades despite the fact that they attended parties at the homes of players whereas one of the reasons proffered by CBSD for Cartee-Haring's termination is that she attended a party at the family home of a player on the team. Under these

circumstances, Cartee-Haring has met her easy burden of establishing a *prima facie* case.

CBSD articulated at least two inconsistent reasons for Cartee-Haring's termination. It claims that former Superintendent Kopicki made the decision to fire Cartee-Haring because she attended a party at the family home of a player on the Lacrosse team. (ECF 140-1) (Cartee-Haring's verified Asnwer to Defendant's Statement of allegedly Undisputed Facts and Counterstatement of Facts is attached hereto as Addendum 3). (Addendum 3, Answer to ¶ 36). But, again, male teachers have attended such parties and remained in their coaching positions. (*Id.* Answer to ¶ 35). A reasonable juror could easily conclude, therefore, that this articulated reason is false or pretextual.

Additionally, the claim that Kopicki made the termination decision is itself false in an attempt to cover-up discriminatory motive. Kopicki never told Cartee-Haring that she was fired. (*Id.* Answer to ¶ 36) Instead, Carttee-Haring learned that she was being terminated in a meeting with other administrators, none of whom told Cartee-Haring that Kopicki made the decision to fire her and none of whom told Cartee-Haring that the reason she was being fired was because she attended a family party at the home of a player on her team. (*Id.*) Instead, Cartee-Haring was told by Human Resources Director DiDio-Hauber that she was being terminated because she lacked character. (*Id.*) DiDio-Hauber claims that it was

not her, but then-Assistant Superintendent Lucabuagh, who asserted the lack of character as the reason for the termination. (*Id.*) This is the classic litany of grounds on which a juror may find an employer's articulated reason for the employment action unworthy of credence under *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) by finding "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action."[9]

Adding to the weakness, implausibility, inconsistency, incoherency and contradiction in the District's articulated reason for firing Cartee-Haring as a coach because she lacked character is that Cartee-Haring remained employed as an English teacher with the District. District witnesses confirmed that the same standards of character that apply to a coach employed by the District also apply to a teacher. (*Id.*). A reasonable factfinder could find that the articulated reason for firing Cartee-Haring as a coach – lack of character – was false because if she really did lack character, she would have been fired as a teacher as well.

CBSD sets forth a factual account of the circumstances purportedly leading to Cartee-Haring's termination involving Roe and Doe, but as set forth in

---

[9] The trial court concluded that Cartee-Haring was fired because of her mishandling of a situation in which she was accused of bullying a member of the team, referred to by the pseudonym Roe. That is not the case. The investigation conducted by CBSD into the bullying accsusation 100% cleared Cartee-Haring of the charges. (*Id.* Answer to ¶ 27).

Addendum 3, the facts upon which the District relies are substantially disputed. The District's spin on those facts is that Cartee-Haring acted wrongly and deserved to be fired even though CBSD's own investigation into the allegation that she bullied Roe completely vindicated her, even though that investigation yielded unanimous praise from every player, coach and parent interviewed other than Roe, and even though Cartee-Haring conducted herself professionally and responsibly at every turn in the face of a mother-daughter duo that set their sights on making Cartee-Haring's life miserable.

Based on these facts, and viewing them and all reasonable inferences in a light most favorable to Cartee-Haring, summary judgment on Cartee-Haring's Title VII gender discrimination was improper.

#### 2. Summary Judgment Was Improperly Granted With Respect To Plaintiff's Age Discrimination Claim.

Plaintiff also claims that she was terminated from her position as Head Girls Lacrosse Coach because of her age. To state a claim for age discrimination, a plaintiff must have proof that: (1) he is over forty; (2) she is qualified for the position in question; (3) She suffered from an adverse employment decision; and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Hill v. Borough of Kutztown*, 455 F.3d 225, 247 (3d Cir. 2006).

As with Cartee-Haring's Title VII claim, the burden under the ADEA shifts to the District to articulate business reasons for its decision to fire Cartee-Haring.

The trial court recognized that Cartee-Haring had established a *prima facie* case but then ruled that CBSD articulated a legitimate business reason for her termination and that Cartee-haring could not adduce evidence of pretext.

But, as demonstrated above, a reasonable juror could conclude that CBSD's articulated business reasons are false and, therefore, summary judgment is not appropriate on Cartee-Haring's age discrimination claim just as it is not appropriate on her gender discrimination claim. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.")

### 3. Summary Judgment On Cartee-Haring's Retaliation Claims Was Improper.

Plaintiff has asserted claims for retaliation under Title VII and the ADEA. Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice" or "made a charge, testified, assisted or participated in" any proceeding under the Act. 42 U.S.C. § 2000e-3(a). The ADEA makes it unlawful for an employer to retaliate against an employee for opposing the employer's

discriminatory practices or participating in any investigation or proceeding under the ADEA. 9 U.S.C. § 623(d).

The trial court granted summary judgment with respect to the retaliation claims believing that temporal proximity did not exist between Cartee-Haring's protected activity and CBSD's refusal to re-hire her. But that is not so.

The temporal proximity between the protected activity and adverse employment action can be "unusually suggestive" evidence of causation. *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000). But, this is not the only means available to the plaintiff, as causation is "gleaned from the record as a whole." *Farrell*, 206 F.3d at 281.

Here, Cartee-Haring opposed conduct that she reasonably believed to violate Title VII and the ADEA. She filed a Charge of Discrimination and a lawsuit averring those violations. (*Id.* Answer ¶ 41). Therefore, she engaged in protected activity under those statutes.

At the time she was applying for the head coaching job in the Fall of 2021, her lawsuit against CBSD – in which she asserted violations of Title VII and the ADEA -- was in full swing and was being fiercely defended by the District. When the head coach position was first posted in September 2021, Cartee-Haring was the only applicant. (*Id.* Answer to ¶ 44). When the posting closed on October 22,

2021, Cartee-Haring was still the only applicant. (*Id.*). In 2019, when Nicole Fisher responded to the posting for the position as the only applicant, the District did not re-post the position but hired her. (*Id.* Answer ¶¶ 37, 57). Not so with Cartee-Haring. When Cartee-Haring was the only applicant in the Fall of 2021, the District re-posted the position since CB West Principal Donovan and then Superintendent Lucabaugh had already determined that they did not want to hire Cartee-Haring back as head coach. (*Id.* Answer ¶ 57). Under these circumstances, Cartee-Haring has met her burden of adducing evidence from which a factfinder could conclude that the evidence sufficiently raised the inference that Cartee-Haring's protected activity was the likely reason she was not rehired as head Lacrosse coach.

Accordingly, the District's summary judgment motion with respect to Cartee-Haring's retaliation claim should be denied.

## VI. <u>CONCLUSION</u>

Plaintiff-Teachers seek the following relief:

(1) an order directing the trial court to recertify the collective action and conduct a new trial on liability and damages, unless this Court agrees that the Plaintiff-Teachers are entitled to judgment as a matter of law based on the first trial, in which case the trial court should be directed to conduct a trial as to damages in the collective action;

(2) an order directing the trial court to enter judgment as a matter of law in favor of Plaintiff-Teachers' on their EPA claims based on the first trial in with respect to liability and to conduct a trial on damages in the collective action;

(3) an order directing the trial court to amend the judgment entered after the second trial to reflect that Cartee-Haring is awarded **$2,371,708** in backpay, prejudgment interest, liquidated damages and for negative tax consequences and that Marinello is awarded **$2,076,267** in backpay, prejudgment interest and liquidated damages;

(4) an order directing the trial court to enter an order requiring CBSD to compensate Marinello at the same teacher's salary rate as John Donnelly going forward;

(5) an order awarding Plaintiffs their attorney's fees of $2,756,662.50 as well as an addition $90,000 in costs;

(6) an order reversing the trial court's grant of summary judgment on Cartee-Haring's sex and age discrimination and retaliation claims and remanding those claims to the district court for trial.

Respectfully submitted,

/s/ Edward S. Mazurek
Edward S. Mazurek (PA I.D. No. 50278)
25201 Cornerstone Drive
Yardley, PA 19067
267.243.3393
emazurek@mazureklawfirm.com

Attorney for Plaintiff-Teachers/
Appellees/Cross Appellants

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief complies with the word limit of Fed. R. App. P. 28(e)(1)(2) because it consists of fewer than 13,000 words excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this Brief complies with Fed. R. Civ. P. 32(a)(5) and 32(a)(6) in that it has been prepared in a proportionally spaced format using Microsoft Word in 14-point Times New Roman font.

January 29, 2026 /s/ Edward S. Mazurek

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

January 29, 2026 /s/ Edward S. Mazurek

## CERTIFICATE OF SERVICE

I certify that I transmitted this Brief to be filed with the Court using the Electronic Case Filing ("ECF") system for filing and Notice of Electronic Filing to counsel for the Appellant/Cross Appellee at the following email addresses in accordance with Fed. R. App. P. 25(a)(2)(D) and LAR 25.1

Michael Levin mlevin@levinlegalgroup.com

David Brown dbrown@levinlegalgroup.com

January 29, 2026 /s/ Edward S. Mazurek

## **CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF**

I certify, pursuant to LAR 31.1(c), that this Brief has been filed with the Court in electronic form and will be filed in paper form and that the text of the electronic form is identical to the text in the paper copies.

January 29, 2026 /s/ Edward S. Mazurek

## **CERTIFICATE OF VIRUS CHECK**

I certify that the electronic version of this Brief is free from any computer virus according to the NordVPN monitoring program.

January 29, 2026 /s/ Edward S. Mazurek

# ADDENDUM 1

# EXHIBIT A

# BUNIN ASSOCIATES

**Forensic Economic Consultants**

**ROYAL A. BUNIN, MBA**

**DAVID T. BUNIN, FSA (1926-2021)**

**THE WYNNEWOOD HOUSE, SUITE 109**
**300 EAST LANCASTER AVENUE**
**WYNNEWOOD, PA 19096**

**PHONE: (610) 642-4700**
**FAX: (610) 642-4787**
**BuninAssociates.com**
**BuninAssoc@gmail.com**

June 3, 2025

*sent via email*

Edward S. Mazurek, Esq.
**The Mazurek Law Firm, LLC**
25201 Cornerstone Drive
Yardley, PA 19067

**Re: Rebecca Cartee-Haring v. CBSD; EDPA Civil Action NO. 20-1995**
**and**
**Dawn Marinello v. CBSD; EDPA Civil Action NO. 21-2587**

Dear Mr. Mazurek:

This is my economic analysis on the above-captioned matter. Pursuant to your request, I have calculated the pre-judgment interest on the damages listed on the Jury Verdict Slip for each of the two named Plaintiffs' above, in addition to the pre-judgement interest presented on Plaintiffs' Exhibit number 14 and number 15, plus the negative tax consequence of receiving liquidated damages equivalent to two time the Verdict Slip/Plaintiffs' Exhibit plus pre-judgment interest. All opinions expressed in this report are held to a reasonable degree of economic certainty. Upon receiving any additional information, I will amend my analysis accordingly.

With respect to the calculation of pre-judgement interest, it is my understanding, for Civil Action matters being heard in federal court (i.e., in the United States District Court), the prevailing State pre-judgement interest rate is to be used. Accordingly, for matters in which pre-judgement interest is to be added to the actual lost earnings pursuant to a contract or agreement [including the Agreement Between the Central Bucks School District and the Central Bucks Education Association, PSEA-NEA], in the Commonwealth of Pennsylvania, pre-judgement interest is calculated based upon a 6% compound interest rate from the date of damages.

In this regard, the annual damages listed on the Verdict Slip and on Plaintiffs' Exhibits were converted to equivalent monthly payments to which pre-judgment interest was added. The cumulative sum at the end of each school year (occurring in June of the year based upon a 10-month payment schedule) was increased for the number of years through the current month, adding interest compounding at 6% per annum.

The spreadsheets attached to this report reflects the calculation of the pre-judgement interest on the damages listed on the Verdict Slip and Plaintiffs' Exhibits. Also presented on the attached spreadsheets is a figure representing the negative tax consequence of receiving liquidated damages in a single lump-sum payment. The calculation of the negative tax consequence is based upon returning Plaintiffs to the position they would have been in, absent the reduction of their lump-sum payment due to the tax consequence upon constructive receipt of these damages. In other words, to make Plaintiffs whole, additional taxable damages must be given to them so that the net result is to be placed in the same monetary position they would have been in absent the need to pay taxes on their award.

In order to calculate the above negative tax consequence, it will be assumed that the taxable event will occur for tax year 2025, and that each Plaintiff will file their tax returns as Married, Filing Separately, and making the Standard Deduction of $15,000 from their estimated 2025 salary. In calculating the estimated 2025 salary for each Plaintiff, reference made to Salary Schedules contained in the 2022-2028 CBSD Teachers' Agreement, and the following salaries:

Rebecca Cartee-Haring:

2024-2025 Master's Degree, Step 16 .... $112,864
2025-2026 Master's Degree, Step 16 .... $114,557

Calendar Year 2025 .......... $113,711

Dawn Marinello:

2024-2025 Master's Degree, Step 8 .... $76,391
2025-2026 Master's Degree, Step 9 .... $81,414

Calendar Year 2025 ......... $78,903

Edward S. Mazurek, Esq.
Cartee-Haring & Marinello v. CBSD - Page 3
June 3, 2025

As noted on the attached spreadsheets, the total amount of Liquidated Damages [2 times (listed damages plus pre-judgment)] plus the amount for the negative tax consequence, would be as follows:

Rebecca Cartee-Haring:

| | Jury Verdict Slip | Plaintiff's Exhibit #14 |
|---|---|---|
| Liquidated Damages ........... | $227,586 | $1,512,240 |
| Negative Tax Consequence ..... | 103,280 | 859,468 |
| Total Damages ........... | $330,866 | $2,371,708 |

Dawn Marinello:

| | Jury Verdict Slip | Plaintiff's Exhibit #15 |
|---|---|---|
| Liquidated Damages ........... | $211,928 | $1,331,346 |
| Negative Tax Consequence ..... | 82,876 | 744,921 |
| Total Damages ........... | $294,804 | $2,076,267 |

Please let me know if you have any questions.

Sincerely,

Bunin Associates

*Royal A. Bunin*

Royal A. Bunin, M.B.A.

RAB/dell

PRE-JUDGMENT INTEREST & NEGATIVE TAX CONSEQUENCES
FOR REBECCA CARTEE-HARING
PART I: FROM VERDICT SLIP:

Edward S. Mazurek, Esq.
Report Date: Jnue 3, 2025

| Period: School Year | | Verdict Slip Amount Per School Year | Equivalent Monthly Amount 10-Month Year | Annual Total: 6% Compound Interest - End of School Year | Years to Now | Annual Total: 6% Compound Interest Through Today |
|---|---|---|---|---|---|---|
| 2017 | 2018 | $16,000 | $1,600 | $16,364.84 | 8 | $26,083 |
| 2018 | 2019 | $12,000 | $1,200 | $12,273.63 | 7 | $18,455 |
| 2019 | 2020 | $10,000 | $1,000 | $10,228.03 | 6 | $14,509 |
| 2020 | 2021 | $6,000 | $600 | $6,136.82 | 5 | $8,212 |
| 2021 | 2022 | $20,000 | $2,000 | $20,456.05 | 4 | $25,825 |
| 2022 | 2023 | $17,000 | $1,700 | $17,387.64 | 3 | $20,709 |
| 2023 | 2024 | $0 | $0 | $0 | 2 | $0 |
| 2024 | 2025 | $0 | $0 | $0 | 1 | $0 |

**Total Verdict: $81,000**

**Verdict + Pre-Judgment Interest: $113,793**

**Liquidated Damages = 2x: $227,586**

**Negative Tax Consequence: $103,280**

**TOTAL VERTIDT PLUS PRE-JUDGEMENT INTEREST AND NEGATIVE TAX CONSEQUENCE: $330,866**

PRE-JUDGMENT INTEREST & NEGATIVE TAX CONSEQUENCES
FOR REBECCA CARTEE-HARING
PART II: FROM PLAINTIFFS' EXHIBIT #14

Edward S. Mazurek, Esq.
Report Date: Jnue 3, 2025

| Period | | Plaintiffs' Exhibit Amount Per School Year | Equivalent Monthly Amount 10-Month Year | Annual Total: 6% Compound Interest - End of School Year | Years to Now | Annual Total: 6% Compound Interest Through Today |
|---|---|---|---|---|---|---|
| 2007 | 2008 | $13,100 | $1,310 | $13,399 | 18 | $38,244 |
| 2008 | 2009 | $10,650 | $1,065 | $10,893 | 17 | $29,332 |
| 2009 | 2010 | $10,750 | $1,075 | $10,995 | 16 | $27,931 |
| 2010 | 2011 | $39,100 | $3,910 | $39,992 | 15 | $95,842 |
| 2011 | 2012 | $37,226 | $3,723 | $38,075 | 14 | $86,084 |
| 2012 | 2013 | $34,542 | $3,454 | $35,330 | 13 | $75,356 |
| 2013 | 2014 | $34,542 | $3,454 | $35,330 | 12 | $71,090 |
| 2014 | 2015 | $29,889 | $2,989 | $30,571 | 11 | $58,032 |
| 2015 | 2016 | $26,051 | $2,605 | $26,645 | 10 | $47,717 |
| 2016 | 2017 | $24,194 | $2,419 | $24,746 | 9 | $41,807 |
| 2017 | 2018 | $24,194 | $2,419 | $24,746 | 8 | $39,441 |
| 2018 | 2019 | $19,070 | $1,907 | $19,505 | 7 | $29,328 |
| 2019 | 2020 | $15,972 | $1,597 | $16,336 | 6 | $23,173 |
| 2020 | 2021 | $14,034 | $1,403 | $14,354 | 5 | $19,209 |
| 2021 | 2022 | $27,874 | $2,787 | $28,510 | 4 | $35,993 |
| 2022 | 2023 | $24,090 | $2,409 | $24,639 | 3 | $29,346 |
| 2023 | 2024 | $7,130 | $713 | $7,293 | 2 | $8,194 |
| 2024 | 2025 | $0 | $0 | $0 | 1 | $0 |

**Total Exhibit:** **$392,408**

**Exhibit + Pre-Judgment Interest** **$756,120**

**Liquidated Damages = 2x:** **$1,512,240**

**Negative Tax Consequence:** **$859,468**

**TOTAL EXHIBIT PLUS PRE-JUDGEMENT INTEREST AND NEGATIVE TAX CONSEQUENCE:** **$2,371,708**

PRE-JUDGMENT INTEREST & NEGATIVE TAX CONSEQUENCES
FOR DAWN MARINELLO
PART I: FROM VERDICT SLIP:

Edward S. Mazurek, Esq.
Report Date: Jnue 3, 2025

| Period: School Year | | Verdict Slip Amount Per School Year | Equivalent Monthly Amount 10-Month Year | Annual Total: 6% Compound Interest - End of School Year | Years to Now | Annual Total: 6% Compound Interest Through Today |
|---|---|---|---|---|---|---|
| 2017 | 2018 | $0 | $0 | $0 | 8 | $0 |
| 2018 | 2019 | $8,000 | $800 | $8,182 | 7 | $12,303 |
| 2019 | 2020 | $9,000 | $900 | $9,205 | 6 | $13,058 |
| 2020 | 2021 | $9,000 | $900 | $9,205 | 5 | $12,319 |
| 2021 | 2022 | $12,000 | $1,200 | $12,274 | 4 | $15,495 |
| 2022 | 2023 | $14,000 | $1,400 | $14,319 | 3 | $17,054 |
| 2023 | 2024 | $16,000 | $1,600 | $16,365 | 2 | $18,388 |
| 2024 | 2025 | $16,000 | $1,600 | $16,365 | 1 | $17,347 |

**Total Verdict: $84,000**

**Verdict + Pre-Judgment Interest: $105,964**

**Liquidated Damages = 2x: $211,928**

**Negative Tax Consequence: $82,876**

**TOTAL VERTIDT PLUS PRE-JUDGEMENT INTEREST AND NEGATIVE TAX CONSEQUENCE: $294,804**

PRE-JUDGMENT INTEREST & NEGATIVE TAX CONSEQUENCES
FOR DAWN MARINELLO
PART II: FROM PLAINTIFFS' EXHIBIT #15

Edward S. Mazurek, Esq.
Report Date: Jnue 3, 2025

| Period | | Plaintiffs' Exhibit Amount Per School Year | Equivalent Monthly Amount 10-Month Year | Annual Total: 6% Compound Interest - End of School Year | Years to Now | Annual Total: 6% Compound Interest Through Today |
|---|---|---|---|---|---|---|
| 2016 | 2017 | $53,573 | $5,357 | $54,795 | 9 | $92,575 |
| 2017 | 2018 | $55,554 | $5,555 | $56,821 | 8 | $90,564 |
| 2018 | 2019 | $52,760 | $5,276 | $53,963 | 7 | $81,141 |
| 2019 | 2020 | $51,386 | $5,139 | $52,558 | 6 | $74,554 |
| 2020 | 2021 | $50,212 | $5,021 | $51,357 | 5 | $68,727 |
| 2021 | 2022 | $63,952 | $6,395 | $65,410 | 4 | $82,579 |
| 2022 | 2023 | $61,170 | $6,117 | $62,565 | 3 | $74,516 |
| 2023 | 2024 | $46,657 | $4,666 | $47,721 | 2 | $53,619 |
| 2024 | 2025 | $43,719 | $4,372 | $44,716 | 1 | $47,399 |

**Total Exhibit: $478,983**

**Exhibit + Pre-Judgment Interest $665,673**

**Liquidated Damages = 2x: $1,331,346**

**Negative Tax Consequence: $744,921**

**TOTAL EXHIBIT PLUS PRE-JUDGEMENT INTEREST AND NEGATIVE TAX CONSEQUENCE: $2,076,267**

**ROYAL A. BUNIN, MBA**
Forensic Economist

Office:
BUNIN ASSOCIATES
The Wynnewood House, Suite 109
300 East Lancaster Avenue
Wynnewood, PA 19096
(610) 642-4700

## EDUCATION:

Masters Plus 36

Continuing Education, Temple University, 1991-2012
Economics and Mathematics (30 Credit Hours)

Continuing Education, Saint Joseph's University, 1993
Education (6 Credit Hours)

Master of Business Administration, MBA, 1990, Temple University.

Bachelor of Business Administration, BBA, Cum Laude, 1988, Temple University.
Major: Economics; Minor Concentration: Mathematics and Statistics.

## CURRENT EMPLOYMENT:

### CONSULTING:

BUNIN ASSOCIATES: May 1, 1983 to the present.
Single Member LLC since January 1, 2022
General Partner: January 1, 1997 – December 31, 2021
Forensic economic consulting practice, providing services for the legal profession:

1) Initial analysis, subsequent research and development, and final preparation of written reports detailing past, current and projected economic losses.

2) Expert testimony on economic damages and expertise opinion regarding future projected losses.

3) Typical areas of concentration:

| | |
|---|---|
| Earning Capacity | Household Services |
| Fringe Benefits | Future Medical Costs |
| Retirement Benefits | Lost Profits |

**PREVIOUS EMPLOYMENT:**

**TEACHING:**

TEMPLE UNIVERSITY:
College of Liberal Arts, Department of Economics.
Adjunct Instructor. Fall, 1999 through the Fall of 2010
Courses: Introduction to Microeconomics, 3 Credit Hours.
Introduction to Macroeconomics, 3 Credit Hours.
Global Economic Issues, 3 Credit Hours.

ROWAN UNIVERSITY:
College of Liberal Arts and Sciences, Department of Economics.
Adjunct Instructor. Fall, 2000
Course: Introduction to Microeconomics, 3 Credit Hours.

**PROFESSIONAL PRESENTATIONS:**

Speaker at the *"Effective Depositions of Financial and Economic Experts"* CLE Seminar,
Presented by the Pennsylvania Bar Institute, Philadelphia, Spring 2014 (4/23/14)

Speaker at the *"Panel Discussion – Economic Damages"* CLE Seminar,
Presented by the New Jersey Association for Justice, AC Boardwalk, Spring 2013 (4/19/13)

Speaker at the *"Advanced Issues in Medical Malpractice"* CLE Seminar,
Presented by the Pennsylvania Association for Justice, Philadelphia, Summer 2010

Speaker at the *"Economic Damages Round Table"* CLE Seminar,
Presented by the New Jersey Association for Justice, AC Boardwalk, Spring, 2004

Speaker at the *"Damages in a Wrongful Death Case"* CLE Seminar,
Presented by the Camden County Bar Association, Camden, Fall 1998

**ARTICLES:**

"How to Understand the Numbers - Hire a Forensic Economist,"
New Jersey Law Journal - 2014 & 2015 HOW-TO-GUIDE, August 2014 & August 2015

"How to Approximate,"
New Jersey Law Journal – 2013 HOW-TO-GUIDE, August 2013

**PROFESSIONAL SOCIETIES:**

1) American Economic Association
2) National Association of Forensic Economics
3) American Academy of Economic and Financial Experts
4) Temple University, School of Business and Management, Alumni Association

**COURT TESTIMONY:**

Economic and actuarial testimony presented in the following jurisdictions:

1) Commonwealth of Pennsylvania Court System:
(A) Pennsylvania Commonwealth Court, (Legislative Court).
(B) Court of Common Pleas:

Adams County
Allegheny County
Armstrong County
Berks County
Blair County
Bucks County
Cambria County
Carbon County
Clinton County
Chester County
Columbia County
Cumberland County
Dauphin County
Delaware County
Fayette County
Franklin County
Lackawanna County
Lancaster County
Lehigh County
Luzerne County
Lycoming County
Mifflin County
Monroe County
Montgomery County
Montour County
Northampton County
Northumberland County
Philadelphia County
Schuylkill County
Washington County
Wayne County
Wyoming County
York County

2) U.S. District Court:
Pennsylvania: Harrisburg, Philadelphia, Scranton, Williamsport
Delaware: Wilmington
Massachusetts: Boston
New Jersey: Camden, Newark, Trenton
New York: New York City

3) U.S. Bankruptcy Court: Wilkes-Barre, Pennsylvania

4) New Jersey State Superior Court:

Atlantic County
Bergen County
Burlington County
Camden County
Cape May County
Cumberland County
Essex County
Gloucester County
Hudson County
Hunterdon County
Mercer County
Middlesex County
Monmouth County
Morris County
Ocean County
Passaic County
Salem County
Somerset County
Union County

5) Delaware State Superior Court:
New Castle County

6) Maryland State Court:
Anne Arundel County
Cecil County

7) Commonwealth of Massachusetts Superior Court:
Suffolk County

8) New York State Supreme Court:

Bronx County
Kings County
Livingston County
Monroe County
Nassau County
New York County
Ontario County
Orange County
Queens County
Westchester County

Arbitrations and depositions in Pennsylvania, Maryland, New Jersey and New York

Chronological list of cases in which Royal A. Bunin, MBA, has rendered expert testimony at trial or by deposition from January 1, 2021 through the current date.

| **DATE** | **ATTORNEY** | **CASE** | **COURT/DEPOSITION** | **JUDGE** |
|---|---|---|---|---|
| 02/05/21 | Arreola | Puggi | Dep Zoom W-wd | |
| 02/09/21 | Sacchetta, M | Capelli | Dep Zoom W-wd | |
| 02/22/21 | Bracken | Baker | Dep Zoom W-wd | |
| 03/03/21 | Begley | Agresti | Dep Zoom W-wd | |
| 03/17/21 | Rosenthal | Hruska | Dep Zoom W-wd | |
| 03/23/21 | Placitella | Bramble | Dep Zoom W-wd | |
| 04/01/21 | Davis | Church | Zoom Taped - PCCP | |
| 04/14/21 | Baldino | Ward | Chester Co, PA | Griffith |
| 04/22/21 | Sacchetta | Oliva | Luzerne Co, PA | Gelb |
| 06/01/21 | Mintzer | Johnson | Chester Co, PA | Tunnell |
| 06/15/21 | Hessel | Murphy | PCCP | Allen |
| 06/23/21 | Dodig | Rosner | PCCP | Crumlish |
| 07/07/21 | Goodman | Dossantos | Dep Zoom W-wd | |
| 07/12/21 | Furber | Rice | Dep Π's Office | |
| 07/21/21 | Kobin | Publia | Dep Zoom W-wd | |
| 07/28/21 | Lentz | DaSilva | PCCP | Erdos |
| 08/09/21 | Murray | Coryell | PCCP | Foglietta |
| 09/10/21 | Rosen | Mader | Allegheny Co, PA | Hertzberg |
| 09/15/21 | McNamara | Cox | Cape May Co, NJ | Pickering |
| 09/22/21 | Sherry | Stevens | Zoom Taped - PITT | Ignelzi |
| 09/29/21 | Armenti | Varquez | Chester Co, PA | Mahon |
| 10/28/21 | O'Brien | Jones | Dep Zoom W-wd | |
| 11/01/21 | Star | Darby | Dep Zoom W-wd | |
| 12/09/21 | Galex | Long | Dep Zoom W-wd | |
| 01/25/22 | Frost | Moriarty | EDPA, PP | Baylson |
| 02/16/22 | Costello | Roseus | Zoom Taped, Union Co, NJ | |
| 02/22/22 | Gingreich | Bloom | Zoom Live, Centre Co, PA | Marshall |
| 02/23/22 | Olson | Gharbi | Zoom Live, MDPA, Scranton | Mariani |
| 02/25/22 | Granato | Peacher | Dep Zoom W-wd | |
| 03/10/22 | Myers | Brown | PCCP | Cunningham |
| 03/22/22 | Sacchetta | Lomonaco | Delaware Co, PA | Whelan |
| 04/19/22 | Gelinas | Fahley | PCCP | Erdos |
| 05/02/22 | Dorsey | Drolet | Dep CRF | |
| 05/23/22 | Harel | Dulaney | PCCP | Allen |
| 06/03/22 | Hildebrand | Shepphard | Trial Video Dep | |
| 06/07/22 | Roberts | Merrill | Dep Zoom Taped W-wd | |
| 06/15/22 | Caputo | Bowser | Armstrong Co, PA | Panchik |
| 07/06/22 | DeVoto | Broxton | Dep Zoom W-wd | |
| 07/09/22 | Bearden | Miller | Dep Zoom W-wd | |
| 07/14/22 | Sacchetta | Ortiz | Dep Zoom W-d | |
| 07/21/22 | Sachs | Grewal | Dauphin Co, PA | Dowling |
| 07/22/22 | Faunes | Selvaggio | PCCP | Kennedy |
| 08/05/22 | Cagney | Sandel | Dep Zoom W-wd | |
| 09/15/22 | Cagney | Garzon | Dep Zoom W-wd | |
| 09/16/22 | Swain | Swartz | Dep Zoom W-wd | |
| 10/06/22 | Moore | Miller | Westchester Co, NY | Giacomo |
| 10/07/22 | Ronnebaum | Outlaw | Dep Zoom W-wd | |

| DATE | ATTORNEY | CASE | COURT | JUDGE |
|---|---|---|---|---|
| 10/13/22 | Sacchetta | Brill | West Chester Co, PA | Mahon |
| 10/28/22 | Slachetka | Rivera | Dep Zoom W-wd | |
| 11/10/22 | Schwartz | Brown | PCCP | Butchart |
| 12/13/22 | Piazza | Requena | Monroe Co, PA | Williamson |
| 02/02/23 | Rassias | Maragos | PCCP | Cunningham |
| 03/10/23 | Pomerantz | Palandro | Dep Zoom Taped W-wd | |
| 03/10/23 | Privitera | Wiseley | Dep Zoom Taped W-wd | |
| 03/16/23 | Vezina | Grant | Dauphin Co, PA | McNaully |
| 05/09/23 | Cohan | Rice | Dep Zoom W-wd | |
| 05/15/23 | Rassias | Deswert | PCCP | Foglietta |
| 06/05/23 | Haroutounian | Sutherland | Zoom Taped - PITT | Connelly |
| 06/08/23 | Liacouras | Clark | West Chester Co, PA | Mahon |
| 06/09/23 | Mark | Abrams | Dep Zoom W-wd | |
| 07/19/23 | Trubman | Moroney | Dep def atty ofc PP | |
| 07/27/23 | Galex | Hendrickson | Dep Zoom W-wd | |
| 08/21/23 | Golkow | Hawkins | Zoom Taped - PCCP | |
| 08/22/23 | Rosenthal | Phillips | Zoom Taped - PCCP | |
| 08/23/23 | Mann | Bartola | Dep Zoom Taped W-wd | |
| 08/24/23 | Trunk | Braggs | Dep Zoom Taped W-wd | |
| 09/11/23 | Sherry | Wherry | PCCP | Foglietta |
| 09/12/23 | Renzi | Hensley | Dep Zoom W-wd | |
| 09/27/23 | Stampone | Ferguson | Delaware Co, PA | Angelos |
| 10/09/23 | Chopko | Gilliam | Dep Zoom W-wd | |
| 10/20/23 | Fischman | Estevez | Dep Zoom W-wd | |
| 10/25/23 | Sherry | Amagasu | PCCP | Thomas-Street |
| 11/02/23 | Sherry | Bouras | Delaware Co, PA | Dozor |
| 11/03/23 | Lommuro | Baldwin | Dep Zoom W-wd | |
| 11/10/23 | Reuter | Wroniuk | Dep Zoom W-wd | |
| 11/16/23 | Schoenhaus | Turner | PCCP | Cunningham |
| 12/01/23 | Vezina | Ved | Lehigh Co, PA | Capehart |
| 12/14/23 | Marino | White | PCCP | Foglietta |
| 01/05/24 | Norman | Henson | Dep Zoom W-wd | |
| 02/06/24 | German | Leon | Camden Co, NJ | Pugliese |
| 02/06/24 | McGeady | Glassman | Dep Zoom W-wd | |
| 02/27/24 | Kirby | Baltzar | Dep Zoom W-wd | |
| 03/04/24 | DeCaro | Esposito | Lehigh Co, PA | Johnson |
| 03/07/24 | DiSandro | Frye | Adams Co, PA | Campbell |
| 04/03/24 | Rosenthal | Scott | PCCP | Butchart |
| 04/04/24 | Grossbart | Kalaigis | Dep Zoom W-wd | |
| 04/26/24 | Rector | Riad | Dep Δ’s Office | |
| 05/14/24 | Sternlieb | Engallena | Middlesex Co, NJ | Rivas |
| 06/04/24 | Schiappa | Hendrickson | Trial Video Dep | |
| 06/11/24 | Colliver | Dixon | Dep Zoom W-wd | |
| 06/24/24 | Chopko | Policastro | Dep Zoom W-wd | |
| 07/03/24 | Swain | Swartz | Atlantic Co, NJ | Paolone |
| 07/11/24 | Starr | Marter | Dep Zoom W-wd | |
| 07/26/24 | Thompson | Newsome | Dep Zoom W-wd | |
| 07/30/24 | Granato | Cardoso | Trial Video Dep | |
| 08/12/24 | Sico | Love | Dep Zoom W-wd | |
| 08/13/24 | Granato | Peacher | Trial Video Dep | |

| DATE | ATTORNEY | CASE | COURT | JUDGE |
|---|---|---|---|---|
| 09/19/24 | Finn | Marino | Dep Zoom W-wd | |
| 09/26/24 | Staurakis | Scott | Trial Video Dep | |
| 10/09/24 | Winebrake | Pepke | Zoom Live WDPA Pittsburgh | Ranjan |
| 10/28/24 | Bradica | Essington | Trial Video Dep | |
| 10/31/24 | Marino | DiBlase | Trial Video Dep | |
| 11/18/24 | Archinaco | Valier Coal | Trial Video Dep | |
| 11/25/24 | Lomurro | Mohamadi | Dep Zoom W-wd | |
| 11/26/24 | Tumolo | Kelly | Dep Zoom W-wd | |
| 11/26/24 | Alvino | Savill | Dep Zoom W-wd | |
| 12/02/24 | Assaad | Boncher | Dep Zoom W-wd | |
| 01/03/25 | Stern | Robinson | Dep Zoom W-wd | |
| 02/11/25 | Costello | Boyle | Dep Zoom W-wd | |
| 02/25/25 | Cohan | Ford | Delaware Co, PA | Scanlon |
| 04/16/25 | Lentz | Phillips | Lehigh Co, PA | Capehart |
| 04/30/25 | Murphy | Lavender | Montgomery Co, PA | Carluccio |

Abbreviation Definitions:
PCCP = Philadelphia Court of Common Pleas
PP = Philadelphia PA
PITT = Allegheny Co, PA
Dep = Deposition
Arb = Arbitration
CH = Cherry Hill NJ
W-wd = Wynnewood, Office or Home
Dep Δ's Office = Deposition held at Defense Attorney's Office
Dep Π's Office = Deposition held at Plaintiff Attorney's Office
Dep CRF = Deposition held at a Court Reporting Facility
Dep Zoom W-wd = Deposition via Zoom format
Dep Zoom Taped W-wd = Video Taped Deposition via Zoom format
Trial Video Dep = in person *de benne esse*
Zoom Taped = Live Stream Taped *de benne esse* deposition
Zoom Live = Live Stream Trial Testimony from Wynnewood
EDPA = U.S. District Court, Eastern District of PA
MDPA = U.S. District Court, Middle District of PA
WDPA = U.S. District Court, Western District of PA
SDNY = U.S. District Court, Southern District of NY

# ADDENDUM 2

# EXHIBIT L

**DECLARATION OF MAURICE R. MITTS, ESQUIRE**

I, Maurice R. Mitts, make this declaration under penalty of perjury.

1. I am over 18 years of age and have been a licensed attorney since 1987.

2. I am admitted to practice law in the Commonwealth of Pennsylvania, the State of New Jersey, and the District of Columbia. I am also admitted to practice before the following Federal Courts:

   a. United States Supreme Court – June 10, 1991
   b. United States Court of Appeals for the Federal Circuit – September 15, 1988
   c. United States Court of Appeals for the District of Columbia Circuit – August 24, 1988
   d. United States Court of Appeals for the Third Circuit – December 8, 1987
   e. United States Court of Appeals for the Ninth Circuit – May 6, 2020
   f. United States Court of Appeals for the Eleventh Circuit – March 30, 2020
   g. United States Court of Federal Claims – September 15, 1988
   h. United States District Court for the Eastern District of Pennsylvania – December 18, 1987
   i. United States District Court for the Middle District of Pennsylvania – October 11, 1988
   j. United States District Court for the District of New Jersey – December 1, 1988
   k. United States District Court for the District of Columbia – October 3, 1988

2. I received my Bachelor's degree *cum laude* from Harvard University in 1982, my Master's degree from Harvard University in 1984, and my Juris Doctorate from the Washington College of Law, American University in 1987.

3. I am the Founder and Managing Member of Mitts Law, LLC, a boutique commercial litigation firm in Philadelphia.

4. While our offices are located in Philadelphia, my practice is national in scope. I have litigated cases not only in Philadelphia and the surrounding counties, but also in Alabama, California, Delaware, Florida, Illinois, Maryland, Massachusetts, Nevada, New Jesey, New York and Virginia.

5. For the past several years and currently, the market for legal services has not been limited to a specific city, state or even region. The market for legal services has become national in scope. Our firm competes with other firms across the country for clients in need of legal representation in litigation matters, and we have secured a number of national engagements.

6. Some of the representative matters in which I have represented, or am currently representing, clients include the following:

-- Obtained largest jury verdict in Bucks County, PA history of $26.6 Million on counterclaims asserted on behalf of a group of employee scientists who were sued by their former employer for $849 Million. The employer lost on all of its claims.

-- Obtained $4 Million verdict in legal malpractice and breach of contract action in Philadelphia County.

-- Representing WCO Spectrum in antitrust lawsuit in the U.S. District Court for the Central District of California against T-Mobile for T-Mobile's creation of barriers to competition, particularly in the purchase of Educational Broadband Service and Broadband Radio Service (BRS) spectrum licenses.

-- Representing Princeton Alternative Income Fund in a $238 million commercial financial fraud case against the Officers and Directors of Argon LLC, a subprime lender in Circuit Court of Cook County, Illinois.

-- Representing San Diego Padres Major League Baseball perennial All-Star, Fernando Tatis, Jr., against Big League Advantage for unlawful and usurious lending practices in San Diego County, California.

-- Obtained United States Supreme Court ruling in client's favor in *Genesis Healthcare Corporation v. Symczyk* that client's Rule 68 offer of judgment rendered collective action under the FLSA moot.

-- Obtained United States Supreme Court ruling in clients' favor in *Fifth Third Bancorp v. Dudenhoeffer* ruling that fiduciaries of Employee Stock Ownership Plans are not entitled to a presumption of prudence.

-- Obtained ruling in Eastern District of Pennsylvania upholding client's ability to press forward with class action claims alleging fraud, RICO and antitrust violations against Coventry First, one of the nation's leading life settlement providers.

-- Obtained successful ruling in U.S Court of Appeals for the Eleventh Circuit overturning Virgil Lee Brownlee's death penalty conviction.

-- Obtained $352 Million verdict in favor of one lender (Pioneer Commercial Funding against another financial institution First Union in the Court of Common Pleas of Philadelphia.

7. I have known Edward Mazurek professionally since 1988 when I was an associate at Saul, Ewing Remick & Saul.

8. Over the years, I have solicited Mr. Mazurek for his expertise on matters that my firm was handling and have referred matters to him. I did so because I know the depth of his legal knowledge and formidable litigation and trial skills.

9. Mr. Mazurek has asked me for my opinion on the legal fees he is seeking on behalf of his clients in the *Cartee-Haring v. Central Bucks School District* and *Marinello v. Central Bucks School District* cases. To that end, I have reviewed the complaints and docket entries in those cases.

10. I often handle complex, protracted and risky cases. In my opinion, *Cartee-Haring v. Central Bucks School District* and *Marinello v. Central Bucks School District* cases are complex, have been protracted litigations and presented very high degrees of risk and uncertainty. Because of the complexity and risks inherent in these lawsuits, Mitts Law would not have undertaken the representation of the plaintiffs on a contingency fee basis unless the contingency fee were very substantial and the solvency of the defendants assured. Additionally, we would not have borne the costs of the litigations out-of-pocket but would have required the plaintiffs to pay them as we incurred them – which is often an insurmountable impediment for a plaintiff to proceed with such litigation.

11. Mr. Mazurek has informed me that he entered into contracts with Ms. Cartee-Haring and Ms. Marinello in which he would not be entitled to any fee in connection with their Equal Pay Act claims unless he obtained a monetary recovery for them. This contractual contingency fee arrangement provides that Ms. Cartee-Haring and Ms. Marinello agreed to pay Mr. Mazurek an hourly rate of $2,625, *if and only if* he obtained a monetary recovery for them. He also informed me that although his engagement agreements with his clients provided that the clients would pay the costs of the litigations as they arose, he has paid most if not all of the costs – which exceed $200,000 out of his own pocket. He also informed me that, after 5 years of litigating *Cartee-Haring* and 4 years of litigating *Marinello,* a jury returned verdicts in favor of both plaintiffs on their Equal Pay Act claims.

12. In my professional opinion, a contingency hourly rate of $2,625 is reasonable under the circumstances in these particular cases in view of (a) the complexity of the Equal Pay Act claims; (b) the risk that the evidence might not ultimately establish the claims in the eyes of a jury and that, therefore, Mr. Mazurek would not be paid anything for the time he expended in these matters and would lose the $200,000+ he paid in costs; (c) the aggressiveness with which the team of lawyers representing the defendant in the cases litigated; (d) the substantial societal benefit at stake in seeking to vindicate women's right to equal pay for equal work; (e) the ongoing risk that the Third Circuit or Supreme Court could yet rule against the plaintiffs on appeal leaving Mr. Mazurek without any fee and at a personal loss of over $200,000; (f) Mr. Mazurek's legal experience, knowledge and skill; and (g) the fact that it took five (5) years for these cases to be worked up, tried and a successful jury verdict obtained.

13. Based on my knowledge and experience as a complex commercial litigator and as the head of a boutique litigation firm, it is my opinion based on a reasonable level of professional certainty that a contingency hourly rate of $2,625 for a lawyer of Ed Mazurek's experience and abilities is reasonable for these cases. I base this opinion on the complexity, work requirements, the protracted duration of these cases, the risks and uncertainties in litigations of this magnitude in the national legal market, including the greater Philadelphia area.

14. Mr. Mazurek has told me that he spent 1,204.3 hours litigating these cases over the last five (5) years. That comes to an average of 240 per year, which I believe to be exceptionally efficient. Obtaining two jury verdicts in these Equal Pay Act cases expending an average of 240 hours per year is an impressive

achievement – indeed many lawyers would have spent far more time litigating such cases. In my opinion, devoting 1,204.3 hours to these cases over 4-5 years and obtaining the favorable jury verdicts is eminently reasonable.

PURSANT TO 28 U.S.C. § 1746 (2), I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on July 14, 2025

Maurice R. Mitts

# EXHIBIT M

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

I, Sidney Gold, hereby make this Unsworn Declaration under Penalty of Perjury pursuant to 28 U.S.C. § 1746.

1. As a licensed attorney, I am the founder and principal shareholder of the Pennsylvania & New Jersey employment law firm of The Gold Law Firm, P.C. in Philadelphia, which has been recognized by the Martindale-Hubbell Bar Register as a preeminent law firm in the field of employment law and civil rights litigation.

2. For approximately forty (40) years, my practice has been primarily concentrated in the representation of both employees and employers in all aspects of employment related litigation in Pennsylvania and New Jersey, including claims under federal and state anti-discrimination laws and federal civil rights laws.

3. I have written extensively on issues of employment discrimination and have authored many articles for the Legal Intelligencer and Pennsylvania Law Weekly. I have also given presentations on employment law to the Philadelphia Bar Association and the Pennsylvania Bar Institute.

4. I serve as an arbitrator and mediator for the U.S. District Court for the Eastern District of Pennsylvania. I have also served as Vice Chair of the Eastern Pennsylvania Chapter of the National Employment Lawyers Association and as Co-Chair of the Labor and Employment Law Committee of the Philadelphia Bar Association for seven years. In addition, I am a member of the Professional Guidance Committee, the Federal Courts Committee of the Philadelphia Bar Association and the Labor and Employment Law Committee of the Pennsylvania Bar Association. I also serve on the Faculty and Planning Committee of the Pennsylvania Bar Institute Employment Law Institute.

5. I have been selected as a Pennsylvania "Super Lawyer" in the area of employment law each year since 2004. I was named to the Best Lawyers in America each consecutive year since 2009. I have earned the highest rating of preeminence in the field of employment law by the Martindale-Hubbell Bar Register. Martindale-Hubbell has additionally rated him as an "AV Rated" attorney for fifteen consecutive years – the highest possible peer review rating in Legal Ability and Ethical Standards.

6. I have been selected as a Fellow of the American Bar Foundation, an honorary organization of lawyers, judges, and legal scholars whose public and private careers have demonstrated outstanding dedication to the welfare of their communities and to the highest principles of the legal profession.

7. I am a founding member of the Third Circuit Court of Appeal Bar Association.

8. I am a 1975 graduate of Temple University School of Law. Before entering private practice, I served as an Assistant City Solicitor for the City of Philadelphia in its Major Trial Division. I have litigated complex cases before courts throughout the United States.

9. I havc known Edward Mazurek professionally for more than thirty (30) years.

10. Over those 3+ decades, I have directly litigated several employment discrimination cases against Mr. Mazurek and have spoken on topics involving employment litigation with him at various conferences and seminars. Additionally, I have discussed with him various legal issues pertaining to employment law and litigation numerous times over the years.

11. I have also interacted with dozens of other attorneys over the years in employment litigation matters and am familiar with rates charged by attorneys in employment law cases.

12. In the Philadelphia area and beyond, I know that Mr. Mazurek has an outstanding reputation as a litigator and attorney. Based on my professional interactions with him for over 30 years, it is my opinion that his outstanding reputation is justified and deserved.

13. I have reviewed the complaints in the *Cartee-Haring v. Central Bucks School District* and *Marinello v. Central Bucks School District* cases.

14. Each of those cases involve important civil rights under the Equal Pay Act.

15. While these cases involved important civil rights, their results were highly uncertain.

16. Because of the complexity, risks and uncertainties attendant with litigating these cases, and because of the substantial work that these cases would require, my law firm and I would not have undertaken the representation of the plaintiffs unless that plaintiffs were in a position to guarantee payment of our fees on an hourly basis as the matters proceeded, or alternatively, without a significant contingency fee arrangement.

17. I understand that the plaintiffs in the *Cartee-Haring* and *Marinello* lawsuits retained Mr. Mazurek to represent them under an agreement through which Mr. Mazurek's contingency fee would be three and a half times the hourly rate of $750 times the number of hours he expends on the matters if, and only if, Mr. Mazurek achieved a monetary recovery on the plaintiffs' behalf. My firm and I would not have undertaken these representations unless the contingency fees were substantially more than the contingency fee rates to which Mr. Mazurek and his clients agreed.

18. Based on my knowledge and experience as an employment law litigator for approximately 40 years, it is my opinion that an hourly rate of $750 for a lawyer of Mr. Mazurek's experience and abilities is not only reasonable, it is low.

19. Also based on my knowledge and experience as an employment law litigator for approximately 40 years, it is my opinion that a multiplier of 3.5 of an hourly rate of $750 is eminently reasonable in view of the complexity, work requirements, risks and uncertainties attendant to litigations of this magnitude.

20. Additionally, Mr. Mazurek sought to vindicate highly important civil rights in these cases.

21. As the United States Court of Appeals for the Ninth Circuit observed, "[a]lthough the [Equal Pay] Act has prohibited sex-based wage discrimination for more than fifty years, the financial exploitation of working women embodied by the gender pay gap continues to be an embarrassing reality of our economy." *Rizo v. Yovino*, 887 F.3d 453, 456 (9th Cir. 2018).

22. In obtaining jury verdicts for both Cartee-Haring and Marinello on their Equal Pay Act claims, Mr. Mazurek achieved a substantial societal benefit in better ensuring that employers will comply with their obligations under the Equal Pay Act.

23. In my professional opinion as a civil rights litigator, this societal benefit is heightened in these cases that are against a public school district that is vested with educating and molding its girl students. That a jury found that the Central Bucks School District discriminated against its teachers because they are women is a tremendous stain on the School District. That the jury and Court are holding the School District accountable for its serious violation of our civil rights laws vests confidence in the School District's girl students that they should not, and cannot, be subjected to gender discrimination by anyone when they enter the workforce, even by someone like the School District that patronizingly holds itself out as looking after their interests.

24. I understand that Mr. Mazurek has stated that he spent 1,204.3 hours litigating these cases for over five (5) years. While I understand that in any litigation, there will be ebbs and flows of the time devoted to it throughout its course, 1,204.3 hours over five years is an average of only 240 hours per year.

25. In my professional opinion, the number of hours that Mr. Mazurek spent on these cases reflects a high level of efficiency and ability on Mr. Mazurek's part and is very reasonable.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on July 9, 2025

Sidney L Gold

Sidney Gold

# EXHIBIT O

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**
**<u>OF JEREMY HEISLER</u>**

I, Jeremy Heisler, make this declaration under penalty of perjury.

1. I have been a licensed attorney since 1980 and remain a member in good standing of the Bars of New York State, the United States Supreme Court, and the United States Court of Appeals for the Second Circuit.

2. I am a Co-Founder and Co-Vice Chairman at Sanford Heisler Sharp McKnight, LLP, a national public interest law firm. Our firm has offices in New York, New York, Washington, D.C. San Francisco, CA, Palo Alto, CA, San Diego, CA, and Nashville, TN.

3. Although our offices are in New York, Washington D.C., California and Tennessee, our representation of clients extends beyond those locations to numerous jurisdictions across the United States.

4. I have represented clients on an individual basis, in class actions, and in collective actions under the Fair Labor Standards Act. My practice focuses on gender discrimination, wage and hour litigation, sexual harassment, civil rights, women's rights, and consumer fraud.

5. Most recently, I have been recognized in the legal community as a Labor and Employment Star by Benchmark Litigation and Employment (2018-2020), a New York Metro Super Lawyer (2020-2023), and a Lawdragon 500 Plaintiff Employment Lawyer (2019-2023).

6. Some of my representations have included, but are by no means limited to, the following:

- In a landmark overtime pay case on behalf of Novartis Pharmaceutical sales representatives, spearheaded the litigation, wrote the appellate briefs and argued the appeal that achieved a victory in the United States Court of Appeals for the Second Circuit. Because of these efforts, the sales representatives received a $99 million class-wide settlement, the largest wage and hour settlement in 2012, and one of the largest in history
- Obtaining a $250 million jury verdict—the largest gender discrimination award in U.S. history—for a class of female sales representatives in *Velez v. Novartis* who alleged that their employer engaged in gender discrimination
- Recovering a $28 million settlement for a class of First-Level Managers wrongfully denied overtime pay by AT&T
- Achieving a $10 million settlement and structural changes and improvements for a class of residents living in the Gateway Plaza housing complex after they alleged that the owner, the LeFrak Organization, failed to adequately maintain heat in the winter and refused to supply air conditioning in the summer
- Attaining an $11 million settlement on behalf of thousands of New Jersey consumers who accused Energy Plus Holdings LLC and Energy Plus Natural Gas LP of perpetrating an illegal bait-and-switch scheme by overcharging members of the class for energy costs

- Achieving a breakthrough ruling extending the statute of limitations for discrimination claims and expanding the right to a jury trial for employment discrimination plaintiffs under the New York State Human Rights Law in *Murphy v. Am. Home Products Corp.*, 136 A.D.2d 229 (1st Dept. 1988). This case has been cited numerous times by New York State courts, as well as federal courts throughout the country.
- Securing an appellate victory for a victim of police brutality committed by an off-duty New York city police officer in Graham v. City of New York
- Accomplishing a major class action ruling in *Naposki v. First National Bank* of limiting the ability of defendants to "buy off" class representatives and prematurely terminate the class action lawsuits

7. I received my law degree *magna cum laude* from Brooklyn Law School and my undergraduate degree from Brooklyn College. While at Brooklyn Law School, I served as Senior Editor of the *Law Review*. In this capacity, I authored "Williams v. Walsh, Tolling of Statutes of Limitations in Section 1983 Actions – Prior Resort to State Forums Will Not Stop the Clock." The article appeared in *Brooklyn Law Review's* Annual *Second Circuit Review.*

8. I have co-authored articles on labor and employment issues, including "States – The Final Frontier: How State Law and State Courts Can Provide Avenues for Justice and Resist the U.S. Supreme Court's "Lochner Lite" Anti-Employee and Anti-Consumer Agenda," which appeared in the Fall, 2021 Edition of *The Labor Law Journal*, p. 125 (Wolters Kluwer Law and Business), and "A Practitioner's Guide to Incentive Payments in Federal Employment Class and Collective Actions," which appeared in the February 2014 issue of *Impact Fund: Strategic Litigation for Social Justice.*

9. After graduating from law school, I served as a law clerk for the Appellate Term, First Department in New York, where I drafted bench memoranda and judicial opinions on appeals ranging from constitutional law actions and criminal prosecutions to multi-million-dollar real estate litigation.

10. Before co-founding Sanford Heisler Sharp McKnight in 2004, I was an associate at the country's leading class action firm, where I was directly and substantially involved in winning landmark pro-employee precedents.

11. Edward Mazurek, Esq. was adverse to our firm's client in a matter in 2011-2012.

12. After that matter concluded, our firm looked to Mr. Mazurek for his legal expertise in several employment law and litigation matters.

13. Based on my direct interactions with Mr. Mazurek over the years and his involvement with our firm, I know that Mr. Mazurek has deep expertise in employment litigation matters and is a highly skillful litigator.

14. The market for attorney representation is no longer limited to specific cities, states or regions. It is national in scope. Attorneys from eastern cities represent clients not only in the east, but in the north, south, west and mid-west. Conversely, attorneys from western, northern, southern, and midwestern cities represent clients in matters outside their cities, states and regions. Admission

to courts pro hac vice enables attorneys effectively and seamlessly to represent clients in states in which they are not admitted to the state bar.

15. I have reviewed the complaints and docket entries in the *Cartee-Haring v. Central Bucks School District* and *Marinello v. Central Bucks School District* cases.

16. Because of the complexity, risks and uncertainties associated with litigating these cases, and because of the substantial work and out-of-pocket expense that these cases would require, Sanford Heisler Sharp McKnight would likely not have undertaken the representation of the plaintiffs.

17. I understand that, after over 5 years of litigating *Cartee-Haring* and 4 years of litigating *Marinello*, a jury returned verdicts in favor of both Ms. Cartee-Haring and Ms. Marinello on their Equal Pay Act claims.

18. Mr. Mazurek accomplished these excellent results as a solo practitioner opposed by multiple lawyers representing the defendant School Districts. One of the firms was Cozen and O'Connor, with 4 attorneys actively participating in the defense of Mr. Mazurek suits. Another opposing law firm utilized 7 lawyers to represent the defendant School Districts.

19. This was an extraordinary David versus Goliath success story and Mr. Mazurek should be recognized for his superlative victories.

20. In my professional opinion, the jury verdicts in favor of the plaintiffs were an extraordinary accomplishment for several additional reasons. First, they defy the odds existing at the outset of the cases against recovery considering the complexity, risks and uncertainties of those litigations. Second, the School District waged an extremely aggressive defense throughout the litigations. Third, the jury verdicts vindicate important civil rights of women and thereby confer a substantial societal benefit in advancing the goals of Congress in enacting the Equal Pay Act to overcome the deeply embedded belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it. This societal benefit is magnified in these cases involving a public school district with female students. It is especially egregious for a public school district that is the steward of female students to discriminate against women teachers based on their gender. The School District implicitly conveyed to its female students through its discriminatory pay practices that no matter how hard they work in school, it is acceptable that they be paid less than their male counterparts for equal work when they enter the job market. The verdicts rendered in these cases send the resounding message, "NOT SO!" The verdicts are reflective of Mr. Mazurek's strong legal abilities and knowledge and tremendous tenacity and commitment to his clients and their cause.

21. I understand that Mr. Mazurek paid more than $200,000 in costs associated with both cases out of his own funds.

22. Mr. Mazurek invested this substantial sum of money even though success in these discrimination cases were far from assured.

23. Mr. Mazurek has informed me that the School District declined to consider settlement throughout the litigations, even after numerous admonishments and efforts by the District Court to encourage the School District to settle the cases.

24. Where a defendant refuses to even consider settlement, that drastically increases the risks that plaintiffs may not recover anything in the cases, and that their attorney will not recover for the costs or fees he expends in the cases since, as in these cases, a jury and appellate courts will have to decide their fates.

25. I understand that the plaintiffs in the *Cartee-Haring* and *Marinello* lawsuits retained Mr. Mazurek to represent them under terms where Mr. Mazurek's regular hourly rate of $750 would be accorded a 3.5 multiplier ($2,625 per hour), if and only if, Mr. Mazurek achieved a monetary recovery on the plaintiffs' behalf.

24. Based on my knowledge and experience as an employment law litigator for over 40 years, and as the co-founder and co-vice chairman of a national public interest law firm, it is my opinion that an hourly rate of $2,625 for a lawyer of Mr. Mazurek's experience and abilities, contingent on actually achieving a monetary recovery, is not only reasonable, it is low, for these cases. Mr. Mazurek, or any other lawyer with the courage to undertake these representations, could easily have spent a substantial amount of time and money on these cases, not recovered anything, and not have been entitled to any fee under his contracts with his clients. In fact, given that the School District can appeal the judgments to the Third Circuit and Supreme Court, Mr. Mazurek still faces a significant risk that he will not be paid anything for the work he performed on these cases over the last 5 years and the $200,000+ he invested of his own money.

25. Based on my knowledge and experience as an employment law litigator for approximately 40 years, and as the Co-Founder and Co-Vice Chairman of a national public interest law firm, it is my opinion that a contingency hourly rate of $2,625 is eminently reasonable in view of the complexity, work requirements, risks and uncertainties attendant to litigations of this magnitude in the legal market of the United States, including but not limited to the greater Philadelphia area.

26. I understand that Mr. Mazurek has stated that he spent 1,204.3 hours litigating these cases for over five (5) years. In my professional opinion, that reflects a high degree of efficiency in handling and managing these cases on Mr. Mazurek's part. With 1,204.3 hours over five years, Mr. Mazurek expended an average of only 240 hours per year. That level of exceptional efficiency can only be achieved by an attorney who has substantial knowledge, experience and skill in litigating the claims in the cases. The number of hours that Mr. Mazurek spent on these cases reflects a high level of efficiency and ability on Mr. Mazurek's part and is very reasonable.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on July 11, 2025

Jeremy Heisler

# ADDENDUM 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| REBECCA CARTEE-HARING, | : | No. 2:20-cv-01995-MMB |
| | : | |
| v. | : | |
| | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | |
| | : | |

**PLAINTIFF'S ANSWER TO DEFENDANT'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS AND COUNTERSTATEMENT OF FACTS**

Plaintiff, Rebecca Cartee-Haring, hereby answers the Defendant's statement of allegedly undisputed facts in accordance with the enumerated paragraphs thereof, and sets forth her counterstatement of facts which are subject to her attached Unsworn Declaration Under Penalty of Perjury.

1. Plaintiff Rebecca Cartee-Haring ("Plaintiff") was born on December 15, 1974.

**ANSWER: ADMITTED. PLAINTIFF IS ALSO A WOMAN.**

2. Plaintiff was hired by the Central Bucks School District as a long-term substitute English teacher in August 2007 at Central Bucks West High School ("C.B. West").

**ANSWER: ADMITTED.**

3. At all relevant times, the District maintained a salary schedule (the "Salary Schedule") applicable to full-time faculty members. The Salary Schedule lays out how teachers are to be paid according to, among other factors, what "step" they are on.

**ANSWER: ADMITTED.**

4. At the time of her hiring, Plaintiff had eight years of experience teaching English and related courses outside of the District.

**ANSWER: DENIED. PLAINTIFF HAD NINE YEARS OF EXPERIENCE TEACHING OUTSIDE THE DISTRICT AT HATBORO-HORSHAM HIGH SCHOOL.**

5. Plaintiff was placed on Step "E" – *i.e,*, Step 5 – of the Salary Schedule upon hiring.

**ANSWER: ADMITTED THAT THE PLAINTIFF WAS PLACED ON STEP E, BUT DENIED THAT STEP E IS EQUIVALENT TO STEP 5. THERE WAS AN A/B STEP AT THE TIME THAT CBSD EMPLOYEES ONLY SPENT ONE YEAR ON BEFORE MOVING TO STEP C. PLAINTIFF ALSO SPENT ONE SEMESTER DURING HER TIME IN CBSD OUTSIDE THE CLASSROOM AT WEST AS A "TEACHER ON ASSIGNMENT" UNDER THE CLASSROOMS FOR THE FUTURE EDUCATION GRANT AND SHE WORKED BETWEEN ALL THREE HIGH SCHOOLS IN CBSD.**

6. Plaintiff has remained in her role as an English teacher at C.B. West continuously since 2007.

**ANSWER: ADMITTED.**

7. Plaintiff was hired each year as the assistant coach for the C.B. West girls' lacrosse team from 2013 through 2017.

**ANSWER: DENIED. THE PLAINTIFF WAS THE ASSISTANT COACH FOR THE C.B. WEST'S GIRLS' LACROSSE TEAM FROM SPRING OF 2013 THROUGH SUMMER OF 2018. IT WAS A CONTINUOS EMPLOYMENT AND NO CONTRACT WAS SIGNED YEAR TO YEAR.**

8. Plaintiff was then hired as the head coach of the girls' lacrosse team for the 2018- 2019 athletic season.

**ANSWER: DENIED. THE PLAINTIFF WAS HIRED AS THE HEAD COACH OF THE GIRLS' LACROSSE TEAM IN OCTOBER OF 2018, BUT THERE WAS NEVER ANY INDICATION GIVEN BY THE DISTRICT THAT IT WAS ONLY FOR ONE YEAR.**

9. The District makes year-to-year coaching appointments and reserves the right not to reappoint a coach from year to year.

**ANSWER: IT IS ADMITTED THAT THE DISTRICT TECHNICALLY MAKES YEAR-TO-YEAR COACHING APPOINTMENTS BUT THE FACT IS THAT MANY COACHES IN THE DISTRICT HAVE REMAINED IN THEIR COACHING POSITIONS FOR MANY YEARS. FOR EXAMPLE, JOHN DONNELLY HAS BEEN A COACH IN THE DISTRICT SINCE 2010. (DONNELLY TR. 4-5). THOMAS HETRICK HAS BEEN A COACH IN THE DISTRICT SINCE 1995. (HETRICK TR. 6-7). MATTHEW COVERDALE HAS BEEN A COACH IN THE DISTRICT SINCE 2002. (COVERDALE TR. 6-7). BRIAN WEAVER HAS BEEN A COACH IN THE DISTRICT SINCE 2018. (WEAVER TR. 6-9). FURTHERMORE, WHILE THE DISTRICT ASSERTS IT HAS THE RIGHT NOT TO REAPPOINT A COACH FROM YEAR TO YEAR, THE DISTRICT MAY NOT REFUSE TO REAPPOINT A COACH BASED ON THE COACH'S GENDER, AGE OF 40+, OR DISABILITY OR BECAUSE SHE ENGAGED IN CONDUCT PROTECTED FROM RETALIATION AS A MATTER OF FEDERAL AND STATE LAW.**

10. One player on the girls' lacrosse team during the 2018-2019 athletic season was a student, hereafter referred to as "Rita Roe."

**ANSWER: ADMITTED.**

11. Roe was also a captain of the girls' lacrosse team.

**ANSWER: IT IS ADMITTED THAT ROE WAS NAMED A CAPTAIN OF THE GIRLS' LACROSSE TEAM BY THE FORMER CB WEST GIRLS' LACROSSE COACH, TARA SCHMUCKER, IN JUNE OF 2018, BUT THAT COACH THEN**

**RESIGNED IN JULY OF 2018. THE "CODE OF CONDUCT FOR ATHLETES AND ATHLETE/PARENT HANDBOOK" THAT WAS IN EFFECT DURING THE 2018-2019 SEASON STATES THAT "WHILE SOME COACHES MAY ALLOW THEIR TEAM TO SELECT CAPTAINS, THE ULTIMATE RESPONSIBILITY LIES WITH THE COACH. THE DECISION TO HAVE OR NOT HAVE TEAM CAPTAINS WILL BE THE SOLE RESPONSIBILITY OF THE COACH" (CBSD 0728-0734). DISTRICT ATHLETIC DIRECTOR, DANIELLE TURNER, NOTED THAT ASPECT OF THE "CODE OF CONDUCT FOR ATHLETES" IN HER DOCUMENTATION OF THE MEETING ON OCTOBER 30, 2018 (CBSD 0701). ROE WAS REMOVED FROM THE CAPTAINCY (1) FOR HER INSISTING ON CONTINUING TO CONDUCT "CAPTAIN'S PRACTICES" WITH THE TEAM ON WAR MEMEOIRAL FIELD AT CB WEST WITHOUT A COACH PRESENT IN VIOLATION OF THE DISTRICT'S "COACHES' CODE OF ETHICS AND COACHES' HANDBOOK/RESOURCE GUIDE" WHICH STATES, UNDER THE SECTION TITLED "PRACTICE SESSIONS," "STUDENT-ATHLETES SHOULD NEVER PRACTICE ALONE. <u>A COACHING STAFF MEMBER MUST BE THE FIRST TO ARRIVE AND THE LAST TO LEAVE."</u> (EMPHASIS IN THE ORIGINAL) AFTER HAVING BEEN TOLD NOT TO CONDUCT "CAPTAIN'S PRACTICES" BY HEAD COACH CARTEE-HARING ON SEVERAL OCCASIONS AND BEING TOLD THAT THE DISTRICT HAD STRICT RULES THAT BARRED ANY PRACTICES TO RUN WITHOUT COACHING SUPERVISION, RITA ROE HELD ADDITIONAL PRACTICES. SHE WAS THEN TOLD AGAIN THAT THE DISTRICT DID NOT ALLOW CAPTAIN'S PRACTICES BY ATHLETIC DIRECTOR, HENRY HUNT, IN A MEETING TO REVIEW TEAM CAPTAIN'S EXPECTATIONS**

**ATTENDED BY THE PLAINTIFF, HENRY HUNT, RITA ROE AND ANOTHER TEAM CAPTAIN. IN THAT SAME MEETING ROE REFUSED TO SIGN THE CAPTAIN'S AGREEMENT TO ABIDE BY CERTAIN RULES AND PRINCIPLES EXPECTED OF TEAM CAPTAINS AND EVEN AFTER SEVERAL DAYS PASSED AND THE PLAINTIFF AGAIN ASKED HER TO SIGN THE DOCUMENT, SHE REFUSED. ROE NEVER SIGNED THE CAPTAIN'S EXPECTATIONS.**

12. Before the 2018-2019 athletic season officially began, Roe began hosting "captain's practices," in which she invited members of the girls' lacrosse team to practice without the Plaintiff or another coach supervising.

**ANSWER: ADMITTED.**

13. Roe was instructed not to host captain's practices.

**ANSWER: ADMITTED**

14. As a result of holding one captain's practice after being told not to do so, Roe was removed as a team captain by Plaintiff, although she remained on the team.

**ANSWER: DENIED. THE ANSWER AND COUNTERSTATEMENT TO PARAGRAPH 11 ARE INCORPORATED BY As IF FULLY SET FORTH HEREIN.**

15. Despite assuring Roe that she would have the opportunity to become a captain again, Plaintiff never gave Roe a chance to do so.

**ANSWER: DENIED. CARTEE-HARING DID INDEED GIVE ROE CHANCES TO BECOME CAPTAIN AGAIN.**

16. Disputes continued between Roe and Plaintiff, causing Roe's mother, Jane Doe, to become involved.

**ANSWER: DENIED. CARTEE-HARING DID NOT HAVE "DISPUTES" WITH ROE. ROE WAS A PETULANT CHILD WHO REFUSED TO COMPLY WITH THE REASONABLE EXPECTATIONS THAT THE DISTRICT AND CARTEE-HARING HAD FOR CAPTAINS OF THE TEAM AND TEAM MEMBERS GENERALLY. ROE'S MOTHER'S INVOLVEMENT OCCURRED IMMEDIATELY AFTER THE PLAINTIFF WAS NAMED HEAD COACH IN OCTOBER 2018, BEFORE THE PLAINTIFF HAD EVEN HELD A MEETING OR PRACTICE WITH THE TEAM. JANE DOE HAD ALSO APPLIED TO BE THE CB WEST GIRLS' LACROSSE COACH IN THE FALL OF 2018 AND CARTEE-HARING WAS SELECTED OVER HER. JANE DOE HAD A DESIRE TO HARM CARTEE-HARING'S REPUTATION AND STANDING IN THE DISTRICT AND IMMEDIATLEY AND ACTIVELY BEGAN TO TARGET THE PLAINTIFF TO HAVE HER REMOVED AS COACH CLAIMING SHE HAD RECORDINGS OF THE PLAINTIFF THAT WOULD HARM HER REPUTATION. ROE'S MOTHER LATER BECAME A COACH IN THE DISTRICT FOR THE MIDDLE SCHOOL IN THE SPRING OF 2019 WHERE THE PLAINTIFF'S YOUNGEST DAUGHTER PLAYED. LACROSSE.**

17. Doe reported that Plaintiff was bullying her daughter.

**ANSWER: DENIED. DOE DID NOT "REPORT" THAT PLAINTIFF WAS BULLYING HER DAUGHTER BECAUSE PLAINTIFF NEVER BULLIED DOE'S DAUGHTER. DOE FALSEY ACCUSED PLAINTIFF OF BULLYING HER DAUGHTER BUT THAT ALLEGATION HAD NO BASIS IN REALITY WHATSOEVER AND DOE ALWAYS REFUSED TO SPECIFIY DETAILS OF WHAT SHE CLAIMED WAS BULLYING. DANIELLE TURNER, HEAD ATHLETIC**

**DIRECTOR, DOCUMENTED THIS STATING THAT ON DECEMBER 3, 2018 "WHEN ASKED TO PROVIDE EXAMPLES OF BULLYING, MS. [DOE] STATES THAT IF SHE MUST PROVIDE EXAMPLES IT WILL 'TAKE THIS WHOLE THING UP A LEVEL.'….AND MENTIONS HER ATTORNEY…WHEN MR. DONOVAN AGAIN ASKS FOR EXAMPLES OR SPECIFICS TO TRY AND FOLLOW UP, THE ONLY NAMES MRS. [DOE] MENTIONS TO SPEAK TO REGARDING THIS BULLYING" ARE TEACHERS. TURNER CONTINUES TO NOTE THAT ON DECEMBER 4, 2019 "[CB WEST PRINCIPAL] MR. DONOVAN FOLLOW UP WITH MR. HUNT. MR. HUNT REPORTS THAT HE FOUND NO VALIDIITY TO CLAIMS MADE BY MS. DOE" (CBSD 0702).**

**IN FACT, PLAINTIFF NEVER BULLIED DOE'S DAUGHTER AND THAT FACT WAS CONFIRMED BY AN EXHAUSTIVE INVESTIGATION BY THE DISTRICT THAT INCLUDED DETAILED INTERVIEWS OF OTHER PLAYERS AND COACHES ON THE TEAM, AND EVEN PARENTS OF PLAYERS ON THE TEAM. (LUCABAUGH INVESTIGATIVE REPORT). THE DISTRICT'S INVESTIGATION YIELDED THE CONCLUSION THAT, NOT ONLY DID PLAINTIFF NEVER BULLY RITA ROE, BUT THAT PLAINTIFF WAS REGARDED AS A MODEL, EXCLELLENT, HIGHLY SUPPORTIVE COACH BY EVERY OTHER PLAYER, COACH AND PARENT ASSOCIATED WITH THE TEAM EXCEPT RITA ROE. (LUCABAUGH INVESTIGATIVE REPORT).**

18. At least two meetings were scheduled between Roe, Plaintiff, and Doe, in which all parties were encouraged to make up and move on.

**ANSWER: DENIED. THERE WAS *NEVER* A MEETING SCHEDULED WITH ROE IN ATTENDANCE ALONG WITH HER MOTHER, JANE DOE. THERE WERE TWO MEETINGS WITH THE PLAINTIFF AND DOE PRESENT. THE FIRST MEETING OCCURED AT DOE'S REQUEST ON OCTOBER 30, 2018 AND CURRIOUSLY SHE ALSO DEMANDED THAT ROE NOT ATTEND AND THAT CARTEE-HARING NOT ATTEND, CLAIMING SHE HAD EMBARASSING INFORMATION ABOUT THE PLAINTIFF STATING IN AN EMAIL ON OCTOBER 30, 2018, "THE REQUEST FOR THE MEETING WAS TO SPARE COACH CARTEE AN UNDO EMBARASSMENT. HAVING HER AT THE MEETING WILL ESCALATE THIS ISSUE AND CREATE AN UNCOMFORTABLE SITUATION FOR [ROE] AND COACH CARTEE" (CBSD 0701). THE PLAINTIFF ONLY CAME INTO THAT MEETING AT THE END TO TELL DOE THAT ROE WOULD NOT BE CAPTAIN BECAUSE SHE REFUSED TO SIGN THE CAPTAIN'S EXPECTATIONS. THE SECOND MEETING OCCURRED ON APRIL 10, 2019. AGAIN ROE WAS NOT IN ATTENDANCE AT THAT MEETING EITHER. THE SEXIST CHARACTERIZATION OF THE PARTIES BEING ENCOURAGED TO "MAKE UP" REFLECTS THE DISTRICT'S DISCRIMINATORY ATTITUDE TOWARD PLAINTIFF. IN CONNECTION WITH A CONFLICT THAT AROSE BETWEEN A MALE COACH, JOHN DONNELLY, AND ANOTHER COACH IN THE DISTRICT, THE DISTRICT DID NOT INSTRUCT DONNELLY TO "MAKE-UP" WITH THE OTHER COACH. (DONNELLY TR. 23-50)**

19. Prior to the start of the 2018-2019 athletic season, Roe was injured and required surgery, causing her to miss part of the season.

**ANSWER: ADMITTED THAT ROE WORE A MEDICAL BOOT AND TOLD THE TRAINER SHE HAD SURGERY, BUT IT IS QUESTIONABLE IF SHE HAD SURGERY AND WHAT WAS ACTUALLY INJURED. DENIED THAT SHE MISSED "PART OF THE SEASON" BECAUSE SHE MISSED THE MAJORITY OF THE SEASON NOT RETURNING TO PRACTICE UNTIL APRIL 22, 2019 WITH ONLY A LITTLE MORE THAN TWO WEEKS REMAINING IN THE SEASON.**

20. Once the season began, Doe continued to complain to the School District about how Plaintiff was treating her daughter.

**ANSWER: DENIED. DOE DID NOT COMPLAIN TO THE DISTRICT ABOUT HOW PLAINTIFF WAS ACTUALLY TREATING HER DAUGHTER. DOE CONTINUED TO FALSELY ALLEGE THAT PLAINTIFF WAS BULLYING HER DAUGHTER AND DOE MANUFACTURED ISSUES SHE HAD WITH CARTEE-HARING THAT WERE PROVEN FALSE (TURNER DOCUMENATION CBSD 0701), AND AS THE DISTRICT'S INVESTIGATION CONCLUSIVELY ESTABLISHED, PLAINTIFF NEVER BULLIED DOE'S DAUGHTER. LUCABAUGH COMMUNICATEDON MAY 23, 2019 IN AN EMAIL TO CARTEE-HARING, "—THE FINAL OUTCOME OF THE INVESTIGATION VERIFIES THAT YOU HAVE NOT BULLED THE STUDENT…" (RCH 03 34).**

21. After Roe recovered from her injuries, she began to play for the lacrosse team, but her playing time was significantly reduced.

**ANSWER: DENIED. HER PLAYING TIME WAS NOT REDUCED BECAUSE SHE HAD ONLY BEGUN TO PLAY IN GAMES APRIL 24, 2019 AND HAD NOT HAD ANY PLAYING TIME DURING THE 2019 SEASON PRIOR TO THAT DATE.**

22. Plaintiff asked C.B. West Principal Tim Donovan and Athletic Director Henry Hunt for permission to remove Roe from the lacrosse team, but the request was denied.

**ANSWER: ADMITTED THAT AFTER MULTIPLE INCIDENTS THAT VIOLATED DISTRICT AD TEAM EXPECTATIONS AND SEVERAL NEGATIVE INTERACTIONS THAT WERE DISRUPTIVE AND INTIMIDATING TOWARDS TEAMMATES, CARTEE-HARING REQUESTED RITA ROE'S REMOVAL FROM THE TEAM.**

23. At one point, several seniors on the team wore T-shirts that listed all the team players; however, Roe's name was blacked out with tape. Plaintiff was informed of this by multiple administrators, including Assistant Superintendent Dr. Abram Lucabaugh and Hunt. Exhibit D-84 tr. 65:6-66:9, Transcript of Dr. Abram Lucabaugh (April 23, 2021) at 61:11-14:62, attached hereto as Exhibit D-85. Henry Hunt stepped in and made the players remove their altered shirts. Exhibit D-84, 66:1-9.

**ANSWER: DENIED. NO SENIORS PLACED TAPE OVER ROE'S NAME. THREE UNDERCLASSMEN PUT TAPE OVER ROE'S NAME AFTER THE TEAM WAS TOLD BY ROE'S FRIEND THAT ROE WAS "DONE WITH THE TEAM" AND WOULD NOT ATTEND SENIOR NIGHT. IT IS DENIED THAT THE PLAINTIFF WAS INFORMED OF THE TAPE ON T-SHIRTS BY ADMINISTRATION. IT WAS THE PLAINTIFF WHO, UPON LEARNING OF THE TAPED-OVER NAME, TEXTED ABRAM LUCABAUGH AT 2:39 PM ON FRIDAY, MAY 10 AND THEN SPOKE WITH HIM BY PHONE BECAUSE SHE WAS AT AN APPOINTMENT AND WAS REQUESTING HIS HELP IN THE MATTER. SHE TEXTED THE TEAM IN THE REMIND APP TO WEAR THEIR T-SHIRTS AS ORIGINALLY ISSUED. THEN WHEN SHE ARRIVED AT CB WEST THAT NIGHT DURING THE JV GAME AND BEFORE THE VARSITY GAME,**

Case: 25-2549 Document: 39 Page: 1108 Date Filed: 01/29/2026

**SHE ADMONISHED THE TEAM IN THE LOCKER ROOM, AS STATED BY SEVERAL PLAYERS AT THE SEPTEMBER 9, 2019 SCHOOL BOARD MEETING. ONLY AFTER THAT DID HUNT TAKE THE VARSITY TEAM T-SHIRTS, WHICH AT THAT POINT HAD NO TAPE OVER ROE'S NAME.**

24. Multiple times through the athletic season, Plaintiff expressed that she was in a negative mental state and that she was severely stressed. Exhibit D-89, 82:11-83:22. Andrea DiDio-Hauber, then-Director of Human Resources, responded by encouraging Plaintiff to make use of the employee assistance program. Exhibit D-89, 79:11-13.

**ANSWER: ADMITTED THAT THE PLAINTIFF EXPRESSED CONCERNS OVER HER MENTAL AND PHYSICAL HEALTH MULTIPLE TIMES, HER FEAR OF JANE DOE AND DOE AND ROE'S HARRASSMENT OF CARTEE-AHRING, AS WELL AS A SCHOOL BOARD MEMBER WAITING LATE AFTER A NIGHT GAME TO DISCUSS CARTEE-HARING'S TEACHING JOB SECURITY AND HIS ROLE IN BEING USED BY JANE DOE (GAMBLE DEP). SOMETIMES PLAINTIFF RECEIVED NO RESPONSE (RCH 03 33) AND OTHER TIMES SHE RECEIVED SUPPORT IN WORDS ONLY. DISTRICT HUMAN RESOURCES DIRECTOR DIDIO-HAUBER SUGGESTED THAT PLAINTIFF AVAIL HERSELF OF THE DISTRICT'S EMPLOYEE ASSISTANCE PLAN ("THE EAP"), BUT DID SO WITH HER DIAGNOSIS THAT IT WAS FAMILY DEATHS THAT CAUSED CARTEE-HARING'S STRESS WHEN IT WAS THE CONSTANT LIES AND HARASSMENT OF DOE AND THE ADMINISTRATION'S FAILURE TO CONTROL IT. DIDIO-HAUBER ALSO REQUESTED THAT CARTEE-HARING SEND HER A DOCTOR'S NOTE CONFIRMING THAT SHE WAS UNDER HIS CARE IN A JUNE 14, 2019 MEETING**

**REQUESTED BY DIDIO-HAUBER AND LUCABUAGH ATTENDED BY BOTH, THE PLAINTIFF AND FELLOW TEACHER KATERINE SEMISH (SEMISCH EMAIL RCH 03 50). PLAINTIFF'S MENTAL CONDITION WAS A SERIOUS HEALTH CONDITION THAT AFFECTED HER MAJOR LIFE ACTIVITIES OF CONCENTRATING, SLEEPING, INTERACTING WITH OTHERS, AND HER ENJOYMENT OF LIFE. SHE WAS OTHERWISE TO PERFORM THE ESSENTIAL FUNCTIONS OF THE HEAD COACHING JOB, WITH OR WITHOUT A REASONABLE ACCOMMODATION BY THE DISTRICT.**

25. During the school year, the School District received several notices, including one from Roe herself, that plaintiff was bullying Roe. Exhibit D-68, pg. 2. An investigation into such allegations was launched by the school in May 2019. *Id.*

**ANSWER: ADMITTED THAT THE DISTRICT SAID THAT DOE HAD CLAIMED ROE WAS BEING BULLIED, BUT NO DOCUMENTATION WAS EVER GIVEN TO PLAINTIFF. EVEN AFTER MULTIPLE REQUESTS TO SEE AN ALLEGED FORMAL COMPLAINT, PLAINTIFF WAS TOLD AT TIMES THERE WAS A FORMAL COMPLAINT AND THEN OTHER TIMES THAT THERE WAS NOT A FORMAL COMPLAINT. AN INTENSIVE INVESTIGATION WAS LAUNCHED MAY 2019 UNDER A POLICY THAT DID NOT EXIST AND THAT EVERY PARENT OF THE 40 PLUS PLAYERS WERE NOTIFIED ON MAY 6, 2019, AT 5:53 PM BY TIM DONOVAN BY EMAIL "CENTRAL BUCKS WEST HIGH SCHOOL HAS RECEIVED A COMPLAINT OF HARASSMENT FILED AGAINST THE COACH OF THE VARISITY GIRLS' LACROSSE TEAM. PURSUANT TO CBSD BOARD POLICY 148, THE DISTRICT IS REQUIRED TO VERIFY THE LEGITIMACY OF THIS CLAIM…"**

26. The investigation was conducted by Lucabaugh. Exhibit D-68. As part of his investigation, between May 7 and May 13, 2019, Lucabaugh interviewed all 24 members of the lacrosse team, eight parents, three coaches, and three teachers. Exhibit D-68, CBSD 222-26.

**ANSWER: ADMITTED THAT LUCABAUGH CONDUCTED THE INVESTIGATION BUT WOULD ADD HE DID IT ALONG WITH DANIELLE TURNER. ALSO, TWO OF THE THREE COACHES WERE INTERVIEWED TWICE, INCLUDING ONCE AFTER THE T-SHIRT INCIDENT ON MAY 10.**

27. Lucabaugh released a report containing the results of his investigation on June 6, 2019, concluding that Plaintiff did not "engage in behavior rising to the level of bullying." D-68, CBSD 227-228. However, the report noted that the Plaintiff had handled the situation poorly, concluding that "at times [plaintiff] may have wavered in maintaining a standard of utmost professionalism[.]" *Id.*

**ANSWER: ADMITTED THAT THE REPORT 100% CLEARED THE PLAINTIFF OF ALL CHARGES OF BULLYING AND HARRASSMENT. HOWEVER, THE CONCLUSION THAT THE PLAINTIFF EVER WAVERED IN "A STANDARD OF UTMOST PROFESSIONALISM" IS DENIED. IT IS ALSO DENIED THAT THE REPORT WAS "RELEASED" ON JUNE 6, 2019. THE REPORT WAS NOT RELEASED TO THE PLAINTIFF UNTIL JUNE 7, 2019.**

28. Lucabaugh's report concluded that Plaintiff was going to receive a year-end coaching evaluation and that a decision on her coaching status for the 2019-2020 school year would be made at a later date. Exhibit D-68, CBSD 228.

**ANSWER: ADMITTED THAT THE REPORT STATED THAT CARTEE-HARING WOULD UNDERGO A YEAR-END EVALUATION, WHICH NEVER ACTUALLY**

**OCCURRED. IT IS DENIED THAT THE INVESTIGATIVE REPORT STATED THAT A DECISION WOULD BE MADE ABOUT PLAINTIFF'S COACHING STATUS. IN FACT, THE REPORT MAKES IT CLEAR THAT SHE WOULD CONTINUE TO BE THE COACH OF THE CB WEST GIRLS' LACROSSE TEAM BECAUSE IT STATES THAT "EXPECTATIONS AND RECOMMENDATIONS FOR ACTION MOVING FORWARD IN THE 2020 SEASON WILL BE COMMUNICATED (LUCABAUGH REPORT P.8). FOLLOWING THAT REPORT ON JUNE 14, 2019 LUCABAUGH AND DIDIO CONFIREMED IN A MEETING THEY ATTENDED WITH THE PLAINTIFF AND TEACHER, KATHERINE SEMISCH THAT THEY WOULD BE READY NEXT YEAR WITH A PLAN IN PLACE TO CONTROL JANE DOE AND SEMISCH'S NOTES FROM THE MEETING CONFIRM THAT LUCABAUGH SAID, "WE WILL MEET AND HAVE A GAME PLAN READY, A PROTOCOL FOR ESCALATING STEPS…" FOR THE NEXT SEASON (RCH 03 50).**

29. As usual for all School District athletic teams, the lacrosse team scheduled a banquet at a local country club to be held at the end of the 2018-2019 athletic season. Exhibit D- 84, 105:18-106:4.

**ANSWER: ADMITTED THAT THE CB WEST GIRLS' BANQUET WAS INITIALLy SCHEDULED TO TAKE PLACE AT DOYLESTOWN COUNTRY CLUB AS LONG AS THE TEAM COULD MEET A MINIMUM NUMBER FOR ATTENDANCE. IT IS DENIED THAT IT IS "USUAL" FOR ATHLETIC TEAMS IN CB TO HOLD BANQUESTS AT COUNTRY CLUBS. IN FACT, THERE IS NOT A POLICY OR RULE REQUIRING COACHES TO HOLD OR ATTEND PARTIES AND A MALE BASKETBALL COACH, RAKOWSKY, HAD NOT HELD A BANQUEST SEVERAL**

**YEARS EARLIER AND HE RETAINED HIS JOB AS THE HEAD GIRLS' BASKETBALL COACH THE FOLLOWING YEAR. (WEAVER MEETING NOTES RCH 01 168- 173)**

30. Plaintiff e-mailed the School District administration, requesting that Roe not be permitted to attend the banquet. Exhibit D-89, 293:11-19; D-59, D-64.

**ANSWER: ADMITTED THAT THE PLAINTIFF EMAILED A REQUEST THAT ROE NOT BE PERMITTED TO ATTEND THE PLANNED BANQUET, BUT IT WAS BECAUSE ROE HAD NOT BEEN PERMITTED BY LUCABAUGH TO ATTEND GAMES, PRACTICES OR TEAM ACTIVITES SINCE THE INVESTIGATION BEGAN AND DANIELLE TURNER ALSO NOTED IN AN EMAIL DATED MAY 15, 2019, "AT THIS POINT, ROE REMOVED HERSELF FROM THE TEAM. IN LIGHT OF ROE'S DECISION NOT TO PARTICIPATE IN SENIOR NIGHT…WE ARE NO LONGER ALLOWING ROE TO PARTICIPATE IN ANY TEAM ACTIVITIES UNTIL THIS INVESTIGATION IS CONCLUDED" (CBSD 1570-1571). ADDITIONALLY, ROE HAD SEVERAL NEGATIVE INTERACTIONS WITH OTHER PLAYERS ON THE TEAM INCLUDING A PHYSICAL ALTERCATION AGAINST A TEAMMATE AT THE CONLCUSION OF A GAME THAT WAS CAUGHT ON CB WEST SECURITY FOOTAGE. ADDITIONALLY, ROE HAD ILLEGALLY AUDIOTAPED THE PLAINTIFF SEVERAL TIMES (RCH 03 42) AND DOE HAD SHARED THOSE RECORDINGS WITH DISTRICT SCHOOL BOARD MEMBER JOHN GAMBLE (GAMBLE DEP). PLAINTIFF EXPRESSED IN A MAY 22, 2019 EMAIL STATING, "I FEEL IT IS INAPPROPRIATE FOR [ROE] TO BE [AT THE BANQUET] GIVEN HER BEHAVIOR AND DISRESPECT TOWARD ME AND HOW SHE BLATANTLY**

Case: 25-2549 Document: 39 Page: 1113 Date Filed: 01/29/2026

**DEFIED DR. LUCABAUGH'S REQUEST THAT SHE NOT ATTEND ANY TEAM EVENTS. HER MOTHER ALSO DEFIED THE DIRECTIVE THAT SHE WAS NOT TO WATCH CB WEST GIRLS LACROSSE GAMES FROM THE SIDELINE AND SHE DID ANYWAY." (RCH 03 34).**

31. Plaintiff was told that Roe and her mother would be permitted to attend, to which Plaintiff responded by sending another e-mail protesting this decision. *Id.*

**ANSWER: ADMITTED THAT AN EMAIL WAS SENT BY THE PLAINTIFF FOR HERSELF AND ON BEHALF OF THE TEAM THAT IT WAS NOT IN THE BEST INTEREST OF THE TEAM TO HAVE ROE AT THE BANQUET. ADDITIONALLY, THE PLAINTIFF EXPRESSED IN A MAY 23, 2019 EMAIL THAT SHE FELT UNSAFE AROUND RITA ROE AND JANE DOE AND REQUESTED INFORMATION ABOUT HOW TO FILE SOMETHING FORMALLY AGAINST THE MOTHER. PLAINTIFF STATED THAT SHE WOULD NOT ATTEND THE BANQUET IF ROE AND DOE DID DID BECAUSE IT WAS NOT IN THE "BEST INTEREST OF [HER] HEALTH" (RCH 03 34). SHE DID NOT RECEIVE INFORMATION ABOUT HOW TO FILE A FORMAL COMPLAINT.**

32. Ultimately, the banquet was cancelled, allegedly due to a lack of attendance. Exhibit D-89, 292:14-19, 303:10-18; Exhibit D-84, 105:18-106:4.

**ANSWER: DENIED THAT IS WAS "ALLEGEDLY" DUE TO LACK OF ATTENDANCE. THE BANQUET WAS CANCELLED BY LAURIE CRECCA, THE COUNTRY CLUB PARENT SPONSOR Of THE BANQUET, BECAUSE ONCE THE PLAYERS LEARNED FROM THE PARENTS COLLECTING THE MONEY FOR THE BANQUET THAT ROE AND DOE WERE ATTENDING, THEY DID NOT WANT TO**

**ATTEND. THE PARTY COULD NOT MEET THE COUNTRY CLUB MINIMUM TO HOLD A BANQUET. THIS WAS COMMUNICATED TO BOTH TIM DONOVAN AND HENRY HUNT. PLAINTIFF HAD NO ROLE IN THE DECISION TO CANCEL THE BANQUET.**

33. To "replace" the banquet, Plaintiff held a party in her classroom where she distributed awards to the team members. Exhibit D-89, 290:10-17, 305:8-13. Roe did not attend the party. *Id*.

**ANSWER: DENIED THAT PLAINTIFF HELD A PARTY TO REPLACE THE BANQUET. THE PLAINTIFF HELD A MEETING IN HER CLASSROOM TO DISTRIBUTE AWARDS, CERTIFICATES, VARISITY LETTERS AND BARS. ROE WAS INVITED TO THE MEETING BUT DID NOT ATTEND. CB WEST ATHLETIC DIRECTOR, HENRY HUNT, WAS FULLY AWARE THAT THE AWARDS WERE DISTRIBUTED THERE INSTEAD OF AT A BANQUEST BECAUSE HE ASKED HOW THE AWARDS WOULD BE DISTRIBUTED.**

34. During the summer of 2019, the family of one team member hosted a pool party for the team at their home. Exhibit D-94, tr. 303:10-16. Roe and her mother were not invited to this party. Exhibit D-89, 304:19-25.

**ANSWER: ADMITTED THAT A FAMILY WHOSE DAUGHTER ON THE TEAM HELD A PARTY BUT THE INVITATION LIST WAS CREATED BY THE DAUGHTER AND WHO WAS AND WAS NOT INVITED WAS HER CHOICE.**

35. Plaintiff was aware that Roe and her mother were not invited to the party. *Id*. Despite this, Plaintiff attended the party. Exhibit D-89, 303:17-18.

**ANSWER: DENIED THAT THE PLANITIFF ATTENDED BECAUSE OF KNOWLEDGE THAT ROE AND HER MOTHER WOULD NOT BE THERE. THE PLAINTIFF WAS INVITED TO THE PARTY BY A PLAYER ON THE TEAM AND ATTENDED THE PARTY WITH HER HUSBAND AND DAUGHTERS AS THEY WERE ALSO INVITED. MANY COACHES EMPLOYED BY THE DISTRICT ATTEND YEAR END PARTIES AT PLAYER AND STUDENT HOMES. MALE COACHES EMPLOYED BY THE DISTRICT COVERDALE, HETRICK AND WEAVER CONFIRMED IN THEIR DEPOSITIONS THAT THEY ATTENDED PARTIES AT THE HOMES OF PLAYERS ON THE TEAMS THEY COACH AND WERE NEVER SUBJECTED TO ANY FORM OF ADVERSE EMPLOYMENT ACTION FOR DOING SO. THERE HAS NEVER BEEN A POLICY IN EFFECT IN THE DISTRICT PROHIBITING OR LIMITING COACHES IN THE DISTRICT FROM ATTENDING PARTIES HOSTED BY THE FAMILIES OF PLAYERS ON THEIR TEAMS TO WHICH THEY ARE INVITED. PLAINTIFF HAD NOTHING TO DO WITH WHO WAS OR WAS NOT INVITED TO THE PARTY.**

36. On September 4, 2019, Superintendent Dr. John Kopicki made the decision to not reappoint Plaintiff as head coach of the girls' lacrosse team. Exhibit D-83, 110:13-17.

**ANSWER: DENIED. WHILE KOPICIKI CLAIMED IN HIS DEPOSITION THAT HE MADE THE DECISION NOT TO REAPPOINT THE PLAINTIFF, HE ONLY DID SO AFTER HE HAD LEFT THE SCHOOL DISTRICT UNDER SECRETIVE CONDITIONS THAT HE REFUSED TO IDENTIFY IN HIS DEPOSITION. LUCABUAGH, ON THE OTHER HAND, WAS THE ONLY PERSON WHO RECEIVED AN EMAIL FROM A LOCAL LACROSSE COACH WHO WAS A FRIEND OF DOE'S, BUT HAD NOTHING**

TO DO WITH THE DISTRICT, JENNIFER DUCKENFIELD, (RCH 01 15) THAT MADE THE EXACT CLAIMS DIDIO, LUCABAUGH AND TURNER MADE AGAINST CARTEE-HARING IN THE MEETING AT WHICH THEY INFORMED PLAINTIFF THAT SHE WAS TERMINATED AS GIRLS LACROSSE COACH (WEAVER NOTES RCH 01 168-173). JOHN KOPICKI WAS NOT PRESENT IN THE DISMISSAL MEETING, NOR DID ANYONE IN THE MEETING EVER SUGGEST STATE THAT HE MADE THE DECISION TO TERMINATE PLAINTIFF AS GIRLS' LACROSSE COACH. IN FACT, IN THE MEETING AFTER ASKING MULTIPLE TIMES IF THE MEETING WAS DISCIPLINARY, THE PLAINTIFF WAS TOLD THEY WERE THERE TO GATHER HER SIDE OF THE STORY (WEAVER NOTES RCH 01 168-173). THE ONLY PEOPLE LUCABAUGH SENT THE DUCKENFIELD EMAIL TO WERE DIDIO-HAUBER AND TURNER AFTER THE 3 PM SEPTEMBER 4, 2019 MEETING AT 18:22:52 (RCH 01 15). KOPICKI CLAIMED IN HIS DEPOSITION THAT HE FIRED PLAINTIFF FROM THE HEAD LACROSSE COACH POSITION BECAUSE SHE ATTENDED THE PARTY TO WHICH SHE AND HER FAMILY WERE INVITED BY A PLAYER ON THE LACROSSE TEAM TO WHICH ROE WAS NOT INVITED. AT THE TERMINATION MEETING, HR DIRECTOR DIDIO-HAUBER STATED THAT PLAINTIFF WAS BEING TERMINATED FROM THE LACROSSE COACH POSITION BECAUSE SHE LACKED CHARACTER. DIDIO-HAUBER DENIED MAKING THIS STATEMENT BUT TESTIFIED, INSTEAD, THAT LUCABAUGH TOLD PLAINTIFF THAT SHE WAS BEING TERMINATED AS A COACH BECAUSE OF LACK OF CHARACTER. THE STANDARDS FOR THE CHARACTER OF A COACH EMPLOYED BY THE DISTRICT ARE NO DIFFERENT THAN THE STANDARDS

**FOR THE CHARACTER OF A TEACHER AND YET PLAINTIFF REMAINED EMPLOYED BY THE DISTRICT AS A TEACHER AFTER SHE WAS FIRED FOR THE ALLEGED REASON OF LACK OF CHARACTER AS LACROSSE COACH.**

37. The School District hired Nicole Fisher as head coach of the girls' lacrosse team for the 2019-2020 school year. Am. Compl., ¶ 16. Fisher, who is female, was in her 20's at the time of hiring. Exhibit D-89, 364:11.

**ANSWER: ADMITTED AND FISHER SHE WAS THE ONLY APPLICANT WHO WAS INTERVIEWED FOR, AND GIVEN THE POSITION.**

38. On October 30, 2019, C.B. West Principal Timothy Donovan and C.B. West Athletic Director Henry Hunt were in Donovan's office preparing a press release about the new girls' lacrosse coach when there was a "very loud knock" on the door, and Plaintiff stormed into the office screaming. Transcript of Tim Donovan (Feb. 2, 2024) at 73:9-74:4, attached hereto as Exhibit D-90. Despite Donovan's and Hunt's attempts to calm the Plaintiff and discuss any issues after school, Plaintiff would not stop shouting. Exhibit D-90, 74:4-9. At one point, Plaintiff "put both of her hands on both sides of [Donovan's] head and was shaking her hands." Exhibit D-90, 74:10-12. Plaintiff was screaming that Donovan was "not a leader," that he was a liar, asking why the new coach had not been named, then stated that "if her kids committed suicide, it would be on [Donovan's] head" before leaving the office. Exh. D-90, 74:12-14, 74:18-

**ANSWER: DENIED. IT IS UNCLEAR WHAT DONOVAN AND HUNT WERE DOING IN THE OFFICE. THE PLAINTIFF KNOCKED ON THE DOOR AND WALKED INTO THE OFFICE, VERY UPSET OVER A STITUATION WITH HER DAUGHTERS WHO WERE STUDENTS AT CB WEST, WHEN DONOVAN CAME AROUND FROM BEHIND HIS DESK TOWARD THE PLAINTIFF AND ORDERED HUNT TO SHUT**

**THE DOOR LEAVING THE PLAINTIFF ALONE WITH TWO MEN, ONE OF WHOM APPROACHED HER DIRECTLY. PLAINTIFF WAS CRYING AND, WHILE SHE DID MOVE HER HANDS BY HER OWN HEAD, SHE IN NO WAY, SHAPE OR FORM PLACED HER HANDS ON ANY PART OF DONOVAN'S HEAD OR BODY. DONOVAN WOULD NOT ALLOW HER TO SPEAK AND WALKED TOWARDS HER TELLING HER TO LEAVE THE OFFICE AND THEY WOULD SPEAK LATER. THE PLAINTIFF WAS TRYING TO COMMUNICATE HER CONCERNS ABOUT THE MENTAL HEALTH OF BOTH OF HER DAUGHTERS AND THE IMMEDIACY OF THE NEEDS OF HER OLDER DAUGHTER AND A SITUATION WITH HER YOUNGER DAUGHTER.**

39. Plaintiff took a leave of absence after this incident. Exh. D-90, 75:10-11.

**ANSWER: ADMITTED.**

40. After not being reappointed as head coach at C.B. West, Plaintiff was hired as head coach of the girls' lacrosse team at Harriton High School in the Lower Merion School District, a position she held until 2021. Exhibit D-2, ¶ 12.

**ANSWER: ADMITTED**

41.On May 13, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Right to Sue letter on August 11, 2020. Exhibit D-82.

**ANSWER: ADMITTED.**

42. At the end of the 2020-2021 athletic season, Nicole Fisher stepped down as head coach of the girls' lacrosse team at C.B. Exhibit D-2, ¶ 16.

**ANSWER: ADMITTED**

43. A job posting for the head coach of the girls' lacrosse team was posted by C.B. West. Plaintiff applied for the position on September 22, 2021. Exhibit D-2, ¶ 20.

**ANSWER: ADMITTED**

44. The posting for the head coach position was closed on October 22, 2021. Exh. D- 2, ¶

**ANSWER: ADMITTED. WHEN THE POSTING CLOSED, PLAINTIFF WAS THE ONLY APPLICANT FOR THE POSITION.**

45.On November 1, 2021, the job posting for head coach was reposted, and the application deadline was extended for one month. Exh. D-2, ¶ 28.

**ANSWER: ADMITTED**

46.When it became apparent that Plaintiff was seeking the girls' lacrosse head coach position, Mr. Donovan expressed to Dr. Lucabaugh that the Plaintiff "should not be considered" for the position. Exhibit D-90, 72:1-7. Dr. Lucabaugh stated that he would support whatever decision Mr. Donovan might have on the subject. Exhibit D-91, 28:10-24.

**ANSWER: ADMITTED THAT DONOVAN DID NOT WANT CARTEE-HARING CONSIDERED FOR THE POSITION, AND LUCABAUGH AGREED WITH THAT DECISION. BOTH DONOVAN AND LUCABAUGH KNEW THAT PLAINTIFF HAD BEEN OPPOSING AGE, SEX AND DISABILITY DISCRIMINATION AND PARTICIPATING IN PROCEEDINGS RELATED TO THE ENFORCEMENT OF LAWS PROHIBITING AGE, SEX AND DISABILITY DOSCRIMINATION.**

47. In November 2021, Mr. Donovan went on medical leave. Transcript of Lyndell Davis (Feb. 9, 2024), 7:19-4:8, attached as Exhibit D-92. Lyndell Davis was then appointed as interim principal at C.B. West. *Id*. Mr. Davis decided to interview the Plaintiff for the coaching position. Exhibit D-92, 16:2-4.

**ANSWER: ADMITTED THAT DONOVAN WENT ON LEAVE AND THAT DAVIS WAS APPOINTTED AS AN INTERIM PRINCIPAL WITH THE EXPECTATION THAT DONOVAN WOULD RETURN AS HEAD PRINCIPAL AFTER HIS LEAVE. IT IS DENIED THAT IT WAS SOLEY MR. DAVIS'S CHOICE TO INTERVIEW THE PLAINTIFF SINCE, ALL ADMINISTRATORS IN THE DISTRICT ARE INSTRUCTED TO ADHERE TO WHATEVER THE SUPERINTENDENT REQUESTS. (DIDIO-HAUBER II Tr. 31). IN FACT, BECAUSE SUPERINTENDENT LUCABAUGH HAD ALREADY AGREED WITH PRINCIPAL DONOVAN THAT PLAINTIFF SHOULD NOT BE CONSIDERED FOR THE HEAD GIRLS' LACROSSE COACH POSITION, THE DECISION TO INTERVIEW PLAINTIFF FOR IT WAS A SHAM.**

48. On November 15, 2021, Mr. Hunt informed Plaintiff that she would be interviewed for the head coach position. Exhibit D-2, ¶ 35.

**ANSWER: ADMITTED THAT AFTER PLAINTIFF ASKED MULTIPLE TIMES FROM THE CLOSE OF THE ORGINAL POST ON OCTOBER 22, 2021 UNTIL NOVEMBER 15, 2021, HUNT FINALLY SAID PLAINTIFF WOULD BE INTERVIEWED. BUT, AS INDICATED ABOVE, THE INTERVIEW WAS A SHAM BECAUSE SUPERINTENDENT LUCABAUGH HAD ALREADY DETERMINED, IN AGREEMENT WITH DONOVAN, THAT PLAINTIFF WOULD NOT BE CONSIDERED FOR THE POSITION.**

49. On November 23, 2021, Plaintiff was interviewed for the head coach position by Hunt, Davis, and Geanine Saullo, principal of Lenape Middle School. Exhibit D-2, ¶ 39. The same group also interviewed Kali Cook-Grisewood as another potential head coach candidate. Exhibit D-2, ¶ 54; Exh. D-81.

**ANSWER: ADMITTED**

50. The interviewers scored the candidates on several factors. Plaintiff received scores of 67, 63, and 62 for a total of 193, while Ms. Cook-Grisewood earned scores of 71, 67, and 65 for a total of 203. Exhibit D-81, pp. 1-6.

**ANSWER: ADMITTED THAT THE INTERVIEWERS PUT DOWN SCORES, BUT IT IS DENIED THAT THOSE SCORES WERE BASED ON REALITY AND FACTS PRESENTED IN THE INTERVIEWS. THE INTERVIEW SCORES WERE MANIPULATED TO JUSTIFY THE ALREADY PRE-DETERMINED CHOICE TO NOT HIRE CARTEE-HARING.**

51.The interviewers made several notes about Plaintiff, stating that she was, *inter alia*, "winning league[s] consistently" and other compliments. Exhibit D-81, p.2.

**ANSWER: ADMITTED**

52. Cook-Grisewood received notes referencing her experience as a lacrosse referee and her "confidence [to] take risks," among other compliments. Exh. D-81, p. 3.

**ANSWER: ADMITTED**

53. On December 7, 2021, Plaintiff was informed that she did not receive the head coach position. Exh. D-2, ¶ 50. Instead, the School District hired Cook-Grisewood. *Id.*, ¶ 54.

**ANSWER: ADMITTED THAT PLAINTIFF WAS TOLD SHE DID NOT RECEIVE THE POSITION, BUT WAS NOT TOLD WHO DID. AFTER COOK-GRISEWOLD WAS HIRED AS HEAD COACH, SHE ATTENDED A PRACTICE WITH THE TEAM AT WHCH SHE WAS UNDER THE INFLUENCE OF ALCOHOL IN VIOLATION OF THE DISTRICT'S POLICIES. A COACH ATTENDING A PRACTICE UNDER THE INFLUENCE OF ALCOHOL WOULD WARRANT HER TERMINATION, BUT COOK-**

Case 2:20-cv-01495-MMB Document 140-1 Filed 05/01/24 Page 22 of 31

**GRISEWOOD WAS NOT TERMINATED BECAUSE THEN, THE DISTRICT WOULD HAVE BEEN PLACED IN THE POSITION OF PLAINTIFF SEEKING THE POSITION AGAIN, WHICH THE DISTRICT DETERMINED WAS NOT GOING TO HAPPEN. BY THE TIME PLAINTIFF WAS REJECTED FOR THE POSITION, HER LAWSUIT CLAMING AGE, GENDER AND DISABILITY DISCRIMINATION HAD BEEN PENDING SINCE APRIL 2020 AND WAS BEING FIERCELY DEFENDED BY THE DISTRICT. LUCABAUGH HAD BEEN DEPOSED AS HAD DIDIO-HAUBER. THE DISTRICT WAS TASKED WITH DOCUMENT PRODUCTION AND OTHER DISCOVERY. THE DISTRICT WAS ALSO TASKED WITH DEFENDING THE MARINELLO COLLECIVE ACTION THAT ASSERTED CLAIMS FOR DISCRIMINATORY COMPENSATION LIKE CARTEE-HARING HAD.**

54. Later that same day, at a meeting between Plaintiff and Davis, Plaintiff received feedback regarding her interview. Exh. D-2, ¶ 52. Plaintiff was told that while it was clear she had a "plethora of knowledge about lacrosse," she had spoken as though she was an assistant coach instead of a head coach, such as how she emphasized delegating tasks to her assistant coach. *Id*.

**ANSWER: ADMITTED THAT ASTONISHINGLY, DAVIS TOLD PLAINTIFF THAT SHE SOUNDED LIKE AN ASSISTANT COACH AND NOT A HEAD COACH IN THE INTERVIEW, DESPITE THE FACT THAT THE PLAINTIFF HAD YEARS OF SUCCESSFUL HEAD COACHING EXPERIENCE AT THE HIGH SCHOOL VARSITY LEVEL, AND COOK-GRISEWOOD HAD ZERO YEARS OF EXPERIENCE AT THE HIGH SCHOOL VARSITY LEVEL AND ONLY EVER ACTUALLY WAS AN ASSISTANT COACH. THEN, EQUALLY AS PREPOSTEROUS, WAS DAVIS'S**

Case: 25-2549 Document: 39 Page: 1123 Date Filed: 01/29/2026

**ACCUSATION THAT A GOOD HEAD COACH DOES NOT DELEGATE TO ASSISTANTS. THE FACT IS THAT HEAD COACHES OFTEN AND NECESSARILY DELEGATE TASKS TO THEIR ASSISTANTS**

55. After not receiving the head coaching position, Plaintiff accepted a girls' lacrosse head coaching position at a private school, Mount St. Joseph's Academy in Flourtown, Pa. Exhibit D-89, 101:21-23.

**ANSWER: ADMITTED**

56. On December 8, 2021, Plaintiff sent an e-mail to DiDio-Hauber, stating that she felt she had been discriminated against due to filing her lawsuit against the School District. Exh. D- 2, ¶ 57. Plaintiff also stated that she believed that Central Bucks re-posted the job posting after she applied explicitly in order to find a different candidate. *Id.*

**ANSWER: ADMITTED**

57. DiDio-Hauber responded on December 10, 2021, informing Plaintiff that reposting a job opening was "standard practice if the district does not get multiple candidates to an initial post." Exh. D-2, ¶ 65. In that same e-mail, DiDio-Hauber directed Plaintiff that she could file a grievance with the Human Resources Department alleging retaliation. *Id.*, ¶ 67. DiDio-Hauber also included a complaint form with her e-mail. *Id.*

**ANSWER: DENIED THAT THERE IS A STANDARD PRACTICE TO REPOST A JOB. NICOLE FISHER WAS THE ONLY APPLICANT FOR THE HEAD GIRLS LACROSSE COACH IN 2019 AND SHE WAS INTERVEWED FOR THE POSITION AND GIVEN THE POSITION WITHOUT IT BEING REPOTSED. ADMITTED THAT DIDIO GAVE INFOMRATION ABOUT FILING A GRIEIVANCE, BUT IT WAS NOT THE CORRECT INFORMATION.**

58. On December 13, 2021, Plaintiff sent an e-mail to Assistant Superintendent Dr. Charles Malone and School Board President Dana Hunter stating that she believed DiDio-Hauber “may be” involved in discrimination and retaliation against Plaintiff arising from her lawsuit against the School District. Exh. D-2, ¶¶ 71-72.

**ANSWER: ADMITTED THAT THE PLAINTIFF SENT THE EMAIL TO THE NEW ASSISTANT SUPERINTENDENT BELIEVING HE WAS UNAWARE OF WHAT HAD HAPPENED AND WOULD BE A NEUTRAL PARTY WHEN IN REALITIY HE WAS BEING UPDATED ON THE COACHING POSITION AND HAD RECEIVED FORWARDED EMAILS.**

59. On December 14, 2021, Dr. Malone began an investigation into Plaintiff’s Title IX claims that she had been a victim of discrimination and retaliation. Exh. D-2, ¶ 74. Dr. Malone interviewed the Plaintiff and the three administrators who had interviewed the head coach candidates. Exh. D-294.

**ANSWER: DENIED THAT MALONE’S REPORT CAN BE REMOTELY CLASSIFIED AS AN INVESTIGATION. MALONE TESTIFIED IN DEPOSITIONS THAT HE HAD NEVER CONDUCTED A TITLE IX INVESTIGATION BEFORE AND DID NOT EVEN RECALL SPECIFICS OF ANY TRAINING. FURTHER, HIS FINAL REPORT MERELY PARROTTED CLAIMS MADE BY DAVIS, HUNT AND SAULLO BEFORE. HE SET OUT TO CONCLUDE EXACLTLY WHAT HE ALREADY PRE-DETERMINED: THAT THERE WOULD BE NO RETALIATION FOUND.**

60. On January 20, 2022, Dr. Malone released his report, which concluded that there had been no retaliation or discrimination. Exh. D-2, ¶ 87. Malone made minor revisions to his findings and released his updated investigation results on January 25, 2022. Exh. D-93.

**ANSWER: DENIED THAT THE CONCLUSION WAS ACCURATE OR THAT MINOR CHANGES WERE MADE. IN FACT, MALONE'S ORIGINAL REPORT CONTAINED IMPLAUSIBLE REASONS FOR THE SELECTION OF THE OTHER COACH -- FOR EXAMPLE THAT THEY WERE LOOKING FOR A COACH TO "BUILD A DIVISION 1 PROGRAM" DESPITE THE FACT THAT NO WHERE ON THE JOB REC WAS THEIR MENTION OF ANY CONNECTION TO DIVISION 1 COACHING BECAUSE THE JOB WAS FOR A HIGH SCHOOL COACH.**

61. According to Malone's report, all interviewers checked the Plaintiff's references, seriously considered her candidacy for the position, and provided feedback for Plaintiff's candidacy. *Id*.

**ANSWER: DENIED. "ALL INTERVIEWERS" DID NOT CHECK THE PLAINTIFF'S REFERENSE NOR DID THE SUALLO, HUNT AND DAVIS DISCUSS THE FINAL CHOICE. SAULLO TESTIFIED THAT AFTER THE INTERVIEWS OF THE CANDIDATES, SHE TOOK HAD NO FURTHER ROLE IN THE SELECTION.**

62. After Malone issued his report, Plaintiff requested a further investigation. Exh. D- 86. The School District hired an independent third party – David F. Conn, Esq., an attorney with the law firm Sweet, Stevens, Katz & Williams – to conduct a second investigation. Exh. D-6.

**ANSWER: IT IS ADMITTED THAT PLAINTIFF REQUESTED FURTHER INVESTIGATION INTO HER TITLE IX RETALIATION COMPLAINT AND THAT THE DISTRICT HIRED MR. KATZ TO ALLEGEDLY TO CONDUCT AN INVESTIGATION. IT IS DENIED THAT KATZ'S INVESTIGATION WAS "INDEPENDENT." TO THE CONTRARY, IT WAS ANOTHER FAÇADE TO MASK THE RETALIATION TO WHICH PLAINTIFF WAS SUBJECTED.**

63. Conn's investigation concluded that: no retaliation had taken place; that Cook-Grisewood was qualified for the head coach position; that the interviewers had done their due diligence in hiring recommendations; and that "there is simply no evidence that the panel consisting of Dr. Davis, Mrs. Saullo and Mr. Hunt made their recommendations based on [Plaintiff's] prior litigation history." Exh. D-6.

**ANSWER: DENIED THAT CONN'S INVESTIGATION WAS ACCURATE OR THAT THE "INTERVIEWERS DID THEIR DUE DILIGENCE" BECAUSE HE WAS LIMITED IN THE EVIDENCE HE WAS ALLOWED TO REVIEW AND DID NOT REVIEW OTHER RELEVANT EVIDENCE OR PEOPLE OUTSIDE MALONE'S REPORT AND WRITTEN QUESTIONS ANSWERED BY THE PANEL WHO AGAIN WANTED TO UPHOLD THE SELECTION OF THE OTHER COACH.**

64. On June 19, 2022, Plaintiff filed an amended Charge of Discrimination against the School District with the EEOC and the Pennsylvania Human Relations Commission ("PHRC"). Exh. D-80.

**ANSWER: ADMITTED**

65. Plaintiff received a right-to-sue letter from the EEOC on September 6, 2022. Exh. D-88.

**ANSWER: ADMITTED**

Respectfully submitted,

/s/ Edward S. Mazurek

Edward S. Mazurek (PA I.D. No. 50278)
THE MAZUREK LAW FIRM, LLC
25201 Cornerstone Drive
Yardley, PA 19067
267.243.3393
emazurek@mazureklawfirm.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was served on counsel for the Defendant through the Court's ECF system.

May 1, 2024 Edward S. Mazurek

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBECCA CARTEE-HARING, | : | No. 2:20-cv-01995-MMB |
| v. | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | |
| DAWN MARINELLO, individually and on behalf of similarly situated female employees | : | No. 2:21-cv-02587-MMB |
| Plaintiff, | : | |
| v. | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

I, Rebecca Cartee-Haring, hereby make this Unsworn Declaration under Penalty of Perjury pursuant to 28 U.S.C. § 1746. The Facts in bold capital letters set forth in my foregoing Answer to the Defendant's Statement of Undisputed Facts and Counterstatement of Facts are true and correct.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on April 30, 2024

Rebecca Cartee-Haring