# United States Court of Appeals
*for the*
# Third Circuit

Case Nos. 25-2540, 25-2541, 25-2612, 25-2613

REBECCA CARTEE-HARING and DAWN MARINELLO,

*Plaintiff-Employees/Appellees/Cross-Appellants,*

v.

CENTRAL BUCKS SCHOOL DISTRICT,

*Appellant/Cross-Appellee.*

Appeal from Civil Judgment Order of May 8, 2025; the Memorandum and Order of July 15, 2025, modifying the judgment; and the Memorandum and Order of July 21, 2025, granting in part the fee petition, as entered in the United States District Court for the Eastern District of Pennsylvania

## THIRD STEP BRIEF BY APPELLANT/CROSS-APPELLEE

Michael I. Levin, Esq.
David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: (215) 938-6378

*Attorneys for*
*Appellant/Cross-Appellee*

# TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT ........ 1
II. ARGUMENT ........ 1
A. District Responses To Issues Raised By Plaintiff-Employees. ........ 1
1. The District Court Properly Decertified the Collective Where the Putative Members Were Not "Similarly Situated": Their Claims Arose From Different Hiring Policies Over Decades, Involved Highly Individualized Step Placement Decisions, Reflected Different Jobs and Certifications With Different Skills, Effort, and Responsibility, and Were Defined by an Impermissibly Overbroad Fail-Safe Collective Definition. ........ 1
2. The Collective Action Definition Is Deficient. ........ 10
3. Plaintiffs' Final Certification Immutability Theory Has No Basis In Law Or This Record. ........ 12
4. Plaintiff-Employees Not Entitled To Judgment As A Matter Of Law. ........ 13
5. The Plaintiff-Employees' Post-Trial Motions Were Properly Denied After The Second Trial ........ 15
6. No Adjustment of Attorney's Fees And Costs Is Warranted. ........ 23
B. District's Reply to Plaintiff-Employees' Responses to the District's Arguments. ........ 26
1. Performing Jobs of Equal Skill, Effort, and Responsibility. ........ 26
2. Evidence of Job Similarity Was Not Uncontroverted. ........ 29
3. Plaintiff-Employees Did Not Prove Wage Differential. ........ 33
4. Plaintiff-Employees Did Not Prove At The First Trial That Any Wage Differential Was Not Due To A Factor Other Than Sex To Prevail On A Rule 50 Motion. ........ 38
C. Appellees Failed to Address Issues Raised by Appellants, Thereby Conceding Those Issues. ........ 40
D. Arguments Raised in Amicus Brief ........ 42
1. Whether The District Court Applied The Correct Standard In Upholding The Jury's Finding That Plaintiff-Employees And Their Comparator Perform Substantially Similar Jobs. ........ 43
2. Whether The Plaintiffs Could Establish A *Prima Facie* Case By Showing A Wage Differential With A Single Comparator. ........ 45
E. Summary Judgment Was Proper on Discrimination Claims. ........ 48
1. Cartee-Haring's Title VII Gender Discrimination Claim. ........ 49
2. Age Discrimination Claim Under The ADEA. ........ 51
3. Retaliation Claims Related To Subsequent Non-Hiring. ........ 53
III. CONCLUSION ........ 54

# TABLE OF AUTHORITIES

## Cases

*Ahad v. Bd. of Trs. of S. Ill. Univ.*, No. 15-cv-3308, 2019 U.S. Dist. Lexis 53392 (C.D. Ill. Mar. 28, 2019)........8
*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)........12
*Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164 (8th Cir. 1995)........17
*Bailey v. Pilots' Ass'n for Bay & River Delaware*, 406 F. Supp. 1302 (E.D. Pa. 1976)........17
*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592, 2011 WL 4351631 (W.D.N.C. Sept. 16, 2011)........4
*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021)........48
*Brinkley v. Harbour Rec. Club*, 180 F.3d 598 (4th Cir. 1999)........17, 48
*Brinkley-Obu v. Hughes Training*, 36 F.3d 336 (4th Cir. 1994)........17
*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988)........21
*Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945)........20
*Burton v. Teleflex, Inc.*, 707 F.3d 417 (3d Cir. 2013)........51
*Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. 09-85J, 2011 U.S. Dist. Lexis 146067 (W.D. Pa. Dec. 20, 2011)........2
*Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972 (11th Cir. 2015)........48
*Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194 (3d Cir. 1994)........54
*Chavarriaga v. N.J. Dep't of Corrections*, 806 F.3d 210 (3d Cir. 2015)........50
*Chickilly v. Panther Valley Sch. Dist.*, No. 3:14-cv-02173, 2015 WL 7069335 (M.D. Pa. Nov. 12, 2015)........17
*Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075 (D. Minn. 2014)........2
*City of Burlington v. Dague*, 505 U.S. 557 (1992)........25
*Coates v. Farmers Grp., Inc.*, 2015 U.S. Dist. Lexis 165817 (N.D. Cal. 2015)........3
Cour*Heller v. Elizabeth Forward Sch. Dist.*, 182 F. App'x 91 (3d Cir. 2006). 23, 38
*De Block v. Speedway LLC*, No. 20-824, 2021 U.S. Dist. Lexis 198782 (E.D. Pa. Oct. 15, 2021)........8
*Dindinger v. Allsteel, Inc.*, 853 F.3d 414 (8th Cir. 2017)........48
*EEOC v. McCarthy*, 768 F.2d 1 (1st Cir. 1985)........17
*EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014)........5
*Eshelman v. Agere Sys.*, 554 F.3d 426 (3d Cir. 2009)........21, 22, 23
*Fobbs v. Riverway Bus. Servs. Inc.*, No. 4:23-CV-0624, 2023 WL 8530844 (S.D. Tex. Nov. 14, 2023)........6
*Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240 (3d Cir. 2013)........42

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ....................................................53
*Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655 (3d Cir. 2002) ................25
*Goulet v. Univ. of Miss.*, No. 3:22-cv-89, 2023 U.S. Dist. Lexis 126790 (N.D. Miss. July 24, 2023) ..........................................................................................45
*In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449 (3d Cir. 2000) .............................26
*Jarosz v. St. Mary. Med. Ctr.*, 2014 WL 4722614 (E.D. Pa. 2014)..........................2
*Joiner v. City of Macon*, 814 F.2d 1537 (11th Cir. 1987) ......................................21
*Kassman v. KPMG LLP*, 416 F. Supp. 3d 252 (S.D.N.Y. 2018)..............................5
*Kevari v. Scottrade, Inc.*, No. CV 18-819-JFW, 2018 U.S. Dist. Lexis 227343 (C.D. Cal. Aug. 31, 2018) ........................................................................................12
*Lindsey v. Tire Discounters, Inc.*, No. 2:15-cv-3065, 2017 WL 5972104 (S.D. Ohio Dec. 1, 2017) ..........................................................................................................3
*Macgregor v. Farmers Ins. Exch.*, No. 2:10-CV-03088, 2011 U.S. Dist. Lexis 80361 (D. S.C. Jul 22, 2011)..........................................................................................4
*Martinez v. Bohls Equip. Co.*, 361 F. Supp. 2d 608 (W.D. Tex. 2005)...................21
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)........................ 50, 52, 53
*Messner v. Northshore Univ. Health System*, 669 F.3d 802 (7th Cir. 2012)...........12
*Moody v. Associated Wholesale Grocers, Inc.*, No. 17-10290, 2019 WL 6036707 (E.D. La. Nov. 14, 2019)........................................................................................6, 8
*Niwayama v. Tex. Tech Univ.*, 590 F. App'x 351 (5th Cir. 2014)..........................48
*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998)................................................42
*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994).. 18, 19
*Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345 (S.D. Fla. 2007)...........3
*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ................................... 24, 25
*Pitts v. Northern Telecom, Inc.*, 24 F. Supp. 2d 437 (E.D. Pa. 1998) .....................19
*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584 (3d Cir. 2005)..................................19
*Pollis v. New Sch. for Soc. Research*, 132 F.3d 115 (2d Cir. 1997)........................17
*Postiglione v. Crossmark, Inc.*, No. 11-960, 2012 U.S. Dist. Lexis 163615 (E.D. Pa. Nov. 14, 2012).....................................................................................................4
*Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357 (D. Me. 2010) ........................8
*Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990)..............................................24
*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Ed.*, 470 F.3d 535 (3d Cir. 2006)...........................................................................................................50
*Silberman v. Bogle*, 683 F.2d 62 (3d Cir. 1982)......................................................24
*Spencer v. Va. State Univ.*, 919 F.3d 199 (4th Cir. 2019) .......................................33
*Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000)..............................................47
*Summy-Long v. Pa. State Univ.*, 715 F. App'x 179 (3d Cir. 2017).........................31
*Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189 (3d Cir. 2011) ......................13

*Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28 (2d Cir. 2015)................47
*Vanzzini v. Action Meat Distribs.*, 995 F. Supp. 2d 703 (S.D. Tex. 2014)................3
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..............................................4
*Wastak v. Lehigh Valley Health Network*, 333 F.3d 120 (3d Cir. 2003).................18
*Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638 (3d Cir. 2015).......53
*Winks v. Virginia Dep't of Trans.*, No. 3:20-CV-420, 2021 WL 2482680 (E.D. Va. June 17, 2021)...........................................................................................4
*Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610 (E.D. Pa. 2015)..........................................................................................................12
*Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012)...............................2, 8

**Statutes**

29 U.S.C. § 206....................................................................................... 35, 37
65 P.S. § 67.701 ...........................................................................................20
65 P.S. § 67.702 ...........................................................................................20

**Rules**

Fed. R. App. P. 28.........................................................................................42
Fed. R. App. P. 28.1......................................................................................42
Fed. R. Civ. P. 30(b)(6)..................................................................................39

**Regulations**

22 Pa. Code § 49.13 .......................................................................................31
29 C.F.R. § 1620.15 .......................................................................................31

# I. SUMMARY OF THE ARGUMENT

This brief addresses five groups of issues: (1) responses of the Central Bucks School District ("CBSD" or "District") to issues raised by Rebecca Cartee-Haring and Dawn Marinello (the "Plaintiff-Employees") in their appeals; (2) the District's replies to the Plaintiff-Employees' responses to issues raised in the District's appeal; (3) issues raised by the District to which the Plaintiff-Employees offered no opposition; (4) the District's responses to issues raised in the EEOC's amicus brief; and (5) the District's responses to Cartee-Haring's appeal from the dismissal of her discrimination and retaliation claims concerning her lacrosse coaching position.

# II. ARGUMENT

## A. District Responses To Issues Raised By Plaintiff-Employees.

### 1. The District Court Properly Decertified the Collective Where the Putative Members Were Not "Similarly Situated": Their Claims Arose From Different Hiring Policies Over Decades, Involved Highly Individualized Step Placement Decisions, Reflected Different Jobs and Certifications With Different Skills, Effort, and Responsibility, and Were Defined by an Impermissibly Overbroad Fail-Safe Collective Definition.

The Plaintiff-Employees seek to revive a collective action encompassing employees hired over four decades under multiple hiring policies, filling widely different positions, and involving individual decisions for salary step placement. These employees performed fundamentally different jobs, held different legal

certifications, and, by law, could not perform the duties of those in other classifications. Yet Plaintiffs contend that this diverse group should nonetheless be treated as "similarly situated" for purposes of the Equal Pay Act of 1963 ("EPA"). The law does not permit such a sweeping and artificial aggregation of individualized employment decisions, and the district court correctly rejected it by decertifying the collective.

**a. Claims Are Not Based on a Common Policy or Practice.**

To proceed as a collective action under the EPA and to prove that employees are "similarly situated," an essential component in the required analysis is whether the employer maintained a common "decision, policy or plan" that affected each class member in a way that violated the EPA. *Jarosz v. St. Mary. Med. Ctr.*, 2014 WL 4722614 at *7 (E.D. Pa. 2014) (*citing Zavala v. Wal-Mart Stores Inc.,* 691 F.3d 527, 538 (3d Cir. 2012); *Camesi v. Univ. of Pittsburgh Med. Ctr.,* No. 09-85J, 2011 U.S. Dist. Lexis 146067, at *3 (W.D. Pa. Dec. 20, 2011). For conditional certification, "[t]he plaintiffs need only establish at that time a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014). "[C]ourts have found proposed classes to be "similarly situated" pursuant to § 216(b) when the plaintiff shows that (1) the plaintiff and the proposed class members were

victims of the same policy, and (2) the plaintiff and the proposed class members may be able to assert EPA claims against the defendant based on that policy." *Coates v. Farmers Grp., Inc.*, 2015 U.S. Dist. Lexis 165817, at *28 (N.D. Cal. 2015); *see also Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007); *Vanzzini v. Action Meat Distribs.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014).

Rather than identifying a uniform policy, Plaintiff-Employees challenge hundreds of individualized hiring decisions made over more than four decades under multiple procedures, administered by different human resources directors, and subject to case-by-case discretion based on factors such as certification requirements, labor market conditions, and the District's needs at the time of hire. Because step placement was determined through these individualized, evolving processes, there is no common transaction or occurrence tying the claims of the putative members together.

#### b. Individualized Decisions Defeat 'the "Similarly Situated" Standard.

Where claims arise from individualized, discretionary decisions rather than a uniform policy, collective treatment is inappropriate. *See Lindsey v. Tire Discounters, Inc.*, No. 2:15-cv-3065, 2017 WL 5972104, at *25 (S.D. Ohio Dec. 1, 2017) ("Taken together, the Court finds these [service manager] experiences too varied to be 'similarly situated' with respect to interviewing, selecting, and training

of employees. Some [service managers] report no involvement whatsoever with interviewing and training; others report significant involvement.”). Similarly, *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592, 2011 WL 4351631, at *26 (W.D.N.C. Sept. 16, 2011) held that “a ‘policy’ of allowing discretion by local supervisors over employment matters is insufficient to establish the commonality requirement of a class action certification pursuant to Rule 23.” Where decisions are individualized or based on supervisor evaluation of a critical need, collective treatment is less likely to be manageable. *Macgregor v. Farmers Ins. Exch.*, No. 2:10-CV-03088, 2011 U.S. Dist. Lexis 80361 at *13-14 (D. S.C. Jul 22, 2011) (*citing Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

In this case, evidence presented at trial would have to be highly individualized and focused on the procedures in place during the time that each putative class member was hired, and take into account the relative experience of each member vis-à-vis comparators hired at the same time, as measured against the District’s critical needs and other hiring issues. *See Postiglione v. Crossmark, Inc.*, No. 11-960, 2012 U.S. Dist. Lexis 163615, at *16-22 (E.D. Pa. Nov. 14, 2012) (denying conditional certification where collective members’ claims differed, so they were not similarly situated to the named plaintiffs); *see also Winks v. Virginia Dep’t of Trans.*, No. 3:20-CV-420, 2021 WL 2482680, at *6 (E.D. Va. June 17, 2021)

(holding that the "individualized nature of pay determinations alone is sufficient to demonstrate the absence of a common policy."). Accordingly, the Plaintiff-Employees have failed to make a showing that the putative class members are similarly situated, and re-certification must be denied.

**c. Collective Action Is Not Warranted When Employee Groups Are as Diverse as The Plaintiff-Employees Are Proposing.**

The central issue is whether an EPA collective action can include employees from an array of job categories – specifically nurses, psychologists, counselors, librarians, speech therapists, and classroom teachers – when these roles do not require substantially equal skill, effort, and responsibility. Such a heterogeneous collective cannot meet the EPA's demanding "equal work" threshold; therefore, collective action should not be permitted. The EPA's requirements for "substantially equal" work are not met where the proposed class encompasses fundamentally different professions, each with distinct qualifications, duties, and responsibilities. *See Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 269-70 (S.D.N.Y. 2018) (denying certification where job content varied among opt-ins); *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255-56 (2d Cir. 2014). Where the proposed collective includes employees whose jobs are not substantially equal, collective action is not permitted. *Kassman* at 269-70; *Port Auth*. at 255-56 (requiring common duties or content).

Courts deny certification or decertify collectives where employees' job duties,

responsibilities, or employment settings are materially different, requiring individualized inquiries into liability or defenses. *See Fobbs v. Riverway Bus. Servs. Inc.*, No. 4:23-CV-0624, 2023 WL 8530844, at *11 (S.D. Tex. Nov. 14, 2023) ("The disparate employment settings and client requirements applicable to CSAs weigh against certification of the proposed collective action because there is no collective basis for determining whether an overtime violation occurred."). Similarly, in *Moody v. Associated Wholesale Grocers, Inc*., No. 17-10290, 2019 WL 6036707, at *3 (E.D. La. Nov. 14, 2019), the court decertified a collective where "the job duties for the different types of supervisors differ to the extent that a decision about one type's FLSA exemption cannot provide the basis for a decision about a different type," and "even within a single type of supervisor role, the duties differed among those supervisors to a degree that would impact the analysis as to each Plaintiff's exempt status."

The Plaintiff-Employees' proposed collective sweeps far beyond any group of employees who could plausibly be considered "similarly situated." The collective includes nurses, psychologists, counselors, librarians, speech therapists, and classroom teachers. Plaintiffs contend that employees in all these categories perform work requiring substantially equal skill, effort, and responsibility. That assertion stretches the concept of comparability well beyond what the EPA permits.

It may not be wholly irrational to argue – as the Plaintiff-Employees do – that classroom teachers, despite differences in grade level or subject matter, share a common core of professional duties – planning instruction, delivering lessons, assessing student progress, and managing a classroom – and therefore may be compared with one another. But the same cannot reasonably be said for the vastly different professional roles Plaintiff-Employees seek to combine into a collective. These roles require distinct educational backgrounds, professional licenses, certifications, and job skills that are fundamentally different from those of classroom teachers.

**d. Collective Members Are Not Similarly Situated When They Are Subject To Different Defenses.**

Because the District's defenses are distinct for putative members of the collective and require separate factual determinations for each member of the putative collective, the group lacks the necessary similarity for certification or continued collective treatment. Courts consistently hold that the presence of individualized defenses – such as those relating to statute of limitations or comparator qualifications – undermines the "similarly situated" requirement. *See, e.g., De Block v. Speedway LLC*, No. 20-824, 2021 U.S. Dist. Lexis 198782, at *2 (E.D. Pa. Oct. 15, 2021) *(citing Zavala*, *supra*)*; Ahad v. Bd. of Trs. of S. Ill. Univ.*, No. 15-cv-3308, 2019 U.S. Dist. Lexis 53392, at *16-18 (C.D. Ill. Mar. 28, 2019).

The rationale for collective actions is to promote judicial economy and fairness by resolving common issues collectively. Where individualized issues predominate, these goals are defeated. *See Ahad*, No. 15-cv-3308; *Moody*, No. 17-10290; *Sanders v. Latshaw Drilling Co.*, No. 3:16-CV-1093-S (N.D. Tex. Mar 14, 2019). Courts have broad discretion to deny or decertify collectives where individualized defenses would require "mini-trials" for each member. *See Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 359 (D. Me. 2010). In this case, multiple defenses are applicable to purported members of the collective.

**e. The Statute of Limitations.**

Claims under the Equal Pay Act must be filed within two years (or three years for willful violations[1]) of the alleged pay violation. Each discriminatory paycheck constitutes a separate violation, and the statute of limitations runs anew with each paycheck. Assuming arguendo that there is a violation, the violation can stop in two ways: (1) when the employee is no longer employed by CBSD, or (2) when the employee reaches the top of the salary scale. In both situations, there are no more discriminatory paychecks, the violation stops, and the claim must be filed within two (or three) years. There are three opt-in plaintiffs who stopped working between two

[1] The jury unanimously decided that CBSD's alleged violation of the EPA was not willful, limiting the statute of limitations to two years. J.A. 2038-40.

and three years before opting in; 55 employees who stopped working more than three years before opting in; 13 plaintiffs who reached the top of the scale between two and three years before opting in, and 91 who topped out more than three years ago.

Plaintiff-Employees argue that the statute of limitations does not apply to these opt-in plaintiffs under “equitable tolling” and the “discovery rule.” CBSD asserts that neither equitable tolling nor the discovery rule applies as a matter of law, but, if they do, they are legal rules that must be applied on an individualized basis. For example, under the equitable tolling exception, one plaintiff may be able to prove that she engaged in diligent efforts while another may not.

#### f. Varying Salary Placement Policies.

Before 1999, the District followed an unwritten practice regarding salary scale placement. In 1999, the practice was reduced to writing. It had general rules that granted “partial” recognition of prior experience and an exception when there was a “critical need” to hire someone. These guidelines have changed several times over the years. J.A. 2264-2278. In addition, the guidelines provided that a person hired as a “true” long-term substitute would be placed on step 1 of the salary scale. This background establishes that each opt-in plaintiff must be evaluated individually to determine which guideline applies to explain the salary placement.

**g. Exceptions For "Critical Need".**

The administrative guidelines allow administrators to make exceptions for teachers filling a "critical need" of the District. A critical need often arises because it is difficult to find teachers with certain specialized certifications. Critical needs also arise when a position must be filled quickly. Determining whether a teacher was properly placed on the salary scale would require an individualized inquiry into whether that teacher was hired to fill a critical need.

**h. Different Rationale For Different Alleged Comparators.**

Determining the proper comparators for each opt-in plaintiff would require assessing the skills, effort, and responsibility of each teacher, then comparing their wages with those of male teachers with substantially similar skills, effort, and responsibility. Such an individualized inquiry for hundreds of plaintiffs would be nearly impossible.

**2. The Collective Action Definition Is Deficient.**

Even if the Plaintiff-Employees made the showing necessary for re-certification, the putative collective membership is overbroad and deficiently defined. The collective was defined: "[a]ll women teachers employed by the District from 2000 through the present who have been subject to compensation under the District's applicable Salary Schedules who were treated less favorably than male teachers employed by the District from 2000 through the present with respect to

compensation under the applicable Salary Schedules." J.A. 424. However, neither the Plaintiff-Employees nor the district court provided any explanation how to determine which female teachers were "treated less favorably" than males. Under that definition, any female teacher who joined the District at any step other than the top of the salary schedule would be a member because she would have received less compensation than any male teacher at the top of the pay scale. Such a result is untenable. Meanwhile, there has never been a claim that any female teacher at a specific step-and-column position on the salary schedule received less compensation than a male teacher at that same position. So by that definition, there are no putative class members.

The putative collective members constitute a "fail-safe" class, which is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 825 (7th Cir. 2012). Its existence, therefore, cannot be ascertained until the conclusion of the case when liability is determined. *See Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 623-24 (E.D. Pa. 2015) (denying certification of a fail-safe class). A fail-safe class is one that defines its members by liability – all individuals wronged by the defendant – in the classic formulation. The class definition requires a determination on the merits before members are identified,

creating what the Supreme Court called "one-way intervention." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974); *see also Kevari v. Scottrade, Inc.*, No. CV 18-819-JFW, 2018 U.S. Dist. Lexis 227343, at *28 (C.D. Cal. Aug. 31, 2018) (denying certification of a fail-safe class in an Equal Pay Act case).

Determining which putative class members should receive notification would require a complete analysis of the claims of each individual putative member, which cannot be allowed. Accordingly, re-certification must be denied.

**3. Plaintiffs' Final Certification Immutability Theory Has No Basis In Law Or This Record.**

Plaintiff-Employees assert that the district court's so-called "final" certification was conclusive and therefore insulated from later decertification. ECF 39 at p. 15. That contention is untenable. Whatever label the court used, the certification order functioned as a notice-stage, conditional certification, entered while discovery was ongoing and before the court had developed the record required to make a true final determination whether the named plaintiffs were "similarly situated" to more than 380 opt-ins. *See* J.A. 405-06; *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011) (final certification occurs after discovery "with the benefit of a much thicker record"), *rev'd on other grounds*, 569 U.S. 66 (2013).

The procedural history confirms the point. The court adjourned the

certification hearing without allowing the District to present its full evidence (J.A. 392-94), then issued an order purporting to "finally" certify a collective without the record that final certification requires (J.A. 424-25). Only after the first jury trial vividly exposed the individualized nature of the claims – resulting in a hung jury – did the court do what the statute permits and the record demanded: decertify. J.A. 65. That sequence does not make decertification unlawful; it demonstrates why it was necessary.

Most importantly, the trial judge recognized that certification was not truly final and that decertification remained available, stating: "I think I have the right under the statute to de-certify in the future, should it appear necessary." J.A. 406. Plaintiffs' argument that certification was irrevocable is unsupported as a matter of law and flatly contradicted by the record.

#### 4. Plaintiff-Employees Not Entitled To Judgment As A Matter Of Law.

Plaintiff-Employees argue that the trial court should have granted their Rule 50 motion for judgment as a matter of law after the first trial, asserting there was no legally sufficient evidentiary basis for a reasonable jury to find for the District. ECF 39 at pp. 18-28. But reversal is warranted only if, viewing the evidence and all reasonable inferences in the non-moving party's favor, no reasonable juror could have returned a verdict for that party. Plaintiff-Employees cannot make that

showing.

Much of the trial of this matter focused on whether the Plaintiff-Employees performed jobs of equal skill, effort, and responsibility as their purported male comparator – John Donnelly. Plaintiff-Employees argued that from a 30,000-foot view, all teachers exhibit similar skills, effort, and responsibility because they are all trained to be educators, and they perform some similar tasks, such as creating lesson plans, and motivating students, etc. However, the District presented testimony that Pennsylvania teachers can teach only subjects for which they are certified – *i.e.*, a high school social studies teacher does not have the skills necessary to teach elementary school. J.A. 1557, 1706. The District presented evidence that individuals need to obtain specialized college training in course and at colleges approved by the Department of Education in order to obtain the skills necessary for the specific certification area. J.A. 1705, 1751. Therefore, how can a teacher certificated in one subject area be similarly situated to another teacher lacking that certification when the second teacher does not have the skills to teach in that subject area?

Plaintiff-Employees state in their brief that the trial evidence was "uncontroverted." *See* Brief, p. 22. Yet not only was the Plaintiff-Employees' evidence controverted, the jury was split on the issue of whether the Plaintiff-Employees performed jobs of equal work as their comparators until Judge Baylson

gave them a way out by suggesting that they could find the District liable and simply reduce the damages award.[2] J.A. 2019, 2032.

### 5. The Plaintiff-Employees' Post-Trial Motions Were Properly Denied After The Second Trial

Plaintiff-Employees argue that their awards at the end of the second trial were improperly limited. However, the Plaintiff-Employees are not entitled to additional awards.

#### a. Plaintiff-Employees' Back Pay Awards Were Properly Limited.

Plaintiff-Employees allege that their back-pay awards should be based on "uncontroverted" evidence while pointing out that their damages calculations far exceeded what they were awarded. ECF 39, pp. 28-29. In doing so, the Plaintiff-Employees misconstrue the meaning of "uncontroverted," which means "not liable to be called into question, not disputed." Oxford English Dictionary (2025). The District did not offer evidence challenging the Plaintiff-Employees' calculations because it was precluded from doing so. J.A. 96-97.[3] However, just because the

---

[2] The District raised the issue of the erroneous *Allen* instructions in its opening brief. *See* ECF 29, pp. 50-53.

[3] The Court prohibited the District from presenting any wage information showing men and women were paid the same. ECF 29, pp. 15-17 (*citing* J.A. 2427-2431, 2434-2437, 2443-2444).

District could not directly challenge the damages calculations did not mean that the court and jury were forced to accept those calculations, especially since those calculations ignored the applicable statute of limitations. Importantly, Plaintiff-Employees cite no case law supporting their position. The post-trial motions were properly denied.

**b. The Statute of Limitations Was Properly Applied.**

Plaintiff-Employees argue that the trial court should not have limited their damage awards based on the statute of limitations because the statute was tolled by the discovery rule. ECF 39, pp. 29-34. This is incorrect because the Discovery Rule does not apply to EPA cases, and even if it did, the Plaintiff-Employees do not meet the criteria to invoke the rule.

In EPA cases, plaintiffs are permitted to recover the differential in pay that is within the statutory period. The Sixth Circuit has explained that a plaintiff who complains of willful violation of the Equal Pay Act over a 10-year period of employment is not barred from suing but "should not be allowed to collect for damages outside the three-year limitations period." *Gandy v. Sullivan County*, 24 F.3d 861, 865 (6th Cir. 1994). The Eighth Circuit reasoned that this approach "strikes a reasonable balance between permitting redress of an ongoing wrong and imposing liability for conduct long past." *Ashley v. Boyle's Famous Corned Beef*

*Co.*, 66 F.3d 164, 168 (8th Cir. 1995); *see also Brinkley-Obu v. Hughes Training*, 36 F.3d 336, 351 (4th Cir. 1994); *EEOC v. McCarthy*, 768 F.2d 1, 3 n.4 (1st Cir. 1985); *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997); *Bailey v. Pilots' Ass'n for Bay & River Delaware,* 406 F. Supp. 1302, 1308 (E.D. Pa. 1976).

The trial court applied this same rule in an earlier ruling saying:

> FEPA has a two-year statute of limitations for most claims and a three-year limit for willful violations, *id.* at § 255; plaintiffs cannot generally recover FEPA damages on paychecks older than that three-year period. S*ee Chickilly v. Panther Valley Sch. Dist.*, No. 3:14-cv-02173, 2015 U.S. Dist. LEXIS 153300, 2015 WL 7069335, at *2-3 (M.D. Pa. Nov. 12, 2015).

J.A. 175.

However, even if the Discovery Rule applies, neither Plaintiff-Employee can meet its standards. Under the rule, a cause of action accrues the moment the plaintiff "either is aware, ***or should be aware***, of the existence of and source of an injury." *Wastak v. Lehigh Valley Health Network*, 333 F.3d 120, 126 (3d Cir. 2003) (emphasis added). In employment discrimination cases, the concept of the discovery rule is limited to when the employee finds out about the ***employment decision made by the employer and the nature of the decision*** **–** *i.e.*, the nature of the personnel action taken – ***not when the employee learns that there may be unlawful discrimination***. This Court in *Wastak* explained:

> Wastak's argument misconceives the nature of the "discovery rule" in employment discrimination cases, and is precluded by our decision in *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994).
>
> ***
>
> On appeal, we upheld the District Court's dismissal of Oshiver's claims as untimely. Like Wastak, who argues that his claim did not arise until he learned that he had been replaced by a younger individual, Oshiver argued that her claim did not arise, and the limitations period did not begin to run, until she first discovered that the firm had replaced her with a male attorney. *Id*. at 1385. We rejected that argument, stating that under the discovery rule a cause of action accrues the moment the plaintiff "either is aware, or should be aware, of the existence of and source of an injury." *Id*. at 1386.
>
> * * *
>
> [A]s we made clear in *Oshiver*, "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." *Id*. at 1386.

*Wastak* at 125-27.

The Discovery Rule stops tolling not when a plaintiff learns that there may have been unlawful discrimination, but when they learn of the employment action taken concerning them. This Court has explained, "a claim accrues as soon as a potential plaintiff either is aware or ***should be aware after a sufficient degree of diligence***, of the existence and source of an actual injury." *Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 590 (3d Cir. 2005) (emphasis added). In *Pitts v. Northern Telecom, Inc*., 24 F. Supp. 2d 437 (E.D. Pa. 1998), the Court explained:

> The standard of reasonable diligence is an objective one. The statute is tolled only if a reasonable person in plaintiff's position would not have been aware of the salient facts.

> ***It has been recognized that there are very few facts which cannot be discovered through the exercise of reasonable diligence***. Once plaintiff is aware of the salient facts, his failure to investigate or to exercise reasonable diligence in the investigation will not prevent the statute of limitations from running.

*Id.* at 441 (emphasis added; citations omitted).

There is no evidence of any investigation by the Plaintiffs. Each Plaintiff was told upon being hired the step and column where they were being placed. In addition, in public School Board meetings, the names, salaries, steps, and columns of every other teacher hired were publicly disclosed. All School Board meeting agendas and minutes are publicly published. All that any Plaintiff needs to do is access and look at the agenda or minutes and she would know the step and column placement of all other teachers – male and female. In addition to the public disclosure of step and column placement and annual wage rate, because the Plaintiffs are covered by a collective bargaining agreement and because the employer is a governmental entity, there are transparency rules that allow any Plaintiff to easily obtain any information she needs to fulfill her duty of diligence.

Although the scope of Pennsylvania's Right to Know Law (the "RTKL") has changed over time, wage information has always been subject to access since the RTKL was enacted in 1957. Under the current RTKL, enacted in 2008, each Plaintiff could have submitted a one-page form to request records of any employee. *See e.g.*,

65 P.S. §§ 67.701, 67.702. Accordingly, application of the Discovery Rule does not support the Plaintiff-Employees' claims.

**c. Plaintiffs Are Not Entitled To Pre-Judgment Interest.**

Plaintiff-Employees seek prejudgment interest on their back-pay awards. ECF 39, pp. 34-36. However, it is well settled that in an action for violations of the Fair Labor Standards Act, prejudgment interest may not be awarded in addition to liquidated damages. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945) superseded by statute on other grounds as recognized by *Martinez v. Bohls Equip. Co*., 361 F. Supp. 2d 608, 620 (W.D. Tex. 2005); *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987); *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1064 (2d Cir. 1988). Among other purposes, liquidated damages compensate for the delay in receiving wages that should have been paid, the same as an award of prejudgment interest. The Plaintiff-Employees here were awarded liquidated damages (J.A. 103), so an award of prejudgment interest is inappropriate.

**d. Plaintiff-Employees Are Not Entitled To An Extra Award Based On The Tax Consequences Of Their Back Pay Awards.**

Plaintiff-Employees argue that they should be awarded amounts to cover the additional income taxes they would be required to pay because of receiving their back-pay awards in a single year. ECF 39, pp. 36-38. Plaintiff-Employees point to this Court's decision in *Eshelman v. Agere Sys.*, 554 F.3d 426 (3d Cir. 2009).

However, such an award is not appropriate in this case. And even if it were appropriate, the Plaintiff-Employees' calculation of the award is improper. In *Eshelman*, which addressed damages awards in cases brought pursuant to the Americans with Disabilities Act, not the EPA, this Court stated:

> We hasten to add that in so holding, we do not suggest that a prevailing plaintiff in discrimination cases is presumptively entitled to an additional award to offset tax consequences above the amount to which she would otherwise be entitled. Employees will continue to bear the burden to show the extent of the injury they have suffered. The nature and amount of relief needed to make an aggrieved party whole necessarily varies from case to case.

*Eshelman*, 554 F.3d at 443 (3d Cir. 2009). The Court went on to equate tax burden awards to the award of prejudgment interest. As noted above, prejudgment interest is not available in EPA cases in which liquidated damages are awarded. Therefore, the same logic would preclude the award of a tax offset. As Judge Baylson stated in rejecting the Plaintiff-Employees' request for a tax offset:

> Plaintiffs cite *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 440-41 (3d Cir. 2009) to support their request for prejudgment interest and compensation for increased tax burden. ECF 469 at 13, 15. Though *Eshelman*'s language is broad, referring generally to "antidiscrimination statutes," the Third Circuit's discussion of remedies is limited to remedies under the ADA. *Eshelman*, 554 F.3d at 441-42 * * * Not so with the EPA which has a specific damages provision that contains no provision for equitable relief.

J.A. 116 n.10. Plaintiff-Employees cite no cases in which a tax offset was awarded in an EPA case, nor could the District's counsel find such a case.

Even if Plaintiff-Employees were to be awarded a tax offset, the amounts calculated by the Plaintiff-Employees wildly overstate the awards because they are based on their improper back-pay calculations that ignored the statute of limitations. Any award of a tax offset would have to be recalculated based on the amounts awarded by the jury.

**e. Plaintiff-Employees Were Awarded Liquidated Damages.**

Plaintiff-Employees seek an award of liquidated damages in an equal amount to their calculations of back pay, combined with prejudgment interest.[4] ECF 39, pp. 38-39. However, the trial court has already awarded liquidated damages based on the back-pay amounts awarded by the jury as molded to account for the Plaintiff-Employees' start dates. J.A. 103-04.

**f. Marinello Should Not Be Awarded Front Pay.**

Marinello claims that her damages award should include an increase in compensation to match that of John Donnelly. She argues that the court has the authority to do so under its equitable powers. ECF 39, pp. 39-40. In rejecting Marinello's post-trial motion on the issue, the trial court explained:

Plaintiffs request that the Court adjust Ms. Marinello's prospective

---

[4] Not only do Plaintiff-Employees improperly seek prejudgment interest, which is not available when liquidated damages are awarded, they now seek doubling of the disallowed prejudgment interest. ECF 39, Addendum 1.

> salary to match her comparator, John Donnelly. Front pay and prospective relief, however, is not a remedy specified in the Equal Pay Act. Third Cir. Model Jury Instructions, 11.3.5 (“[F]ront pay cannot be awarded under the Equal Pay Act.”). Plaintiffs’ cases in support of its contention are inapposite and do not apply remedies under the Equal Pay Act. *Eshelman*, 554 F.3d at 440-41 (analyzing equitable remedies in an ADA case); *Heller*, 182 F. App’x at 96 (affirming a front pay award under the ADEA because “the District Court has discretion to fashion equitable relief to effectuate the purposes of the Title VII statutory scheme”).

J.A. 116-17. Marinello cites the same two cases here (ECF 39, p. 40) and offers no new argument to challenge Judge Baylson’s ruling. Accordingly this claim fails.

**6. No Adjustment of Attorney’s Fees And Costs Is Warranted.**

Plaintiff-Employees seek to increase the amount of attorney’s fees and costs awarded by the trial court, arguing that the amounts originally requested are reasonable given the complexity of the legal issues and the financial risk for the attorney undertaking the litigation. ECF 39, pp. 40-45. However, no such increase is merited.

Calculating an award of attorneys’ fees and costs has long been regarded as a matter of discretion for the trial court, so long as the trial court gives reasonably specific explanations for adjusting the fee award. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010) (“Determining a ‘reasonable attorney’s fee’ is a matter that is committed to the sound discretion of a trial judge.”); *see also Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (“[T]he district court has the

discretion to make certain adjustments to the lodestar.”). So this court applies an abuse of discretion standard of review. *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir. 1982) (“[O]ur standard of review is a narrow one.”).

Plaintiff-Employees’ counsel, Edward Mazurek, is seeking $2,756,662.50 in attorneys’ fees. This amount includes 1,204.3 hours of billable time times $2,250 (three times Mazurek’s billable rate of $750 per hour), plus an additional 17.9 hours of post-petition hours times $2,625 (three-and-a-half times the $750 rate). In reducing the award to $516,415.26, Judge Baylson explained that although the lodestar amount was reasonable, he declined to accept Mazurek’s hourly rate multipliers that were being sought due to the risk associated with contingency litigation.

> [T]he Supreme Court has time-and-again cautioned against enhancing the lodestar amount absent exceptional circumstances, *Perdue*, 559 U.S. at 552-58, and has specifically disallowed a multiplier based on contingency risk, *Goodman v. Pennsylvania Tpk. Comm’n*, 293 F.3d 655, 677 (3d Cir. 2002) (“In *City of Burlington v. Dague*, 505 U.S. 557 (1992), the Supreme Court held that contingency multipliers are not permitted for fees awarded pursuant to fee shifting statutes.”).

J.A. 132-33. Judge Baylson went on to analyze several factors supporting reduction of the lodestar amount, focusing on counsel’s “missteps that caused extensive delays, drove up costs, and hindered judgment in the first trial.” J.A. 134. Other factors included: 1) counsel not informing the court that teacher salaries are

published online; 2) counsel's continued challenges to collective decertification; 3) the District is a public entity supported by taxpayer funds; and 4) the limited recovery garnered at trial by the Plaintiff-Employees. J.A. 135-36.

In their brief, Plaintiff-Employees do not challenge Judge Baylson's analysis, choosing instead to argue that they should be relieved of their contractual obligation to pay Mazurek the greater of a percentage of their recovery (40% for Marinello, and 35% for Cartee-Haring) or three-and-a-half times the hourly rate of $750 times the number of hours expended on the matter. ECF 39, p. 41. They then argue that their attorney fee request should be granted because three "highly reputed" attorneys signed affidavits attesting to its reasonableness. *Id.* at p. 44. That is not the standard for reviewing the trial court's award. Judge Baylson's well-reasoned decision cannot be overturned simply because the Plaintiff-Employees' request is not patently unreasonable.

Plaintiff-Employees include a final paragraph requesting that they be awarded $90,000 in costs for paralegal work performed by Cartee-Haring. ECF 39, p. 45. Judge Baylson rejected the paralegal fee both because there was no evidence that Marinello was informed of the fee, and because no case law was cited to support such a cost. J.A. 139-40. The standard of review for costs is an abuse of discretion. *In re Paoli R.R. Yard PCB Litig*., 221 F.3d 449, 458 (3d Cir. 2000) While Plaintiff-

Employees disagree with Judge Baylson's decision, they do not allege an abuse of discretion. Accordingly, the awards should not be disturbed.

### B. District's Reply to Plaintiff-Employees' Responses to the District's Arguments.

#### 1. Performing Jobs of Equal Skill, Effort, and Responsibility.

The only issue raised by the District in its opening brief to which the Plaintiff-Employees responded is the argument that the Plaintiff-Employees did not perform jobs of equal skill, effort, and responsibility as their comparators. *See* ECF 29, pp. 35-37. The Plaintiff-Employees contend that they established at trial that all teachers perform jobs of equal skill, effort, and responsibility. *See* ECF 39, pp. 20-22. However, despite acknowledging that such a determination relies on comparing the work performed by an EPA plaintiff with any alleged comparators (*see* ECF 39, pp. 20), the Plaintiff-Employees merely adduced from witnesses conclusory statements that all teachers possess the same general skills. They made no effort to describe the job duties actually performed by Cartee-Haring, Marinello, or their chosen comparators.

Plaintiff-Employees cite the evidence allegedly supporting their argument. ECF 39, pp. 15-16. However, all the testimony cited by the Plaintiff-Employees refers to the first trial, which resulted in a hung jury in 2024. Plaintiff-Employees offer no citations to the trial at issue, which was conducted in May 2025. Even so, a

review of the evidence cited by the Plaintiff-Employees shows that it fails to support their claim and instead offers only conclusory statements.

The testimony of chemistry teacher Keith Sinn was as follows:

> **Q.** Mr. Sinn, do all teachers perform substantially equal work in the District?
> **A.** Yes.
>
> * * *
>
> **Q.** All right. Now are all teachers, including librarians, nurses, speech pathologists, librarians, school psychologists, are all of those teachers subject to the same salary scales?
> **A.** Yes.
> **Q.** So why are all these people subject to the same salary scale?
> **A.** Because the skill, effort, responsibility is the same across all levels.

J.A. 667-668. Sinn then testified that all bargaining unit members have the same skills, effort, and responsibility, including not only teachers, but also others such as school nurses and librarians. Yet even he admitted that among classroom teachers, there is specific content knowledge required to do the job.

> **Q.** Okay. So explain to the jury how it is that all teachers in the District, whether they be Latin teachers . . . or special ed teachers, or school nurses, or school psychologists, librarians, et cetera, how do they all have the same skill that applies to the schools?
> **A.** I think there is a conflation between, like, pedagogical skill and content knowledge. For example, as a chemistry teacher in 33 years at Central Bucks, I have never once been trained by Central Bucks in chemistry. There's never been one professional development day where they said, "Hey, today we're going to be doing dimensional analysis and mole calculations." It's never happened. But there's always, always training on pedagogy, the art of teaching, how to help meet the students where they are, how we help students access their learning. That's always the case. And

> that skill is across everything, whether you're teaching Latin or you're teaching chemistry. ***Now, I don't know a bit of Latin. Okay. No, I probably wouldn't be able to teach Latin very well***.

J.A. 668-669 (emphasis added). In fact, on cross-examination, Sinn admitted that he lacks the skill to perform the jobs of numerous classifications of employees that the Plaintiffs want to have included in the collective. J.A. 713. Another witness for the Plaintiff-Employees, teachers union President Cara Alderfer, similarly testified in conclusory fashion that all bargaining unit members perform jobs of equal skill, effort, and responsibility. Yet she also stated that teachers must acquire and use skills in their specific field of instruction. She testified, "Well, subsequent to their certification and their specialty, **you have to acquire the skills <u>in your specialty area</u> to be able to provide adequate education** to reach the needs of all students no matter what their developmental needs are." J.A. 729 (emphasis added). Then, when asked to compare the skills of certain male teachers in the district to female teachers, Ms. Alderfer was unable to do so because she had never observed any of the men teaching. J.A. 741-42.

At the second trial, Rebecca Cartee-Haring admitted that she did not have the same teaching certification as her alleged comparators, John Donnelly and Malcolm Mosley. She also could not testify to their teaching skills because she never observed either Donnelly or Mosley teaching. J.A. 1706, 1712. Accordingly the Plaintiff-

Employees failed to prove that they performed jobs of equal skill, effort, and responsibility as their alleged comparators because that determination requires comparing the job duties that were actually performed by the plaintiffs and their comparators, yet the Plaintiff-Employees cannot do so, as they seemingly do not even know what job duties were performed by their comparators.

**2. Evidence of Job Similarity Was Not Uncontroverted.**

Plaintiff-Employees allege that they demonstrated by "uncontroverted evidence" that male and female teachers perform substantially similar jobs. ECF 39, pp. 20-22. The District is perplexed by how the Plaintiff-Employees could make such a claim, given the District's repeated evidence that teachers with different teaching certifications do not possess or exercise substantially similar job skills. *See, e.g.*, J.A. 618-23, 707-13, 737-38, 757-59.

As the Plaintiff-Employees point out, this Court has held that substantial equality is not determined by job titles, but rather turns on "actual job content." *Summy-Long v. Pa. State Univ.*, 715 F. App'x 179, 183 (3d Cir. 2017). Yet the Plaintiff-Employees address their alleged skills only at a very general level, ignoring the educational content that a teacher is hired to provide. The element of skill is defined in federal regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") to include "consideration of such factors as experience,

***training, education***, and ability.” 29 C.F.R. § 1620.15(a) (emphasis added).The Pennsylvania Department of Education has published guidelines governing certification under 22 Pa. Code § 49.13(b)(10). The published staffing guidelines are online on the PDE website at the following link: www.pa.gov/agencies/education/programs-and-services/educators/certification/certification-staffing/staffing-guidelines. Proper certification is required for teachers to perform their specific jobs as determined by their specific job descriptions. *See* CSPG-1 – Appropriate Certification in Pennsylvania. Different subjects require different skills and responsibilities. For example,

> A person holding a valid PA certificate for Art is qualified to teach Art courses and content to include the following: crafts; ceramics; drawing; painting; sculpture; fiber/textiles/weaving; glass; metal/jewelry; digital and basic photography; basic graphics art design; printmaking; computer art; digital media, art conservation; art history; art management; art theory; art criticism; art techniques; studio art; and intermedia art (techniques and processes for expressing emotions, ideas, or visions in 2 or 3 dimensions using a variety of materials/media simultaneously).

CSPG 31 – Art, Exhibit D-407. In contrast, the skills and responsibilities for a biology teacher are stated as follows:

> An educator holding a certificate for Biology is qualified to teach biological and life science courses including the following:
>
> - life science (an introductory course comprised of learning experiences related to the ways living things interact with the world around them, but below the level of difficulty of a biology course)

- botany, anatomy, biochemistry, biophysics, cell and molecular biology, ecology, environmental science, evolutionary biology, genetics, human and animal physiology, marine and aquatic biology, microbiology, radiation biology, toxicology, zoology
- general science
- nutritional biology course which involves the scientific study of biological processes by which organisms function.

CSPG 32 – Biology. Exhibit D-408. Just as the CSPG describes the skills and responsibilities of different teachers, some of them also contain specific restrictions. For example, the biology CSPG provides:

> An educator holding a certificate for Biology is not qualified to teach chemistry, physics, physical science, earth and space science or any major science content area other than biology where high school graduation credit is given.

School nurses have significantly different skills and responsibilities. The applicable CSPG provides:

> An educator holding a valid PA certificate as a School Nurse is qualified to provide information and services in school health related areas. The School Nurse assesses, documents, and manages the health care needs of children in grades PK-12, including those with disabilities and to recognize symptoms and consequences of safety and environmental factors related to student health.

CSPG 80 – School Nurse (PK-12). Exhibit D-451. Furthermore, there is precedent indicating that, concerning professional positions, jobs that require advanced education are less likely to be considered similar.

> [Plaintiff's position] is particularly unpersuasive given the inherent features of academia. Professors are not interchangeable like widgets.

> Various considerations influence the hiring, promotion, and compensation of different professorial jobs. *Cf. Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) (discussing the tenure process). As a result, faculty salary decisions require a complex balancing of factors. Among other things, those decisions account for the differences in skill and responsibility attendant to different jobs. For instance, an engineering professorship requires different skills, effort, and responsibility than professorships in other fields, such as sociology. Evidence offered by Spencer proves this very point: The University systematically pays engineering professors more than humanities professors. This reflects differences in skill along with market forces that compensate engineers more highly. This market reality confirms that Spencer's broad generalizations about tasks and skills, which apply to virtually all teachers, fail to satisfy her burden to show equal work.

*Spencer v. Va. State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019). The District asserts that the reasoning differentiating between college professors teaching different subjects is equally applicable to high school teachers in different educational disciplines, as in this case. It is undisputed that: (a) teachers must attend colleges or universities approved by the Pennsylvania Department of Education and be specially trained to teach the content the content for which they were certified, (J.A. 1558, 1620, 1705-06, 1750-51); (b) that the curriculum taught by the Plaintiffs and the comparators are different, (J.A. 1559,1623, 1760); and (c) that the content knowledge is different (J.A. 1621-23, 1749).

Accordingly, it is clear that the jury reasonably could have found that Plaintiff-Employees did not make out a *prima facie* case. This alone was grounds for denying the Rule 50 motion.

### 3. Plaintiff-Employees Did Not Prove Wage Differential.

The Plaintiff-Employees claim that there was unlawful wage discrimination under the EPA because male teachers were allegedly given step placement credit for all their years of experience, while female teachers were not. ECF 39, pp. 22-26. However, credit for prior experience is not an EPA issue; it is a Title VII issue. This case should be dismissed in its entirety for this reason alone.

#### a. Plaintiffs' Theory Is Not Cognizable Under the EPA Because It Challenges a Salary Step Placement Practice, Not Unequal Wages for Equal Work

Plaintiff-Employees' Equal Pay Act claim fails at the threshold because it does not allege the wrong the statute prohibits. The EPA is a narrow, comparator-driven statute. It forbids one form of discrimination: paying employees of one sex "at a rate less than the rate" paid to employees of the opposite sex for equal work requiring equal skill, effort, and responsibility under similar working conditions. 29 U.S.C. § 206(d)(1). The statute is directed to actual wage disparities, not to alleged differences in how employers credit prior experience when setting initial salary placement.

Plaintiffs' own evidence exposes this mismatch. Their theory of liability is that the District improperly credited prior experience when determining step placement. If that were the claim, then damages would necessarily be calculated by correcting the alleged error in step placement – *i.e.*, determining what each Plaintiff

would have earned had she been placed at the "proper" step and comparing that amount to what she actually received. Plaintiffs in fact prepared such an exhibit. Plaintiff Cartee-Haring's Exhibit 1A calculates her alleged backpay by adjusting her step placement and projecting the wages she claims she should have received, yielding $256,310.50 in purported losses from the 2007-2008 school year through 2023-2024. J.A. 2693.

Yet Plaintiff-Employees do not seek damages on that basis. Instead they abandon their step-placement theory and seek recovery based on raw wage comparisons between Cartee-Haring and a male employee, untethered to experience credit or step placement. Under that approach, Cartee-Haring claims $357,927.00 in damages for a shorter period, 2010 through 2024. J.A. 2307. The discrepancy is telling. Plaintiff-Employees assert liability based on alleged unequal credit for prior experience, but seek damages based on unexplained wage differentials. They never connect the two.

That analytical gap is fatal under the EPA. The statute requires proof that a plaintiff was paid less than a male comparator for substantially equal work because of sex. It does not permit a plaintiff to challenge a compensation-setting input – such as prior experience credit – while recovering damages based on wage disparities that are not shown to result from that input. Plaintiff-Employees' "flip-flop" between

theory and damages confirms that this is not an EPA case.

The flaw is not merely evidentiary; it is doctrinal. Plaintiffs' claim is directed at the process by which compensation is determined, not the wage comparison the EPA governs. The EPA does not regulate whether an employer properly valued prior experience or assigned the "correct" step. It asks only whether a woman was paid less than a man for substantially equal work. Plaintiffs' theory never answers that question.

If Plaintiff-Employees believe that the District's experience-crediting decisions were discriminatory – whether intentionally or in their effects – that is a challenge to a compensation practice. Such claims are cognizable, if at all, under Title VII, which broadly prohibits discrimination "with respect to … compensation" and permits challenges to particular employment practices. By contrast, the EPA does not provide a vehicle to litigate whether salary-setting criteria were fair, neutral, or properly applied.

The mismatch is especially stark given the scope of Plaintiff-Employees' claims. All employees at issue are part of a collective bargaining unit and are paid pursuant to the same negotiated salary scales. Plaintiffs nevertheless seek to aggregate a wide range of positions – teachers, nurses, librarians, psychologists, and others – under a single EPA theory, even though those roles involve different duties,

certifications, and labor-market conditions. Under Title VII, such breadth may be addressed through challenges to a common practice. Under the EPA, however, Plaintiff-Employees must show equal work and unequal pay; they have not done so.

In short, Plaintiffs attempt to transform a disagreement over how prior experience was credited into an EPA claim, but the statute does not permit that. It provides a remedy only for actual wage disparities between men and women performing substantially equal work. Because Plaintiff-Employees' theory targets step placement rather than comparative wages, and because their damages model is untethered to their liability theory, their claim is not cognizable under the EPA. The proper course is dismissal of the EPA claim, without prejudice to any properly pleaded claim under Title VII.

#### b. Plaintiff-Employees Failed to Show That Their Chosen Comparators Were Proper Comparators

The law is clear that the Plaintiff-Employees must prove that male comparators were paid more than they were. 29 U.S.C. § 206(d). Yet at the first trial, the Plaintiff-Employees failed to identify specific male comparators, arguing generally that all male teachers in the District were comparators. The trial court properly rejected this argument.

> Plaintiffs' Counsel's theory at trial was that all men are comparators to all women because essentially all professional employees in the school district perform substantially similar jobs and, therefore, Plaintiffs need

> not identify specific male comparators. Counsel is incorrect and disregards cases that he himself cites. Indeed, despite admitting that determining substantial equality is "heavily fact-driven" and "must be determined on a case-by-case basis," ECF 318-1 at 5 (*quoting Heller v. Elizabeth Forward School District*, 182 F. App'x 91, 95 (3d Cir. 2006) (non-precedential), counsel at trial refused to produce specific comparator witnesses for the jury to properly evaluate the jobs being compared. Plaintiffs' trial evidence is thus insufficient to establish a *prima facie* case under the EPA as a matter of law. Plaintiffs' post-trial Motion must be denied.

J.A. 88-89. So while the Plaintiff-Employees attempt to relitigate the issue in this appeal by simply listing various employees' starting salaries, their claim must fail because, among other reasons, they never demonstrated that the male teachers identified were proper comparators for themselves and other female teachers named.

Meanwhile, the District prepared several exhibits showing that the Plaintiff-Employees were better compensated than most male comparators. For example, Exhibit D-535 lists the starting salary for all 37 male secondary English teachers and the Plaintiff-Employees by year of hire. J.A. 2427-28. Rebecca Cartee-Haring's starting salary was of $54,100 was well above the average salary of $41,998, and was higher than all but two male teachers. *Id.* Marinello's starting salary of $51,156 was also higher than the average salary and lower than only four of the male teachers. *Id.* Similarly, Exhibit D-536 lists the starting salaries for all 91 male secondary social studies teachers, including the Plaintiff-Employees. J.A. 2429-31. Cartee-Haring's starting salary of $54,100 was above the average salary of $40,209, and was higher

than all but one male teacher. *Id.* Marinello's starting salary of $51,156 was also higher than the average and lower than only three male teachers. *Id.*

Accordingly, the Plaintiff-Employees' Rule 50 motion was properly denied.

#### 4. Plaintiff-Employees Did Not Prove At The First Trial That Any Wage Differential Was Not Due To A Factor Other Than Sex To Prevail On A Rule 50 Motion.

Plaintiff-Employees claim that the District was unable to show that any wage differential was due to a factor other than gender to assert that affirmative defense to the EPA claim. ECF 39, pp. 26-28. As noted above, the trial court found that the Plaintiff-Employees' novel argument that all male teacher were comparators of all female employees was not valid, thereby precluding judgment as a matter of law. J.A. 66-67. However, even if the court had accepted that argument, the District offered sufficient evidence that any wage differential was due to a factor other than sex, such that a reasonable juror could have found in the District's favor.

The Plaintiff-Employees allege that the District "admitted" that it did not know what factors explained why certain male teachers were placed where they were placed on the salary scales. ECF 39, pp. 26-27. The supporting transcript citation (J.A. 827-831) was from the first trial when Plaintiff-Employees' counsel asked Mrs. Cartee-Haring if she had ever heard a Rule 30(b)(6) witness for the District say that he or she did not know why certain placements were made. *See id.*, p. 27. However,

that statement mischaracterized the 30(b)(6) witnesses' testimony. In reality, the District's witnesses ultimately offered explanations for the placement of several of the identified male teachers in the salary schedule. *See, e.g.*, J.A. 2135-36, 2152.

Also at the first trial,[5] the District played for jurors the videotaped deposition of former Superintendent Dr. N. Richard Laws (J.A. 957), who explained that the hiring and salary scale placement of John Donnelly had nothing to do with gender and everything to do with attracting a highly qualified teacher and football coach.

> Q. And what was your involvement in the decision where to place Mr. Donnelly on the salary scale?
> A. I made that decision.
> Q. In 2010, were you aware that there was a written salary placement guideline that was in – the Administration was using?
> A. Yes.
> Q. I show you what has been marked as Exhibit D21 and the highlighting put on there. Do you see that this guideline was quote, effective beginning the 2007 to 2008 school year?
> A. Yes.
>
> * * *
>
> Q. And then the next paragraph. Can you read the rules that I highlighted in green and underlined a couple of the phrases?
> A. Yes. In the event of a critical need situation or the lack of suitable certificated candidates, it may become necessary to adjust the formula to hire the best candidate. Deviations from the formula will occur only upon recommendation of the superintendent.
> Q. And were you aware of that in the salary placement guideline?
> A. Yes.

---

[5] The Laws deposition was also a key piece of evidence at the second trial. J.A. 1823-1854.

Q. And how did that come into play, if at all, with respect to your decision where place John Donnelly?
A. Well, in a sense it was the governing wording because following extensive advertising and a lack of suitable candidates, we placed Mr. Donnelly at the top of the salary schedule. He was working in a neighboring school district, had a number of years of experience. And in order for him to take employment with Central Bucks he needed to be offered at that salary level.
Q. And how did Mr. Donnelly's coaching at the other school district and coming here at Central Bucks play into this decision?
A. Well, he not only brought qualifications and a reputation of an outstanding teacher, he also had the reputation in the community of being a fine football coach. We had experienced some difficulties with people prior to him that we had to discharge. And it was important, in my judgment, to bring in a credible person to head the team
Q. Was Mr. Donnelly's sex or gender considered by you when you decided to place him on the top step of the salary scale?
A. No, it had nothing to do with it.

J.A. 2743-45. So based on Dr. Laws' testimony, a reasonable juror could have found in favor of the District, and therefore the Rule 50 motion following the first trial was properly denied.

### C. Appellees Failed to Address Issues Raised by Appellants, Thereby Conceding Those Issues.

In their opening brief, the Plaintiff-Employees failed to address most of the appellate issues raised and briefed by the District. When an appellee fails to respond to arguments or issues raised and briefed by the appellant, courts generally treat those arguments as waived by the appellee, and may decide the appeal based on the appellant's presentation. *See, e.g., Norton v. Sam's Club*, 145 F.3d 114, 117-18 (2d

Cir. 1998) (holding that issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal); *see Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("[T]he doctrine of appellate waiver is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues.").

The Federal Rules of Appellate Procedure set the framework for appellate briefing. Rule 28(a)(8) requires appellants to present their contentions, reasons, and supporting authorities and record citations. "The appellee must file a principal brief in the cross-appeal and must, in the same brief, respond to the principal brief in the appeal." Fed. R. App. P. 28.1(c)(2). The Plaintiff-Employees failed to respond to the following issues raised and briefed by the District:

1) that the district court prohibited the District from presenting evidence that it does not discriminate against women;

2) that the District had the right to name other comparators and to examine the wages paid to other comparators;

3) that Plaintiff-Employees failed to present competent evidence at trial of a wage differential under the EPA;

4) that the court erred by precluding the District from offering evidence refuting Plaintiff-Employees' damages calculations;

5) that the Plaintiff-Employees did not produce sufficient evidence to dispute that John Donnelly's salary differential was due to a factor other than sex;[6]

6) that the court improperly admitted evidence on John Zappa and Christopher Burns. *See* ECF 29, pp. 15-31.

7) most courts require EPA plaintiffs to compare their pay with the average of all comparators to establish a *prima facie* case;

8) the court erred by not granting the District's post-trial motions

9) the court made several errors regarding jury instructions; and

10) the court's *Allen* instructions were erroneous and prejudicial. ECF 29, pp. 32-35, 39-53.

By failing to respond to these arguments, the Plaintiff-Employees waived their right to challenge the District's assertions, and this Court should find in the District's favor on each of the issues ignored by the Plaintiff-Employees. Those issues were not refuted and are deemed abandoned.

### D. Arguments Raised in Amicus Brief

The Equal Employment Opportunity Commission ("EEOC") filed an amicus brief. ECF 45. The District hereby responds to the arguments raised in that brief.

---

[6] Plaintiff-Employees did argue that the School District did not adduce evidence to prove the defense that Donnelly's salary differential was based on a factor other than sex. ECF 39, pp. 26-28. However, that is a different argument.

### 1. Whether The District Court Applied The Correct Standard In Upholding The Jury's Finding That Plaintiff-Employees And Their Comparator Perform Substantially Similar Jobs.

The EEOC takes the position that although the Pennsylvania Department of Education ("PDE") does not allow people to teach a subject without being certified in that subject area, the fact that a teacher is not certified in the same subject area as a teacher of the opposite sex does not conclusively establish that the two teachers do not perform jobs requiring substantially similar skill, effort, and responsibility. ECF 45, pp. 14-18. Yet even if the PDE guidelines are not conclusive, they are strong evidence that teachers with different certifications do not perform jobs of substantially similar skill, as evidenced by the fact that the state deems people without a subject area certification to be lacking in the training and skill to teach that subject, or to perform the job.

Other circuits have recognized the difficulty of equating skills in academia. In *Goulet v. Univ. of Miss.*, No. 3:22-cv-89, 2023 U.S. Dist. Lexis 126790, at *5 (N.D. Miss. July 24, 2023), the court granted summary judgment for the University of Mississippi when a biology professor presented men in other scientific fields as EPA comparators, noting that such a comparison did not comport with Fifth Circuit law.

> The successful plaintiff must show that her circumstances are *nearly identical* to those of a better-paid employee who is not a member of the protected class. A purported comparator must have held the same job

> or responsibilities, shared the same supervisor, or had their employment status determined by the same person, and have essentially comparable violation histories. Employees with different jobs or supervisors, for example, are not similarly situated.

*Goulet v. Univ. of Miss.* at *4-5 (citations omitted).

The EEOC further argues that "the plaintiffs and their comparator performed substantially equal work despite teaching different subjects" and that "the teachers perform the same core of duties."[7] ECF 45, p. 17. Yet this was never proven, as the Plaintiff-Employees conveniently avoided discussing the specific skills performed by either themselves or their comparators, despite having the burden to make a *prima facie* case that they perform substantially similar jobs. Importantly, the EEOC does not argue that all public school secondary teachers perform substantially similar jobs. Instead they recognize that the trier of fact must "compare the totality of work performed" and scrutinize the job as a whole." ECF 45, p. 16. That was not done at trial in this case.

[7] The EEOC seems to be restricting its discussion to classroom teachers and ignores any discussion of how it can be argued that certified school nurses, school psychologists, and speech therapists have the same skills, effort, and responsibilities as classroom teachers, as the Plaintiff-Employees are arguing in this case.

### 2. Whether The Plaintiffs Could Establish A *Prima Facie* Case By Showing A Wage Differential With A Single Comparator.

The EEOC next argues that "the *prima facie* case standard requires a plaintiff to show that the defendant paid a single opposite-sex comparator more for substantially equal work." ECF 45, p. 16 (*citing* J.A. 2079-82). Courts have taken different positions on this issue. Importantly, this does not mean that a female plaintiff can simply rely on a wage differential with one male employee to prove her EPA claim.

The EEOC argues that a plaintiff can point to one higher-paid member of the opposite sex to make out a *prima facie* claim; however, the EEOC acknowledges that once the burden shifts to the employer to prove one of the affirmative defenses, the employer can offer evidence tending to show that men and women are treated equally. *See* ECF 45, p. 27 ("The pay of individuals other than a plaintiff's identified comparator (such as opposite-sex comparators paid less or same-sex employees paid more) could be relevant to an employer's efforts to establish an affirmative defense.") In fact, the EEOC's Compliance Manual states: "[I]f other women are paid the same as or more than males, this may indicate that a factor other than sex explains the complainant's compensation." *See id.* As such, the EEOC appears to agree with and support the District's arguments that the trial court erred by

prohibiting the District from presenting all of the wage and step placement evidence that it had desired.

Meanwhile, some courts even allow the employer to challenge the plaintiff's assertion of a wage differential at the *prima facie* stage. In *Talwar v. Staten Island Univ. Hosp.*, the Second Circuit said that the plaintiff's claim "fails at the first step" where two male employees were paid less than the plaintiff, and one male who was paid more than the plaintiff still made less than another woman. 610 F. App'x 28, 30-31 (2d Cir. 2015).

**3. Whether An Employer Bears The Burden of Showing That A "Factor Other Than Sex" Caused A Wage Disparity**

The EEOC argues in its brief that once an EPA plaintiff makes out a *prima facie* case, the employer has the burden to prove not only that one of the four statutory affirmative defenses could explain the wage differential, but that it "***did in fact*** cause the disparity." ECF 45, p. 28 (*citing Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3d Cir. 2000)) (emphasis in original). However, in *Stanziale* this Court was analyzing the standard for an employer to succeed on a motion for summary judgment, not at trial. At trial the defendant must prove only by a *preponderance of the evidence* that the wage differential is justified under one of the four affirmative defenses, including "a factor other than sex." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021); *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 621 (4th Cir.

1999); *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 422 (8th Cir. 2017); *Niwayama v. Tex. Tech Univ.*, 590 F. App'x 351, 358-59 (5th Cir. 2014); *Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972, 980-81 (11th Cir. 2015). So at trial the employer must simply show that a factor other than sex caused the wage differential more likely than not.

In this case, the District adduced testimony from Dr. N. Robert Laws and Dr. Abram Lucabaugh that teacher John Donnelly was hired at the top of the pay scale because the District needed a football coach with a reputation for running an exemplary program, and because Donnelly was earning a similar salary in his prior position. The Plaintiff-Employees had no witness to rebut this testimony. Accordingly, the District proved that Donnelly's salary placement was due to a factor other than sex, and the jury should have been directed to enter judgment in favor of the District.

The EEOC goes on to claim that if the District intends to rely on a market forces *alone*, that argument would be flawed. ECF 45, p. 29 (emphasis in original). However, the District does not rely on market forces alone. The District has consistently maintained that its primary objective was finding a top-notch football coach, regardless of that coach's gender. And in that case, the EEOC supports the District by noting that "market value may qualify as a 'factor other than sex' if the

employer proves that it assessed the marketplace value of the particular individual's job-related qualifications, and that any compensation disparity is not based on sex." ECF 45, p. 30.

### E. Summary Judgment Was Proper on Discrimination Claims.

While this case has focused on the EPA claims of the Plaintiff-Employees, the seeds of the litigation were sown when the District opted not to renew Mrs. Cartee-Haring as a high school girls' lacrosse coach following the 2018-19 school year. J.A. 39-41. The nonrenewal enraged Cartee-Haring, who sued the District, falsely alleging that the decision was discriminatory and was based on her gender, age, or alleged disability. J.A. 152-71. She later filed another lawsuit, alleging that a subsequent decision not to rehire her was also discriminatory. J.A. 426-53. After discovery failed to adduce any facts in support of Mrs. Cartee-Haring's claims, the district court granted summary judgment in favor of the District on all of the discrimination claims. J.A. 38-64. Cartee-Haring now seeks to revive most of those claims.[8] ECF 39, pp. 46-53. However, there are no genuine issues of material fact to

---

[8] The Plaintiff-Employees make no argument to revive Cartee-Haring's disability discrimination claim under the ADA. ECF 39, pp. 46-53. Accordingly, any such claim is waived.

sustain her claims.[9]

### 1. Cartee-Haring's Title VII Gender Discrimination Claim.

To prevail on a claim for gender discrimination under Title VII where there is no direct evidence of discrimination, a plaintiff must satisfy the three-step burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Ed.*, 470 F.3d 535, 539 (3d Cir. 2006). First, a plaintiff must establish a *prima facie* case of gender discrimination. *Id.* To do so, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) either members of the opposite sex were treated more favorably, or the adverse employment action occurred under circumstances that could give rise to an inference of intentional gender discrimination. *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Judge Baylson held that Cartee-Haring failed on the fourth element because when she was nonrenewed, she was replaced as coach by another female. J.A. 50.

---

[9] This Court applies the same summary judgment standard as the district court. *See Chavarriaga v. N.J. Dep't of Corrections*, 806 F.3d 210, 218 (3d Cir. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Cartee-Haring now alleges that male coaches were treated more favorably. ECF 39, p. 47. A look at the facts of the case is instructional. Former Superintendent John Kopicki made the decision not to renew[10] Cartee-Haring as coach following a school year when Mrs. Cartee-Haring continually butted heads with a lacrosse team member, leading to allegations that the coach was bullying the teenager. The clashes between the coach and player repeatedly forced various district administrators to step in and referee their interactions. The District eventually had an assistant superintendent set aside his regular duties and devote numerous hours conducting an investigation into Cartee-Haring's actions. J.A. 40. The investigation found that her actions did not rise to the level of "bullying," but that she had "wavered in maintaining a standard of utmost professionalism." *Id.* The final straw for the superintendent was when a lacrosse team banquet was canceled when Mrs. Cartee-Haring stated that she would not attend after the player and her mother signed up to attend. A team pool party was then held at the home of one of the players. The player at issue was not invited to the party, and Cartee-Haring was invited and did attend.

---

[10] While many sports coaches in the School District serve in those positions for multiple years, the appointment to a coaching position is for just one year at a time. A decision on possible reappointment to a coaching position is made at the end of each school year. J.A. 40.

J.A. 41. Cartee-Haring has continually tried to spin the facts to claim that the District did not renew her as a coach simply for attending a party at a student's home. *See, e.g.*, ECF 39, pp. 47-48. In reality, Cartee-Haring was nonrenewed for her mistreatment of the student-athlete in canceling the banquet so that the student could not attend. The District's decision was not made because Cartee-Haring attended a party at a student's home. Judge Baylson recognized this distinction.

> Even if Plaintiff did successfully establish a *prima facie* case of gender discrimination under Title VII, her claim fails under the remaining steps of the *McDonnell Douglas* burden-shifting framework. Defendant has a legitimate, non-discriminatory reason for terminating Plaintiff. It is clear from deposition testimony in the record and Central Bucks' investigative report into the allegations of bullying against Plaintiff that the decision not to reappoint Plaintiff as head coach was based on Plaintiff's mishandling of the conflict between her and Rita Roe (and her mother Doe) over a period of time – which is a legitimate nondiscriminatory reason for the termination – and not simply due to Plaintiff's attendance at a pool party hosted by a student athlete.

J.A. 50. Cartee-Haring cannot point to any evidence adduced in discovery to satisfy the fourth prong of the *prima facie* case, nor can she show that the District's legitimate nondiscriminatory explanation for her nonrenewal was pretextual. Accordingly, the grant of summary judgment must be affirmed.

**2. Age Discrimination Claim Under The ADEA.**

The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). As with Title VII claims, ADEA claims relying on circumstantial evidence and are subject to the *McDonnell Douglas* burden-shifting framework. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). To succeed on an ADEA claim, a plaintiff must show that she (1) was over the age of 40; (2) was qualified for the position she sought to retain or attain; (3) suffered an adverse employment action; and (4) was ultimately replaced by a younger person so as to support an inference of a discriminatory motive. *Id.* Once she establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

The court held that Cartee-Haring was able to make out a *prima facie* case of age discrimination, but that she was unable to show any evidence that the District's legitimate nondiscriminatory explanation for her nonrenewal was pretextual. ECF 39, pp. 54-55. Plaintiff-Employees now argue that a juror could find pretext because of "contradictions" in the District's articulated reason. They claim that Kopicki allegedly did not make the decision not to renew the Plaintiff as a coach; that the District let Cartee-Haring keep her teaching job; and that Cartee-Haring was allegedly told that she was being disciplined for lacking character. *Id.*, p. 48. Yet

Cartee-Haring points to no evidence to support these claims other than her own counterstatement of facts. *See id*. More importantly, even if true, Plaintiff-Employees do not explain how these "contradictions" have anything to do with the alleged age discrimination. Accordingly, the grant of summary judgment must be affirmed.

### 3. Retaliation Claims Related To Subsequent Non-Hiring.

Cartee-Haring claims that the trial court erred in granting summary judgment on her retaliation claims under Title VII and the ADEA. ECF 39, pp. 51-53. To establish a *prima facie* case of unlawful retaliation, a plaintiff must demonstrate that (1) she engaged in protected conduct; (2) the employer took adverse action against her; and (3) a causal link exists between her protected conduct and the employer's adverse action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir. 1994). As Cartee-Haring acknowledges, the court found no causal link between her protected activity – *i.e.*, the filing of her initial lawsuit – and the District's decision not to rehire her as lacrosse coach in 2021. J.A. 60-61.

Cartee-Haring claims that a causal connection can be found in the fact that she was not rehired despite being the only applicant when the initial job posting closed. ECF 39, p. 52. Judge Baylson addressed this same argument in granting summary judgment.

> Plaintiff asserts, without identifying any supportive evidence in the record, that Defendant interviewed Plaintiff for the position "to make it appear that the District was considering Cartee-Haring for the position, and not retaliating against her" even though "the Superintendent had made the decision in agreement with Principal Donovan that Cartee-Haring would not actually be considered the position." ECF 140 at 10. These assertions do not establish a causal connection where the record shows that (1) it was common practice to repost coaching positions when there are an insufficient number of applicants, and (2) Plaintiff and the other candidate were both interviewed by a panel of three interviewers who found that Plaintiff was qualified for the position but ultimately scored slightly lower than the other candidate.

J.A. 61-62. Cartee-Haring again cites no evidence to support her claim. ECF 39, pp. 51-53. Accordingly, the grant of summary judgment must be affirmed.

## III. CONCLUSION

For the foregoing reasons, the District respectfully requests that the Court reverse the judgment entered in favor of the Plaintiff-Employees and deny the Plaintiff-Employees' arguments on appeal.

Respectfully submitted,

Date: April 10, 2026

*<u>/s/ Michael I. Levin</u>*
LEVIN LEGAL GROUP, P.C.
Michael I. Levin, Esquire
David W. Brown, Esquire
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006

*Counsel for Appellant/Cross-Appellee*
*Central Bucks School District*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Fed. R. App. P. 28(e)(1)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,969 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: April 10, 2026

*/s/ David W. Brown*
David W. Brown

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to L.A.R. 28.3(d), I hereby certify that the attorneys for the Appellant/Cross-Appellee – Michael I. Levin and David W. Brown – are members of the bar of the U.S. Court of Appeals for the Third Circuit.

Date: April 10, 2026

*/s/ David W. Brown*
David W. Brown

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2026, I electronically re-transmitted the foregoing Third Step Brief by Appellant/Cross-Appellee to be filed to the Clerk's Office using the Court's Electronic Case Filing system ("ECF") for filing of a Notice of Electronic Case Filing to Appellants' counsel at the following addresses in accordance with Fed. R. App. P. 25(a)(2)(D) and L.A.R. 25.1.

**Edward S. Mazurek, Esq.**
emazurek@mazureklawfirm.com

*Attorney for Appellees/Cross-Appellants*

*/s/ David W. Brown*
David W. Brown

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

Pursuant to L.A.R. 31.1(c), I hereby certify that this Third Step Brief by Appellant/Cross-Appellee has been filed with the Court in both electronic and paper form, and that the text of the electronic brief is identical to the text in the paper copies.

Date: April 10, 2026

*/s/ David W. Brown*
David W. Brown

## CERTIFICATE OF ANTI-VIRUS DETECTION PROGRAM USE

Pursuant to L.A.R. 31.1(c), I hereby certify that the computer files of the Levin Legal Group are constantly monitored for computer viruses. Accordingly the electronic version of this Third Step Brief by Appellant/Cross-Appellee is guaranteed to be free of any computer virus. The monitoring program utilized is ThreatLocker.

Date: April 10, 2026

*/s/ David W. Brown*
David W. Brown